```
 1
 2   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF WESTCHESTER
 3   - - - - - - - - - - - - - - - - - - -X
     JOSHUA BERNSTEIN,
 4                      Plaintiff,
 5              - against -              Index No:
                                         02579/09
 6   BAYROCK GROUP, LLC,
                        Defendant.
 7   - - - - - - - - - - - - - - - - - - -X
 8
                            11 Martine Avenue
 9                          White Plains, New York
10                          March 8, 2010
                            10:04 a.m.
11
12
13          EXAMINATION BEFORE TRIAL OF
14   JOSHUA BERNSTEIN, the Plaintiff herein,
15   taken by an attorney for the Defendant,
16   pursuant to Notice and Order, held at the
17   above place and time before Apryl S.
18   Montero, a Stenotype Reporter and Notary
19   Public within and for the State of New
20   York.
21                *   *   *   *
22
23
24
```

Joshua Bernstein

Page 194

1   A. Most do, yes.
2   Q. Did you ever take that hard
3 drive, download any of it for any reason
4 whatsoever?
5   MR. OBERLANDER: Compound
6 question. Objection.
7   Q. Did you ever take out that
8 hard drive physically?
9   A. No.
10   Q. Did you ever download
11 portions of the hard drive?
12   A. I believe so.
13   Q. Could you explain that when,
14 how, what did you download, for what
15 purpose?
16   A. At the direction of Felix
17 Satter I downloaded regularly files from
18 that hard drive and the server.
19   Q. What drives, what files?
20 Particular files or groups of files?
21   A. Groups, various.
22   Q. What directions did Felix
23 give you as far as --
24   A. To keep them offsite, an

Page 195

1 archival copy as much of the server as I
2 could. This was on or about December 17,
3 2007, I think well before, when he was
4 afraid that the firm was going to screw
5 him, that he wouldn't be able, you know,
6 to make his profits of his half of the
7 ownership of the firm.
8   Q. And did you follow his
9 instructions?
10   A. Yes.
11   Q. So you downloaded files from
12 what computers or what servers?
13   A. There was only one active
14 server within the firm.
15   Q. What files?
16   A. Various e-mail files.
17   Q. Of whose?
18   A. Of various users.
19   Q. Okay. I'm going to ask you
20 about that in a couple of minutes. I
21 want to finish with this exhibit.
22   Please turn to page 11. Did
23 you receive an e-mail from Felix Satter
24 on September 8th saying, "Where are you?"

Page 196

1 It's September 8, 2008, on page 11?
2   A. Yes.
3   Q. And on page 12 did you
4 receive another one from him on
5 September 4th -- these may be -- I tried
6 to keep them chronological, but I see
7 that September 4th comes after September
8 8th. "Where are you?"
9   A. Yes.
10   Q. So both on September 4th and
11 September 8th he, Felix, asked you where
12 you were?
13   A. Sure, which he would
14 regularly send to the employees who
15 worked for him, including Dan Ridloff,
16 and we'd correspond about where we were
17 at the time.
18   Q. And on September 4th on
19 page 13 he says, "Where are you? Answer
20 now."
21   Did you receive that?
22   A. Yes.
23   Q. Does that indicate to you
24 that he was impatient to hear from you?

Page 197

1   A. Yes, because I was sleeping
2 at this time.
3   Q. You were in Europe?
4   A. Yes.
5   Q. Let's go back to the --
6   THE WITNESS: Can I take a
7 break, a bathroom break.
8   MR. DOMB: Sure.
9   (Whereupon, a short recess
10 was taken.)
11   MR. DOMB: Let's mark the
12 next exhibit. I think it's a
13 multipage exhibit which I've
14 numbered 1 through 24.
15   MR. OBERLANDER: Off the
16 record.
17   (Whereupon, a discussion was
18 held off the record.)
19   (Whereupon, Defendant's
20 Exhibit S, a 24-page document, was
21 marked for identification as of
22 this date.)
23   Q. Exhibit S.
24   A. Yes.

