```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
 2
   --------------------------------X
 3                                  :
   UNITED STATES OF AMERICA,        :   CR-98-1101
 4                                  :
            v.                      :   U.S. Courthouse
 5                                  :   Brooklyn, New York
   JOHN DOE,                        :
 6                                  :
                 Defendant.         :   TRANSCRIPT OF HEARING
 7                                  :   June 21, 2010
   --------------------------------X    10:30 a.m.
 8
   BEFORE:
 9            HONORABLE I. LEO GLASSER, U.S.D.J.

10
   APPEARANCES:
11
   For the Movant:             MORGAN LEWIS & BOCKIUS LLP
12                             101 Park Avenue
                               New York, New York 10178-0060
13                      BY:    KELLY A. MOORE, ESQ.
                               BRIAN A. HERMAN, ESQ.
14                             DAVID A. SNIDER, ESQ.

15 For the Respondent:         WILSON ELSER MOSKOWITZ EDELMAN
                               & DICKER LLP
16                             150 East 42nd Street
                               New York, New York 10017-5639
17                      BY:    RICHARD LERNER, ESQ.
                               LAUREN J. ROCKLIN, ESQ.
18
                               STAMOULIS & WEINBLATT LLC
19                             6 Denny Road - Suite 307
                               Wilmington, DE 19809
20                      BY:    STAMATIOS STAMOULIS, ESQ.

21
   Court Reporter:             Mickey Brymer, RPR
22                             Official Court Reporter
                               United States District Court
23                             225 Cadman Plaza East
                               Brooklyn, New York  11201
24                             (718) 613-2255

25          Proceedings recorded by mechanical stenography.
         Transcript produced by Computer-Assisted Transcription.
```

1          THE CLERK:  This is criminal cause for order to show

2   cause in docket number 98-CR-1101, U.S.A. versus Doe.

3   Counsel, please state your name for the record.

4          MS. MOORE:   Kelly Moore and Brian Herman from Morgan

5   Lewis for movant John Doe.

6          MR. LERNER:   Richard E. Lerner of Wilson Elser

7   Moskowitz Edelman and Dicker for nonparty respondent Frederick

8   M. Oberlander.

9          MR. STAMOULIS:   Stam Stamoulis on behalf of nonparty

10  respondents Jody Kriss and Michael Ejekam.

11         THE COURT:   Everybody is ready to proceed?

12         MS. MOORE:   Yes, your Honor.  Could I ask who the

13  gentlemen in the back row are?

14         MR. STAMOULIS:   He's my law partner.

15         AUDIENCE SPEAKER:  Good morning.

16         THE COURT:  Good morning.

17         MS. MOORE:  Your Honor, I would ask to proceed with

18  the testimony of Mr. Oberlander.

19         THE COURT:  I'm sorry.

20         MS. MOORE:   I would ask we proceed with the

21  testimony of Mr. Oberlander.

22         THE COURT:  Please.

23  F R E D E R I C K   M.   O B E R L A N D E R ,        called

24  as the witness herein, having been first duly sworn/affirmed,

25  testified as follows:

 1          THE CLERK:   Could you please state and spell your

 2   name for the record.

 3          THE WITNESS:   Frederick M. Oberlander, O-b-e-r-l-

 4   a-n-d-e-r.

 5          THE COURT:  You my be seated.  Thank you.

 6          All right, Ms. Moore.

 7   DIRECT EXAMINATION

 8   BY MS. MOORE:

 9   Q.   Mr. Oberlander, what do you do for a living?

10   A.   I'm an attorney.

11   Q.   How long have you been practicing law?

12   A.   For a living, approximately seven years.

13   Q.   For how long have you had a law license?

14   A.   Ten years.

15   Q.   And what type of law do you practice?

16   A.   Mostly commercial law and primarily transactional,

17   financial and taxation, but I do general work.

18   Q.   Do you handle any criminal matters?

19   A.   No.

20   Q.   You're admitted in the State of New York; is that right?

21   A.   Yes.

22   Q.   You practice in both Federal and State Court?

23   A.   Recently I started practicing in Federal Court.  I was

24   admitted a few months ago in Southern District.

25   Q.   Are you admitted anywhere else other than New York?

1  A.    I was admitted pro hac in a couple of jurisdictions.  I

2  don't remember whether those expired or not.