Joshua Bernstein

Page 198

1 Q. That is a composite exhibit
2 which is consists of e-mails and maybe
3 e-mail attachments.
4 Did you sign the e-quote
5 with Greenhouse, that's the first page,
6 Greenhouse IT.
7 A. I believe that's my
8 signature.
9 Q. And that's July of '07;
10 there's a date right under your
11 signature?
12 A. Yes.
13 Q. And what were you
14 contracting to get from Greenhouse IT?
15 A. Software installation.
16 Q. What kind of software?
17 A. Spector CNE and configure
18 Trend anti-spyware.
19 Q. Can you explain in layman's
20 terms what that software does?
21 A. That's a monitoring
22 software.
23 Q. What does it enable you to
24 do?

Page 199

1 A. It enables the administrator
2 to monitor activities on computers.
3 Q. Does it enable the
4 administrator to see what people are
5 seeing on their monitors and at their
6 workstation computers?
7 A. I believe that's a function
8 of it.
9 Q. Well, does that apply to,
10 let's say, web pages that they may be
11 looking at on the Internet?
12 A. I believe anything that's on
13 the screen.
14 Q. So it includes e-mails, for
15 example?
16 A. I believe anything that's on
17 the screen.
18 Q. And if you put up a contract
19 that would also be capable of being
20 monitored?
21 A. Anything on the screen.
22 Q. And who was the
23 administrator that could monitor this?
24 A. Felix Satter.

Page 200

1 Q. Was he the only one?
2 A. No.
3 Q. Who else could?
4 A. I had the ability to as
5 well.
6 Q. You had the ability. Did
7 you actually monitor what people looked
8 at?
9 A. When asked by Felix, yes.
10 Q. Did you monitor when, on
11 your own, when not asked by Felix?
12 A. Not that I recall.
13 Q. But you had the ability do
14 that?
15 A. Yes, given my administrative
16 rights, yes.
17 Q. When you signed up for this
18 software on line one it says on five
19 workstation, do you see that, the first
20 page?
21 A. Yes.
22 Q. And then if you look through
23 these e-mails you'll see that at some
24 point additional workstations were added;

Page 201

1 correct?
2 A. I don't see that.
3 Q. Well, let's look at page 8,
4 at the bottom you e-mailed --
5 Simon Binder was from
6 Greenhouse; correct?
7 A. Yes.
8 Q. You e-mailed Simon Binder,
9 and you said, "Here are five other
10 users -- "
11 And you gave initials;
12 correct?
13 A. Yes.
14 Q. Who is D. R.?
15 A. Dan Ridloff.
16 Q. J. K.?
17 A. Jody Kriss.
18 Q. J. S.?
19 A. Julius Schwarz.
20 Q. R. L.?
21 A. Ray Lee.
22 Q. And K. S.?
23 A. (No response.)
24 MR. FEINBERG: K. S.?

51 (Pages 198 to 201)

Golkow Technologies, Inc. - 1.877.370.DEPS

Joshua Bernstein

Page 202

```
 1     A.   I don't recall who K. S.
 2  was.
 3     Q.   As a result of --
 4          Was this software, in fact,
 5  installed, at least on these monitors?
 6     A.   I don't recall whether these
 7  additional ones were ever completed.
 8     Q.   Well, I think if you look
 9  through, we're going to look through and
10  be able to determine that.
11          Look on page 11.  There's a
12  list of computer users for this software;
13  correct?
14     A.   Yes.
15     Q.   And I count ten here; is
16  that right?
17     A.   Yes.
18     Q.   And were all these installed
19  in those ten?
20     A.   I believe so.
21     Q.   Look on page 13.
22  Greenhouse, is writing, someone from
23  Greenhouse writes to you and says that,
24  "I think that in order to get J. S.
```