3  Q.    Did that include Delaware?

4  A.    At one time.

5  Q.    Where is your practice located?

6  A.    In Montauk, New York.

7  Q.    That's where your office is located?

8        THE COURT:  Did you say Montauk?

9        THE WITNESS:  Yes, in the Hamptons.

10  Q.    What is the address of your office?

11  A.    The street address is 28 Sycamore Lane.

12  Q.    And is that a solo practice?

13  A.    It is.

14  Q.    Do you have any employees at all?

15  A.    Not full time, but I occasionally add staff depending on

16  needs.

17  Q.    Now, you filed a complaint in the Southern District of

18  New York captioned Jody Kriss, Michael Ejekam and Bayrock

19  Group versus Bayrock Group and various others; is that

20  correct?

21  A.    Yes, I did.

22  Q.    When did you file that complaint?

23  A.    I'm sorry, I didn't hear you.

24  Q.    When did you file that complaint?

25  A.    The 10th of May.

1 Q.   Around the same time you sent an email to Ron Kriss

2 attaching a copy of that complaint; is that correct?

3 A.   I believe I sent that on May 12th.

4 Q.   And was the version that you sent to Ron Kriss the same

5 version that you filed in the Southern District of New York?

6 A.   The version of the complaint itself was.

7 Q.   What was different?

8 A.   The exhibits to the complaint that I filed, which was

9 physically filed in New York and not by ECF, had only limited

10 excerpts from some of the materials that you referred to in

11 the order to show cause as the sealed and confidential

12 documents, but the file attachments on email that went to Ron

13 Kriss I believe had additional pages in the PDF files on some

14 of those documents.

15          MS. MOORE:   Your Honor, may I?

16          THE COURT:   Sure.

17 Q.   Mr. Oberlander, let me show you a copy of the version you

18 sent to Mr. Ron Kriss on May 12th.  Is that the copy you sent

19 to Ron Kriss?

20 A.   It appears to be, but it is hundreds of pages.  It would

21 be impossible for me to tell for sure just glancing at it.  It

22 does appear to be.

23          MS. MOORE:   Your Honor, I offer that.

24          THE COURT:   Is there any objection to that?

25          MR. LERNER:   No objection.

1          THE COURT:  Thank you.  It will be received as I

2    guess Plaintiff's 1.

3          Precisely what is that?  Would you identify that for

4    the record.

5          MS. MOORE:   Your Honor, Exhibit 1 is the SDNY

6    complaint captioned "Jody Kriss, et al. versus Bayrock

7    Group."

8          THE COURT:  Is that the document that you handed up,

9    somebody handed up to me?

10         MS. MOORE:   Yes, your Honor, that's Exhibit 1.

11         THE COURT:  Together with all the attachments?

12         MS. MOORE:   Correct.

13         MR. LERNER:   Your Honor, I think Ms. Moore may be

14   leading now with the topic.

15         THE COURT:  I'm having a little trouble hearing you,

16   Mr. Lerner.

17         MR. LERNER:   I think Ms. Moore may be leading into

18   areas of work product.  Now, the topic of this order to show

19   cause, as set forth in the order to show cause, is from whom

20   Mr. Oberlander received the purportedly sealed and

21   confidential documents and to whom he gave them, so, I would

22   like to object in advance to any questioning that may go to

23   why he did certain things and simply ask that the Court limit

24   it to what he did, not why he did it.

25         THE COURT:  Ms. Moore.

1          MS. MOORE:    Your Honor, I mean objections can be

2    made to the questions asked.  We believe the order to show

3    cause --

4          THE COURT:   This is in the nature of a motion in

5    limine.  To avoid constant objections and so on, if there's no

6    objection to what it is that Mr. Lerner is suggesting would be

7    appropriate, then we'll proceed accordingly.

8          MS. MOORE:    Your Honor, I do intend to inquire as to

9    what Mr. Oberlander knew and what his intent was specifically

10   with respect to sealed documents.

11         THE COURT:   What is the relevance of that insofar as

12   this order to show cause is concerned?  I understand the order

13   to show cause in this proceeding is addressed to where these

14   documents came from, how he obtained it and not what his

15   intent was.  I don't know what the relevance of that is.  It

16   seems to me your concern was the unauthorized or seemingly

17   apparently unauthorized use and possession of sealed

18   documents.

19         MS. MOORE:    That's correct, your Honor.  To the

20   extent Mr. Oberlander knew they were sealed and acted anyway,

21   we believe it is relevant to our application.

22         THE COURT:   What is your application beyond that?

23         MS. MOORE:    Eventually our application, your Honor,

24   would be probably attorney's fees and sanctions related to his

25   conduct which typically under the law follow the elements of

1  whether or not there was in fact civil contempt of a court

2  order.