Page 203

```
 1  working we need to reboot his laptop."
 2          Do you see that?
 3     A.   Yes.
 4     Q.   And then he suggests that
 5  the computer has to be shut down, and if
 6  it's not shut down you have to schedule a
 7  reboot to occur overnight, which will
 8  force any work he leaves open to close.
 9          Do you see that?
10     A.   I do.
11     Q.   Do you recall whether this
12  was done in order to get Julius Schwarz'
13  computers under this software?
14     A.   I don't recall.
15     Q.   Well, look on page 22,
16  please.  On October 9th, middle of the
17  page, you e-mailed someone at this
18  company and say, "Please let me know
19  about user J. S."
20          Do you see that?
21     A.   Yes.
22     Q.   That's Julius Schwarz, isn't
23  it?
24     A.   Yes.
```

Page 204

```
 1     Q.   And then the answer is to
 2  you, "I founded activity for user J. S.
 3  from 9/6/07 to 10/9/07.
 4          Do you see that?
 5     A.   Yes.
 6     Q.   And this e-mail was written
 7  on October 9, '07, 10/907; correct?
 8     A.   Right.
 9     Q.   So this person had said that
10  the software was, in fact, operating on
11  Julius Schwarz' computer, at least from
12  September 6th to October 9th of '07?
13     A.   That's what this e-mail
14  says.
15     Q.   And none of these e-mails
16  are copied to Felix, Felix Satter, are
17  they?
18     A.   Not unless they are blind
19  carbon copied, no.
20     Q.   It's just between you and
21  Greenhouse, isn't it?
22          MR. OBERLANDER:  Objection.
23  It's calling for a conclusion.  He
24  couldn't possibly know.  No one
```