3  THE COURT:  Well, Ms. Moore, it would be perfectly

4  proper to ask whether Mr. Oberlander was aware of the fact

5  these documents were sealed.  What his intent was I don't

6  think has any relevance to this proceeding.  Why don't you

7  proceed.

8  MS. MOORE:  Okay.

9  Q.  Mr. Oberlander, attached as Exhibit A are two proffer

10  agreements, a cooperation agreement and a pretrial statement;

11  is that correct?

12  A.  What you handed me you're referring to?

13  Q.  Yes.

14  A.  I think there's only one proffer agreement.

15  Q.  Oh, two, I'm sorry, you're right.  They are double-sided

16  pages and I didn't see that.

17  From whom did you obtain the documents that were

18  attached to the email you sent to Mr. Ron Kriss as Exhibits A

19  and C?

20  A.  Joshua Bernstein.

21  Q.  Who is Joshua Bernstein?

22  A.  He was a client of mine at one time.

23  Q.  In what matter did you represent him?

24  A.  In an action he had against Bayrock Group LLC in White

25  Plains Supreme Court, New York.

1 Q.    Was there an engagement letter for that representation?

2 A.    There was.

3 Q.    Did he pay you for your legal services?

4 A.    No, he did not.

5 Q.    Were you paid by anyone else in connection with your

6 legal services in that matter?

7 A.    No.

8 Q.    Did you enter an appearance on his behalf in that matter?

9 A.    No.

10 Q.    Who entered an appearance on his behalf in that matter?

11 A.    I really don't know.  I know he was represented at all

12 times by a gentleman I would refer to as lead counsel.  I had

13 no personal knowledge who put in an appearance for him.

14 Q.    But you had a separate engagement letter with him?

15 A.    Separate from what?

16 Q.    That other individual's.

17 A.    It was my own engagement letter.  I wrote it.

18 Q.    When did you stop representing Joshua Bernstein?

19 A.    April this year, 2010.

20 Q.    What date?

21 A.    I have to check.  Towards the end of the month.

22 Q.    And was the termination of your attorney-client

23 relationship memorialized in any way?

24 A.    There is -- there are emails that confirm that he is a

25 prior or past client for purposes of rules and privileges and

1  not a current client.

2  Q.   When did you obtain the Exhibits A and C to the SDNY

3  civil complaint from Josh Bernstein?

4  A.   It was the overnight of February 28th to March 1st.  It

5  was after midnight of February 28th, so that would be

6  technically March 1st this year.

7  Q.   And that was an overnight package?

8  A.   No.

9  Q.   How was it obtained?

10 A.   He handed them to me.

11 Q.   Where did he hand them to you?

12 A.   In his office.

13 Q.   Which is where?

14 A.   That particular office was in an apartment on the Upper

15 East Side.

16 Q.   Would the documents be part of a bigger group of

17 documents?

18 A.   He handed the documents to me in physical form and to my

19 recollection they were the only physical documents he handed

20 me.

21 Q.   What were the only physical documents he handed you?

22 A.   He handed me a proffer and a cooperation agreement and a

23 PSR.  And for avoidance of ambiguity as I'm not a criminal

24 lawyer, what he handed me had attached to the back of the

25 proffer what I understand to be or you referred to as a DOJ

1   financial statement, but I would not know that is considered

2   as part of a proffer or not.   Maybe attached to a cooperation

3   agreement.   To me there were three documents.

4   Q.   Did he give you any other documents relating to my client

5   John Doe's criminal case?

6   A.   No.

7   Q.   Did he give you a complaint that was filed in that case?

8   A.   Not at that time.   If you'll excuse me, for clarification

9   I assume you're asking what he handed me at that time on March

10  1st.

11  Q.   So, he handed you nothing else on March 1st?

12  A.   Not as related to the criminal matter, the CR matter,

13  what is it, 1101.

14  Q.   Did he provide you with a complaint in that case on some

15  other date?

16  A.   Yes, he did.

17  Q.   When did he provide you with a complaint in that case?

18  A.   I believe it was March 3rd.

19  Q.   Was that once again in person?

20  A.   No.

21  Q.   In what form did he provide you --

22       MR. LERNER:   I'll object to the questioning about

23  the complaint in another unrelated matter.

24       THE COURT:   I'm about to inquire about that,

25  Mr. Lerner.   Complaint in what proceeding?

1          MS. MOORE:   United States versus John Doe, your

2    Honor, sealed complaint.

3          MR. LERNER:   I'm sorry, I was confused.  I thought

4    you were refer -- Ms. Moore is referring to a different

5    document.  I withdraw my objection.