Page 205

```
 1  could know because a blind copy
 2  won't show up.
 3          MR. FEINBERG:  It's --
 4  BY MR. DOMB:
 5     Q.   Apart from blind copies, no
 6  one else from Bayrock is copied; isn't
 7  that true?
 8     A.   Not on these e-mails.
 9     Q.   And from your recollection
10  did you copy Felix Satter on these
11  e-mails?
12     A.   Not on these, although Felix
13  Satter sent an e-mail to Greenhouse
14  authorizing this.
15     Q.   How do you know that?
16     A.   Because he told me he did.
17     Q.   Did you see it?
18     A.   I did.
19     Q.   Did you tell Julius Schwarz
20  about this?
21     A.   No.
22     Q.   You never copied him on any
23  of this?
24     A.   No.
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Page 206

1 Q. In fact, it was your
2 intention not to tell Julius Schwartz;
3 correct?
4 A. It was Felix's intention to
5 not tell Julius Schwarz.
6 Q. And it was your intention
7 also?
8 A. To follow my instructions,
9 yes.
10 Q. And you were aware that
11 Julius Schwarz was company counsel who is
12 an attorney for the company; correct?
13 A. I was aware, but I believe
14 at this time he was acting --
15 Yes.
16 Q. And he was superior to you
17 in the company or senior to you, was he
18 not?
19 A. Yes, he was.
20 Q. And you had the ability to
21 look at everything that he looked at on
22 his computer?
23 A. I believe I had the ability.
24 Q. And, in fact, you did look

Page 207

1 at what, from time to time at what was on
2 his computer?
3 A. I don't believe I did.
4 Q. You don't believe you did?
5 Are you a hundred percent certain of
6 that?
7 A. Not a hundred percent. This
8 is three years ago, two years ago.
9 Q. So you may have looked at it
10 and you just don't remember right now?
11 A. I don't remember.
12 Q. Did you ever copy things --
13 Did you have the ability to
14 copy, not just look, but copy things on a
15 screen?
16 A. They were generated in the
17 log filed. They were automatically
18 copied.
19 Q. So you could go to the log
20 and pull up whatever the person had
21 looked at and get a copy of it or forward
22 it to some other place electronically?
23 A. Yes.
24 Q. Do you recall doing that?

Page 208

1 A. I don't recall do that.
2 Q. Is it possible that you did
3 and you just don't recall right now?
4 A. It's possible. I don't
5 recall doing it.
6 Q. Do you think it was proper
7 for somebody without Julius Schwarz's
8 knowledge to monitor what he was looking
9 In the computer?
10 A. Absolutely. Felix Satter
11 owned the firm, so he told me to do
12 things and I was listening to the boss.
13 Q. And did he tell you this
14 verbally?
15 A. Yes, and then he wrote an
16 e-mail confirming the software should be
17 put on.
18 Q. To your knowledge, did you
19 produce a copy of that e-mail in this
20 litigation?
21 A. Perhaps, but I can double
22 check.
23 Q. Did he copy you on that
24 e-mail?

Page 209

1 A. I don't recall.
2 Q. If he did then that should
3 be in your inbox?
4 A. It should.
5 Q. Around what time did Felix
6 send the e-mail that you say he sent to
7 Greenhouse?
8 (Whereupon, the Witness
9 conferred with his attorney.)
10 A. Please repeat the question.
11 Q. Around what time did Felix
12 send Greenhouse the e-mail authorizing
13 the e-mail that you say he sent?
14 A. I don't remember the time.
15 Before this date.
16 Q. On or around July 2007?
17 A. Yes.
18 Q. To your knowledge did Felix
19 ever monitor the, what these various
20 computer users were looking at on their
21 computers?
22 A. I believe so.
23 Q. What's your basis for
24 believing so?

Page 210

1     A.   Because he had the
2 administrative rights and the ability to
3 do. That's what it was installed for,
4 his use.
5     Q.   Did he ever tell you that he
6 did this?
7     A.   Yes.
8     Q.   Did he ever tell you what
9 things he looked at?
10    A.   No.
11    Q.   Did he ever tell you
12 anything else about what he looked at or
13 why or when? Do you recall any specifics
14 about what he told you?
15    A.   No.
16    MR. OBERLANDER: Which?
17    THE WITNESS: ABC.
18    MR. OBERLANDER: All of
19 them?
20    THE WITNESS: Yes.
21    MR. OBERLANDER: Wouldn't
22 that be a massive amount of
23 storage; right?
24    THE WITNESS: I'll tell you

Page 211

1 later. I'm good.