6          THE WITNESS:   Your Honor, may I just correct one

7    thing I said?

8          THE COURT:   Sure.

9          THE WITNESS:   To the best my recollection the

10   complaint was given to me-- I'm going on recollection -- on

11   March 3rd.  He sent me several documents and I'm certain the

12   complaint was there.

13         THE COURT:   Was that received by hand as well?

14         THE WITNESS:   No, no.  She asked me whether he ever

15   gave me a complaint and I'm saying I'm substantially certain

16   he did, and, if he did, it was in an email that was given to

17   me or I received on March 3rd.

18         THE COURT:   An email?

19         THE WITNESS:   It was attached to an email, yes.

20   Q.   In the email you received from him on March 3rd, did he

21   attach any other documents related to the criminal case

22   against my client in Federal Court in Brooklyn?

23   A.   The same ones he had given me physically on the first

24   were attached to that.

25   Q.   Was an indictment or information or draft information

1  attached as well?

2  A.    It may well have been, but I just simply don't recall.

3  It could very well have been, yes.

4  Q.    Have you in connection with this order to show cause gone

5  back and checked what was attached to that email?

6  A.    No.

7  Q.    So, as you sit here today, you don't know what else was

8  attached to that email?

9  A.    I answered you to the best of my knowledge.  I feel

10 substantially certain that a complaint was and that I don't

11 have any reason to doubt that the -- what you call an

12 information, I think, is that what you referred to it as?

13 Q.    A draft information I referred to it as.

14 A.    Draft information.  But I have no specific absolute

15 certain recall because those were not in the order to show

16 cause so I had no reason to check.

17 Q.    How many documents were attached to the March 3rd email?

18 A.    About four, five.

19 Q.    But you don't know what they were other than the

20 complaint and the one that was attached to the SDNY --

21 A.    As I continue to say, I know the same three he gave me

22 were attached to that email.  I'm reasonably certain the

23 complaint was attached to the email and I'm relatively certain

24 that the draft information was and I believe that's it, but it

25 is possible there may have been six -- four, five or six.

1  This is the best information I can give you from

2  recollection.  I certainly don't deny that it was attached.

3  Q.    The March 3rd email, was that simply an email from Josh

4  Bernstein to you with attachments or was it forwarding an

5  underlying email to which those documents had been attached?

6  A.    May I ask for clarification, please?

7  Q.    Absolutely.

8  A.    Do you mean was there any message inside or just --

9  Q.    No, I'm asking whether aside from the email that

10  Mr. Bernstein sent to you, whether or not he was forwarding

11  another email that had attached these documents?

12  A.    You mean did I receive a forwarded email?

13  Q.    Correct.

14  A.    That had been primarily addressed to someone else and I

15  was getting it forwarded?

16  Q.    Correct.

17  A.    That's not correct.  It was addressed to me.

18  Q.    And, so, it was just the email to you plus the

19  attachments; is that correct?

20  A.    It was the email was primarily addressed to me.  There

21  were other addressees.

22  Q.    Who else was the email addressed to?

23  A.    That would be Arnold Bernstein and Jerry, spelled

24  J-e-r-r-y, I don't recall the last name, who was the gentleman

25  I refer to as Josh's lead attorney in the White Plains case.

1     If I may, your Honor, for clarification, I'm saying I

2 didn't get forwarded somebody else's email.  The email was

3 addressed to three people and I was one of them.

4 Q.   Were there any CCs on that email?

5 A.   I don't recall.

6 Q.   In preparation for this hearing, you didn't review it?

7 A.   Probably a week or two, maybe three, when the order to

8 show cause came in to check the dates, I'm substantially

9 certain there were no cc's, but I will not say my memory is

10 infallible.  It would be highly unlikely there were any at all

11 other than the three of us.  I sincerely doubt there --

12 Q.   What did the email to you, Mr. Bernstein and other

13 lawyers say?

14 A.   The first sentence in the email said, as requested, here

15 are the Doe docs or the John docs.  There was an additional

16 sentence.  I'm not convinced revelation of that sentence is

17 within the very limited privilege waiver that Mr. Bernstein

18 gave me, so however you want to handle that, but I can't

19 testify to what else was in there.

20 Q.   Well, the email was addressed to Arnold Bernstein, who is

21 Mr. Bernstein's father, right, not his lawyer, correct?

22 A.   No, that is not correct.  He is always very much his

23 lawyer and always held himself out to me as his attorney and

24 Jerry as his lawyer.

25 Q.   In a recent conversation with us he did not hold himself

1  out to be his lawyer, but putting that aside I don't believe

2  you can waive attorney-client privilege in a limited fashion

3  and your recent June 14th letter, is it your position you are

4  not waiving it or it is not waived?