2    MR. DOMB: You gentleman are
3 speaking on the record. Do you
4 want to share with us what you're
5 talking about?
6    MR. FEINBERG: No. There's
7 no question posed, and we can talk
8 whatever we want to talk about.
9    Pose your question and we'll
10 stop talking.
11 BY MR. DOMB:
12    Q.   Please look at page 11 of
13 this exhibit, Exhibit S.
14    (Whereupon, the Witness
15 conferred with his attorney.)
16    Q.   I'm sorry, 18. If I said 11
17 I meant 18.
18    A.   Okay.
19    Q.   There's an e-mail here on
20 September, in September 2007 from
21 Greenhouse. It says, "Josh Bernstein
22 would like a list of all admin passwords
23 along with the IP address of the servers
24 and the firewall."

Page 212

1 Do you see that?
2    A.   Yes.
3    Q.   And then it goes on to say,
4 "We collected the requested information
5 and e-mailed it to Josh as per his
6 request."
7    Do you see that?
8    A.   Yes.
9    Q.   What was the purpose in
10 requesting all admin passwords?
11    A.   I was asked to keep a record
12 of everything, because when Greenhouse
13 was brought in they had changed
14 passwords, and we didn't have them on
15 site. So we didn't know the passwords.
16    Q.   Did you need the passwords
17 in order to monitor the individual
18 computers?
19    A.   No.
20    Q.   So what, this was just --
21    Why did you need it then?
22    A.   Recordkeeping. We didn't
23 have access I think -- maybe a day before
24 this we had some problem. We couldn't

Page 213

1 access the server, and Greenhouse wasn't
2 able to fix it and I needed to go into
3 it, but I didn't have the password.
4    Q.   So sometime in middle, in
5 the second half of 2007, based on you and
6 Felix Satter, you installed spyware on an
7 a number of individuals' computers at
8 Bayrock; correct?
9    A.   I'm not sure that's the
10 appropriate term of art.
11    Q.   Well, it was a spyware
12 software. You described it yourself.
13    A.   No, I did not.
14    Q.   Well, okay. You installed
15 spyware that enabled the administrator to
16 look at the contents of the screens of
17 all of the users that are mentioned here?
18 I think we went over this --
19    MR. FEINBERG: Object to
20 just the form, your
21 characterization. It is what it
22 is. Just take out the word --
23    A.   Here's what's happening.
24 You're misspeaking.

Joshua Bernstein

Page 214

1    There's two parts to what
2 you're looking at in the document. The
3 first part is a piece of software that
4 enabled the administrator to view.
5    The second part is Trend,
6 it's anti-spyware, which is the second
7 piece of software, which is specific.
8    Q.   I'm focusing on the first
9 piece of software, the Spector CNE.
10   A.   CNE, yes.
11   Q.   And that enables the
12 administrator to look at the various
13 computer screens --
14   A.   Yes, yes.
15   Q.   -- as we just discussed.
16   A.   Correct.
17   Q.   And how long was this
18 software operating at Bayrock, to your
19 recollection?
20   A.   I believe from inception
21 until --
22   Q.   Until the time you left
23 Bayrock?
24   A.   I don't know the end date of

Page 215

1 it.
2    Q.   But as far as you know when
3 you left Bayrock it was still
4 operational?
5    A.   As far as I know.
6    MR. DOMB: Please mark
7 Exhibit T, another composite of
8 e-mails and et cetera, numbered 1
9 through 21.
10   (Whereupon, Defendant's
11 Exhibit T, a 21-page document, was
12 marked for identification as of
13 this date.)
14   MR. OBERLANDER: There's no
15 question now; correct?
16   MR. DOMB: No, but there
17 soon will be.
18   MR. OBERLANDER: I
19 understand that, but I want to
20 check something.
21   1&1 is the web hosting
22 company, right?
23   THE WITNESS: (Indicating.)
24 BY MR. DOMB:

Page 216

1    Q.   Looking at Exhibit T, and I
2 notice you're leafing through it. Maybe
3 we can go a little quicker on this one.
4    Do you remember ordering
5 some services and equipment from 1&1
6 Internet Team in or around July of 2008?
7    A.   Sounds about right.
8    Q.   What were you ordering?
9    A.   Service for website hosting
10 and e-mail.
11   Q.   For different domains?
12   A.   Yes.
13   Q.   Which domains?
14   A.   MiraxUK.com and
15 Bayrockinc.com and SwissCIB.com.
16   Q.   Were those companies related