5  A.   My counsel would know.

6       MR. LERNER:   I spoke to Mr. Bernstein who stated to

7  me he waived his privilege with respect to how Mr. Oberlander

8  received the documents.  So, that was the scope of the

9  waiver.

10       MS. MOORE:   Your Honor, I don't believe there can be

11  partial attorney-client privilege waiver.  I believe once you

12  waive with respect to certain things, it is waived.  Certainly

13  what the email said is passing these documents on to

14  Mr. Oberlander falls even within the waiver that they seem to

15  have received.

16       THE WITNESS:  Your Honor, I understand I am the

17  witness but he was my former client.  May I address the Court

18  briefly?

19       THE COURT:  Why don't you let your attorney do that.

20       THE WITNESS:  Can I consult with him for a minute?

21       THE COURT:  Absolutely.  It is rather unorthodox to

22  have a witness represented by a lawyer also act as his own

23  attorney.

24       THE WITNESS:  There's nothing I'm going to say that's

25  secret.

1          THE COURT:  I don't know whether it is or isn't.  I

2   think you would be well advised to consult with your lawyer.

3          (Mr. Lerner and the witness confer.)

4          THE COURT:  Where were we?

5          MR. LERNER:   Your Honor, Mr. Bernstein in speaking

6   with me gave a limited waiver.  If that is to be interpreted

7   as a waiver for all purposes, then he gave no waiver at all,

8   so he can't -- Mr. Oberlander can't be asked further questions

9   regarding these conversations or communications with

10  Mr. Bernstein.

11         THE COURT:  Well, Ms. Moore, again, what is the

12  relevance of that question, or perhaps there's something I'm

13  missing?

14         My understanding was that the entire purpose or focus

15  of this proceeding from the very beginning that the order to

16  show cause was presented to me was a concern and a real

17  concern not only for your client but for the Court and the

18  integrity of the entire criminal proceeding as well as to how

19  documents which were clearly intended to remain sealed and

20  clearly intended not to be available for public distribution

21  or even public viewing by anybody unless by virtue of a court

22  order unsealing those documents.  So, the focus of this

23  proceeding, as I understand it, is how did those documents

24  which were sealed find its way into a complaint in a civil

25  action commenced in the Southern District of New York, how did

1  the persons who had possession of those documents, obviously

2  had possession of them, acquire them in some fashion because

3  they were attached to a complaint filed in the Southern

4  District?  How did those documents come into the possession of

5  the persons who attached them to a complaint?  That's the

6  concern which I believe was the focus of this proceeding and I

7  think that is what is at issue here.  How did you get them,

8  from whom, and then the question will be how did that person

9  get them and from whom.

10        If those documents were obtained in some fashion

11  other than by a voluntary delivery or disclosure of them by

12  Mr. Doe, then there is a very, very serious concern which this

13  Court has regarding that issue.

14        That is what is before me.  With respect to counsel

15  fees and all the rest of it, that's another matter.

16        MS. MOORE:   Fair enough, your Honor.

17  Q.   Mr. Oberlander, does the second sentence of the email

18  address how Mr. Bernstein obtained the documents?

19  A.   It does not.

20  Q.   Now, did he when he spoke to you either in person on

21  March 1st, or any other time, advise you of how he obtained

22  those documents?

23  A.   He did.

24  Q.   When did he advise you of how he obtained them?

25  A.   Every time, one time or you mean the first time, what?

1  Q.   Let's start with the first time.

2  A.   The first time would be March 1st.

3  Q.   What did he say to you?

4  A.   He said Doe gave them to him but to be clear, the general

5  impression, because I can't recall the exact words, the

6  general impression was that Doe gave them many documents and

7  included among the documents were these.

8  Q.   Did he say whether or not Doe provided them in electronic

9  form or hard copy?

10 A.   Not at that time.

11 Q.   And did you credit his statement that Doe gave him these

12 documents?

13 A.   In the context of everything else that he told me during

14 the preparation of his White Plains case, yes, I did.

15 Q.   Why did he give you these documents?

16 A.   You have to ask him that.  They were unsolicited.  I

17 didn't say would you please give me these documents.  He

18 volunteered.

19 Q.   You described the first sentence of his email to be as

20 requested here are the documents.  What's the request you're

21 referring to?