17 to Bayrock?
18   A.   Yes.
19   Q.   Mirax was the one that you
20 mentioned before that was a joint venture
21 with Russian entities?
22   A.   Yes.
23   Q.   What's Bayrockinc?
24   A.   That was a, I believe a

Page 217

1 Delaware company that then Felix Satter
2 took over to transfer his ownership
3 shares of Bayrock into or out of Bayrock
4 Group, LLC.
5    Q.   Was that while he was still
6 working at Bayrock or after he left?
7    A.   He was still employed.
8    Q.   And what about Swiss CIB?
9 What is that?
10   A.   That was the name under
11 which the company that Felix was trying
12 to start, Swiss Capital Investment
13 Banking, CIB.
14   Q.   So these were websites that
15 each of these companies were setting up?
16   A.   Yes.
17   Q.   And you did this under whose
18 instruction?
19   A.   Felix Satter.
20   Q.   Was anyone else from Bayrock
21 involved in these entities other than
22 Felix, to your knowledge?
23   A.   Yes.
24   Q.   Who?

Joshua Bernstein

Page 218

1  A. Alina Gorbachev, Yuiliya
2 Gashapova, Stan Tolstinov, Paul McKewan
3 or Paul Mozlitz, I don't know which name
4 is legal, and at various times Julius
5 Schwarz.
6      MR. FEINBERG: I'm sorry,
7 what was the question that was
8 posed?
9      MR. DOMB: Who else at
10 Bayrock was involved in these
11 entities.
12      Give me a minute and I'll
13 get these in order.
14      THE WITNESS: Do you mind if
15 I grab bottle of water?
16      (Whereupon, a brief recess
17 was taken.)
18  Q. When your employment at
19 Bayrock ended, did you take with you or
20 retain any Bayrock documents?
21  A. Yes.
22  Q. What documents?
23  A. Various documents.
24 Thousands of different e-mails and such.

Page 219

1  Q. Well, did you keep them in
2 paper form or electronic form?
3  A. Both.
4  Q. What did you keep in paper?
5  A. Hundreds of documents,
6 various things that were printed out.
7  Q. Do you still have them?
8  A. I believe so.
9  Q. And in general, you say
10 hundreds of documents?
11  A. Mainly e-mails.
12  Q. So they were printouts of
13 e-mails?
14  A. Mainly.
15  Q. So you printed out e-mails,
16 hundreds of them, and kept them?
17  A. Yes.
18  Q. And you printed them while
19 you were employed at Bayrock?
20  A. Yes, and after.
21  Q. Where did you keep them?
22  A. In my files.
23  Q. At home?
24  A. Yes.

Page 220

1  Q. Any particular topics of
2 e-mails that you chose to print? How did
3 you choose which e-mails to print and
4 keep?
5  A. I don't recall. Usually
6 expenses.
7  Q. Is it fair to say if there's
8 anything important you were more than
9 likely to keep it than if it was wasn't
10 so important?
11  A. That's fair to say.
12  Q. Did you ever, to your
13 knowledge during your employment, write
14 an e-mail to someone at Bayrock
15 confirming a verbal discussion that you
16 had had about your compensation or bonus
17 or benefits?
18  A. Yes, but only parts of it.
19  Q. I mean, we looked at one
20 before where you wrote to Julius Schwarz,
21 remember, and I questioned you about
22 that? Let's just get a number.
23      That was Exhibit G, your
24 e-mail to Julius Schwarz.

Page 221

1  A. Oh, yes, the one where Felix
2 threatened me if I didn't write the
3 e-mail.
4  Q. Apart from that, do you
5 recall ever writing to someone at
6 Bayrock, for example writing to Felix and
7 saying, "Felix, I want to confirm our
8 conversation where you promised to do, to
9 pay me X or Y."
10     Did you write any such
11 e-mails?
12  A. You provided one here where
13 I said that you confirm our agreement
14 from yesterday, in exhibit --
15  Q. You mean the one about your
16 trip, your cancelled trip?
17  A. Yeah, and severance,
18 correct.
19  Q. Okay. Other than what we've
20 seen today, do you recall, specifically,
21 recall any other times when you wrote --
22      For example, did you write
23 an e-mail to Felix saying, "I want to
24 confirm that you promised to pay me

Page 222

1  $200,000, not $100,000, in connection
2  with the Loehmann's deal"?
3      A.   No.
4      Q.   Did you write an e-mail to
5  Tevfiq Arif saying that you expected to
6  be paid the equivalent of a broker, a
7  broker's fee on the Loehmann's deal,
8  which would be about million dollars?
9      A.   No. Tevfiq Arif did not
10 have e-mail.