22 A.   Because he gave them to me physically and I have a

23 scanner and I prefer to work with electronic records and I

24 probably March 1 or March 2 -- I mean I forgot which day it

25 was, asking if he could possibly send them to me in PDF form

1  and it would be easier for me.  It was here, I'm sending you

2  PDF files.

3  Q.   And, so, beyond the first conversation that he told you

4  Doe gave them to him, what other conversations have you had

5  with him describing how he obtained them?

6  A.   Indirectly through third party, during the preparation of

7  an affidavit for this proceeding, Mr. Bernstein from my

8  understanding and this, of course, is hearsay, my

9  understanding Mr. Bernstein clarified that Mr. Doe had given

10  him several disks containing files and that these were among

11  them, but, as I said, that was told to me by someone who

12  claims that he said it to him and I can't say whether or not

13  it is true.

14  Q.   Who was it that claims that was said to him?

15       MR. LERNER:   That would be Richard Lerner.

16  Mr. Bernstein said to me when we were having a conversation

17  that he thought he gave them to Mr. Oberlander on -- or he

18  obtained them on a computer disk from Mr. Doe.

19  Q.   And, so, Mr. Oberlander, is it your understanding

20  Mr. Bernstein thinks that's how he obtained them or he knows

21  that's how he obtained them?

22  A.   I have absolutely no idea what relative state of

23  confidence he has in his memory.

24  Q.   And the document that was forwarded to you, it was not

25  part of a disk, right, it was not part of a set of a bunch of

1  documents; what he sent to you were five documents relating to

2  a criminal matter, right?

3  A.    He sent me to be specific five separate attachments to

4  one email.   Whether and what degree an attachment is a

5  document in the context of your question I'm not certain.

6  Q.    But it wasn't part of a bigger disk that contained a

7  whole bunch of documents; is that right?

8  A.    There is no difference.   He sent me an email.   I'm not

9  following your question.

10  Q.    My understanding is through a third party, namely,

11  Mr. Lerner, who had a connection with this hearing and advised

12  that Mr. Bernstein claims that my client gave him three disks

13  that contained a bunch of documents including these; is that

14  right?

15  A.    No.   First of all, nobody said there were three.   I

16  believe we said it is a few and that's indeterminate.   Yes, I

17  just answered that question.   It is my understanding that

18  Mr. Bernstein has some degree of confidence, more than zero or

19  less than 100, that the physical means by which he obtained

20  them from Mr. Doe was on disks.

21  Q.    But what you in turn received from Mr. Bernstein was not

22  the disk, you obtained the individual separate documents; is

23  that right?

24  A.    I received -- are we talking about ever, on the 3rd, in

25  that email?   What specifically are we talking about?

1  Q.   We're talking about March 1st, the 3rd or any other time

2  you may have received these documents.

3  A.   I only received them twice and as I testified on March

4  1st I was given three what I call documents.  That's the way I

5  testified.  They were three successive papers stapled

6  together.  So to me that's three documents.  Then, on March

7  3rd I got an email that had five attachments.  You can say an

8  attachment is a document, it is perfectly acceptable usage,

9  but the term document there doesn't necessarily refer to

10  document in any other context.

11        I'm telling you as honestly as I can I got four, five

12  or six attachments on that email.  If you want to refer to

13  attachment as a document, that's okay with me.

14  Q.   Did it ever occur to you that Mr. Bernstein had stolen

15  those files?

16  A.   Work product privilege.

17  Q.   You're asserting the work product privilege to answer

18  that question as to whether or not it ever occurred to you you

19  may have been obtaining stolen documents?

20  A.   Any thoughts I had about the preparation of his case or

21  his case including materials given to me by anybody are work

22  product.

23  Q.   I'm concerned with your state of mind.  Did you think you

24  were obtaining stolen documents?

25  A.   Work product exception.

1  Q.   You knew, did you not, that Mr. Bernstein upon being

2  fired from Bayrock had taken thousands of pages of documents

3  with him?

4          MR. LERNER:   Objection.

5          THE COURT:   I will allow it.

6  A.   I don't know any such thing.

7  Q.   You knew he was in possession at his home of thousands of

8  pages of documents of Bayrock; is that right?

9  A.   No.

10 Q.   Were you aware he was in possession of Bayrock documents

11 at his home?

12         MR. LERNER:   At what time, Ms. Moore?

13         MS. MOORE:   After he was fired from Bayrock.

14 A.   I'm sorry, I'm confused.   You're asking me if I'm aware

15 of what he possessed in his home on every day since the day he

16 was hired?