11     Q.   Did you write such an e-mail
12 to anyone else at the company to let them
13 know what deal that you say he had
14 promised you?
15     A.   No. They were all verbal.
16     Q.   Now, getting back, you said
17 you took paper files and you also took
18 some electronic files with you when you
19 left Bayrock?
20     A.   Yes.
21     Q.   What other electronic files?
22     A.   Backup files of my e-mail
23 and anything else that was available on
24 my computer.

Page 223

1      Q.   Well, did you have a backup
2  file of all your e-mails, incoming and
3  out-going?
4      A.   No.
5      Q.   How did you --
6          What is in that backup
7  file -- well, let me withdraw that.
8          Whatever you took in a
9  backup file do you still have it, from
10 Bayrock?
11     A.   Yes.
12     Q.   So it hasn't changed, you
13 haven't deleted things from it?
14     A.   I don't believe so.
15     Q.   So you still have that --
16         Is it in a thumb drive?
17 What kind of a --
18     A.   Portable hard drive, thumb
19 drive.
20     Q.   And you still have it in the
21 same condition containing the same items
22 that it had before you left Bayrock?
23     A.   Hard to answer the question,
24 the condition or containing the same

Page 224

1  items.
2      Q.   Containing the same items?
3      A.   I believe so.
4      Q.   And what was in it
5  generally --
6          Did you go through a similar
7  process where you selected what to put in
8  there, or did you just download large
9  numbers of files indiscriminantly?
10     A.   Indiscriminantly.
11     Q.   What period of time?
12     A.   From approximately
13 December 2007 to the end of my
14 employment.
15     Q.   Well, were you able to
16 download things through September 16th or
17 through some date earlier when you were
18 in the office?
19     A.   Through September 16th.
20     Q.   So we discussed before that
21 for some reason unknown to me and unknown
22 to Bayrock, four months of e-mails from
23 your sent box couldn't be found at
24 Bayrock.

Page 225

1          Are they in your backup
2  drives that you've maintained all this
3  time?
4      A.   I don't believe so.
5      Q.   Why not?
6      A.   Because I don't believe they
7  are there.
8      Q.   But you, it was the
9  intention when you left Bayrock to
10 download all these files and put them
11 into this portable hard drive; correct?
12     A.   Correct.
13     Q.   So you didn't get them
14 either? Just like Bayrock doesn't have
15 them you don't have them either?
16     A.   I don't believe so.
17     Q.   Do you have any explanation
18 for where they are or what happened to
19 them?
20     A.   Yes. Bayrock deleted them.
21     Q.   Well, the period --
22         That's your belief. Do you
23 have any --
24     A.   That's my belief.

Page 226

1  Q. Do you have any hard
2  evidence or hard basis for saying that
3  other than your belief?
4  A. Not at this point.
5  Q. Do you, the period -- I
6  think we went over this -- the period of
7  missing sent e-mails was roughly May
8  through August or September of 2008?
9  A. I don't have it offhand.
10 Q. Approximately. I won't hold
11 you. Give or take a month; is that
12 right?
13 A. I will give that, yeah.
14 Q. So during that period did
15 you download any of your files or all of
16 your files to this portable hard drive?
17 A. During that period I did
18 download files.
19    THE WITNESS: Can I use the
20 bathroom real quick.
21    (Whereupon, a short recess
22 was taken.)
23    MR. DOMB: What's the last
24 question please.

Page 227

1    (Whereupon, the requested
2  question was read back by the
3  reporter.)
4  Q. And you said, I believe that
5  you keep these in a portable hard drive?
6  A. What are these?
7  Q. The electronic files from
8  Bayrock that you took with you?
9  A. I did.
10 Q. And you still have it?
11 A. I don't have that drive,
12 that specific drive, no.
13 Q. You transferred it to a
14 different drive?
15 A. Yes.
16 Q. So the contents are still
17 there?
18 A. Yes.
19 Q. Does the drive have things
20 on it other than Bayrock-related items?
21 A. Does the current drive or
22 the --
23 Q. Well, how many do you now
24 have?

Page 228

1  A. I don't know. I don't keep
2  count.
3  Q. Do you have the more than