17 Q.   No.   On any day after he was fired are you aware that he

18 was in possession of documents of Bayrock's?

19 A.   If you can define, please, for me, clarify when you say

20 of Bay Rock's, are you specifically referring to documents by

21 which Bayrock would assert ownership of the intellectual

22 property of the contents.

23 Q.   Documents taken from the premises of Bayrock's offices is

24 what I mean by Bayrock documents.

25 A.   So, that would include his own personal property that he

1  took home with him.

2  Q.   Excluding his own personal property.

3  A.   Mr. Bernstein had documents in his office.  I didn't read

4  them, I don't know what they were.  I certainly have no

5  information as to what he did or didn't take.

6  Q.   But you knew that he was fired, right?

7  A.   He told me that he was fired, so I assume it is true.

8  Q.   As a practicing attorney, you are aware when people are

9  fired they are typically not permitted to take documents and

10 property of their employer with them, right?

11 A.   I'm sorry, I'm not aware of what's typical in the world.

12 Q.   So, when you obtained these documents, cooperation

13 agreement, proffer agreement and a PSR, you had no concern

14 these documents were stolen?

15 A.   Work product.

16 Q.   Are you familiar with the declaration that Thomas Hylan

17 submitted to the Court in connection with your opposition to

18 this motion?

19 A.   It's been a couple weeks since I've seen it, but, of

20 course, I did read it.

21 Q.   By the way, does Mr. Hylan still represent you?

22       MR. LERNER:   The law firm of Wilson Elser represents

23 Mr. Oberlander in this matter.  Mr. Hylan is my partner.

24 Q.   Did you draft the Hylan declaration?

25 A.   Did I draft it?

1  Q.   Yes.

2        MR. LERNER:   Objection.

3        THE COURT:  Sustained.

4  Q.   Did you read it before it was filed?

5  A.   I'm sure I did.

6  Q.   Do you agree with its contents?

7        MR. LERNER:   Objection.

8        THE COURT:  Pardon.

9        MR. LERNER:   Objection as to relevance.

10        THE COURT:  Objection is sustained.

11        It would seem to me if Mr. Hylan was in effect the

12  agent of Mr. Oberlander and Mr. Oberlander had seen that

13  document, it seems to me 801(c) whatever subdivision in the

14  Federal Rules of Evidence might be applicable.

15        Why don't you move on.

16  Q.   Mr. Oberlander, if you knew at the time that that

17  declaration was filed that Mr. Bernstein said he got those

18  documents voluntarily from Mr. Doe, why is a good portion of

19  that declaration committed to an inquiry as to whether or not

20  my client had kept the documents under lock and key?

21  A.   You would have to ask Mr. Hylan.  I'm sure he would make

22  the work product objection, if you did.

23  Q.   It is your testimony at the time that declaration was

24  filed you had a good faith belief Mr. Bernstein obtained the

25  documents legally?

1 A.   I told you that any belief or thoughts I had about the

2 documents with respect to what he said are work product.

3 Q.   There was a cross motion made in connection with your

4 opposition.  You submitted an affidavit in connection with

5 that and in that you say that you believe that permitted to

6 contact the client, who I assume is Mr. Bernstein, he would

7 submit an affidavit that described how he obtained the

8 documents; is that correct?

9 A.   Something like that.

10 Q.   That motion was granted by the court; is that right?

11 A.   So many words, yes.

12 Q.   And did you thereafter contact Mr. Bernstein?

13 A.   He --

14       MR. LERNER:   Your Honor, I contacted Mr. Bernstein.

15 I spoke with him about the issues.  He agreed to a, quote,

16 unquote, limited waiver to allow Mr. Oberlander to testify as

17 to his giving the documents to Mr. Oberlander.  I prepared an

18 affidavit based on what he had told me and then his father

19 intervened and said speak with me only, he's not submitting

20 any affidavits to the Court, he's represented by counsel.

21 Q.   In a follow-up letter to the Court in connection with

22 this matter, the other attorney, Mr. Lerner, submits a letter

23 on June 14th, and that letter very specifically says that you

24 obtained the documents from Mr. Bernstein and that

25 Mr. Bernstein told you he obtained them from Mr. Doe, but that

1  any statements in that letter are not yours.  Specifically

2  states the statements in the letter are not yours.

3       Why is that?

4  A.   You would have to ask the author of that letter.

5  Q.   You stand by the statements that you obtained from

6  Mr. Bernstein and Mr. Bernstein told you he obtained them --

7       MR. LERNER:   May I address it?

8  Q.   -- from Mr. Doe?

9       MR. LERNER:   May I address the Court as to why I

10  made certain statements or should we move on?