4  one external drive containing Bayrock
5  materials?
6  A. I don't believe so.
7  Q. So you have one?
8  A. Yes.
9  Q. Does that, what do you call
10 that, an external drive? Is that a good
11 term for you to use?
12 A. It works.
13 Q. Does that drive contain
14 items other than Bayrock-related items?
15 A. I believe so.
16 Q. Is there a way for you to
17 separate out the Bayrock from the
18 non-Bayrock?
19 A. Should be.
20 Q. How would you do it?
21 A. Manually.
22 Q. One by one?
23 A. Absolutely.
24 Q. How many different e-mails

Page 229

1  or files are in it?
2  A. I don't know.
3  Q. When you produced documents
4  in this case you did not produce all the
5  Bayrock-related items in that portable
6  hard drive, did you?
7  A. It's all relevant documents.
8  Q. And you made the decision as
9  to what is relevant or not?
10 A. (No response.)
11 Q. Who made that decision?
12    MR. FEINBERG: You served a
13 documented request. He responded
14 to the document request.
15    MR. DOMB: I'm asking a
16 simple question.
17 Q. Who made the decision as to
18 what to produce from that drive? Was it
19 you?
20 A. Between my counsel and I.
21 Q. So did you, are there some
22 Bayrock-related materials that you did
23 not produce?
24 A. Yes.

Golkow Technologies, Inc. - 1.877.370.DEPS

Joshua Bernstein

Page 230

1  MR. DOMB: Do you have any
2  objection to producing all
3  Bayrock-related materials that you
4  have not yet produced from that
5  portable hard drive.
6  MR. FEINBERG: I guess if
7  you make a request specifically
8  we'll take it under advisement
9  whether we have a problem with it
10 or not.
11 MR. DOMB: From my review of
12 the document request I thought it
13 was very broad and it was already
14 requested.
15 But, for the record, we do
16 request that you produce promptly
17 all Bayrock-related items from
18 that drive.
19 And as you know there's been
20 a dispute. We also request the
21 ability for an independent
22 computer expert to review that and
23 make sure that that happens. So
24 we do make that request, and

Page 231

1  please mark that.
2  MR. OBERLANDER: That's
3  bilateral, isn't it? I think we
4  made the same request. I'm just
5  saying that it can be coordinated.
6  MR. FEINBERG: You made the
7  request, because you have missing
8  documents that we were going to
9  access to try to find out why or
10 in what manner they were deleted,
11 okay. We've never indicated that
12 we have files that have been
13 deleted or other materials that
14 require --
15 You don't get access
16 automatically to someone's
17 computer just because you want to
18 see what they have. You made your
19 request and we'll take it under
20 advisement.
21 MR. DOMB: The record says
22 what it says. There are
23 Bayrock-related materials that
24 your side made a decision not to

Page 232

1  produce some and not others, and
2  we are entitled to see all of
3  them. So we make that request.
4  MR. FEINBERG: And we'll
5  verify to see whether the request
6  that you made in terms of the
7  document response has been
8  complied with.
9  And there may be documents
10 other than those which were
11 responsive to your request, which
12 is what I assume you're asking
13 for.
14 In other words, just so
15 we're clear, you have a document
16 request --
17 MR. DOMB: I'm making two
18 requests. If we requested it and
19 it hasn't been produced, obviously
20 we want it.
21 MR. FEINBERG: Obviously.
22 MR. DOMB: And if you did
23 not read our request broadly
24 enough, we now request all

Page 233

1  Bayrock-related items in that
2  portable hard drive, whether you
3  deem them to be within our
4  document request, or whether
5  anyone deems them to be --
6  MR. FEINBERG: That's a new
7  request, and we'll take that under
8  advisement.
9  BY MR. DOMB:
10 Q. Have you now described
11 fairly all of the Bayrock-related items
12 that you took with you after you left
13 Bayrock, that is, paper and electronic
14 files?
15 A. All of what I -- there was a
16 Blackberry that I sent back to Bayrock,
17 that I retained or sent back.
18 Q. Okay. On the Blackberry,
19 you had a Blackberry that was issued to
20 you or provided to you by Bayrock?
21 A. Correct.
22 Q. And after you left Bayrock
23 you sent it back?
24 A. Yes.