11       THE COURT:   It seems that question has been answered,

12  Ms. Moore.

13  Q.   Do you know who would have been given or provided any of

14  the documents you were given either on March 1st or that you

15  obtained on March 3rd, 2010?

16  A.   I'm sorry, I missed the first few words of the question.

17       THE COURT:   So did I.

18  Q.   To whom have you given or provided the documents that you

19  obtained on March 1st and March 3rd from Mr. Josh Bernstein?

20  A.   As to everything other than the documents you referred to

21  in the order to show cause as the sealed and confidential

22  documents, it is my recollection that I never gave them to

23  anyone.  So, as to the sealed and confidential, actually, let

24  me amend that, I apologize.  I believe I forwarded the email

25  intact to my attorneys, so my attorneys received everything

1  that was attached to that email.

2  Q.    Who are your attorneys?

3  A.    Wilson Elser.

4  Q.    When did you send it to them?

5        MR. LERNER:    I believe it was last Saturday.

6        THE COURT:    I'm sorry.

7        MR. LERNER:    I believe it was the Saturday before

8  this past Saturday.  I can check my Blackberry, if the Court

9  wants to know the precise date.

10 Q.    So, other than your attorneys, Wilson Elser, you did not

11 provide the March 3rd email in its entirety to anyone else; is

12 that correct?

13 A.    To the absolute best of my recollection, I did not

14 forward intact that email to anyone else.  That's to the best

15 of my recollection.  I could be mistaken.

16 Q.    Okay.

17        Now let's take it to the other documents, even if

18 they are not intact, any part of them.  The documents we

19 referred to as the sealed and confidential documents, to whom

20 have you provided those documents?

21 A.    The clerk of the Southern District, the cashier, the

22 in-take clerk, whatever her official title is who receives

23 physical filings was given the original complaint and attached

24 to there were I believe five pages from the PSR, the two

25 proffer agreements and the cooperation agreement, but not DOJ

1   financial statement, and Mr. Kriss received those documents

2   electronically in the same form that Mr. -- I'm sorry, this is

3   a confusing answer.  Let me start it again.

4           Mr. Jody Kriss, my client, was given those documents

5   to the extent that they were given in the email to Ron Kriss.

6   In other words, as I testified, the attachments on the May 12

7   email to Ron Kriss had more pages in some of the sealed and

8   confidential documents, so those versions went to Ron Kriss on

9   May 12th at around 12:30 noon.  About an hour earlier I sent

10  the same email with slightly different text to John Elzufon,

11  who is an attorney representing Alex Solomon, one of the

12  defendants in the case, and I sent him the same attachments

13  Ron Kriss had.

14          Jody Kriss I believe was copied on one of those

15  emails and Stam Stamouilis, who is Mr. Kriss's attorney from

16  Delaware and local counsel for the prior Delaware matter,

17  received a copy of that email, and prior to that the only

18  other thing I can recall is that a couple of weeks before

19  filing the complaint I gave extracts of those documents

20  electronically to Mr. Kriss for his use and verification of

21  the complaint because he had to verify the complaint.

22          To the best of my knowledge, that's the absolute --

23  actually, no, let me just change that.  There was one other

24  person.  I believe I sent one or two of them to another

25  attorney sometime in March.

1 Q. Who is that attorney?

2 A. The gentleman's name is David Schlecker.

3 Q. He is an attorney of yours?

4 A. Yes.

5 Q. Could you spell John Elzufon's last name for us, please?

6 A. E-l-z-u-f-o-n.

7 Q. And Mr. Schlecker's last name?

8 A. S-c-h-l-e-c-k-e-r.

9 Q. So, besides Jody Kriss, Ron Kriss, John Elzufon, Stam

10 Stamoulis, Wilson Elser, David Schlecker, is there anyone else

11 you know of to whom you sent any part or portion of the

12 documents we have been referring to as the sealed and

13 confidential documents or any other documents relating to

14 Mr. Doe's criminal file?

15 A. I don't know what documents related to his criminal file

16 means. To the best of my recollection there isn't anybody

17 else I sent them to.

18 Q. To your knowledge, do you know whether or not any of the

19 other people you sent them to sent them further to anyone

20 else?

21 A. I have no knowledge that they did, no. I have no

22 knowledge, sorry.

23 Q. Did they ever advise you that they had it?

24 A. Not specifically. I'm not -- no, not specifically,

25 nobody said to me we sent these down here to somebody else.