UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X
UNITED STATES OF AMERICA,

                     Plaintiff,

                -against-

FELIX SATER,

                     Defendant.

---------------------------------------------------------------------X

                    98 CR 1101 (ILG)

                    **FILED UNDER SEAL**

## DECLARATION OF KELLY MOORE

**KELLY MOORE** declares as follows:

1.      I am member of the Bar of this Court and am a member of the law firm of Morgan, Lewis & Bockius LLP, 101 Park Avenue, New York, New York, 10178, counsel for Felix Sater.

2.      I make this declaration in support of Mr. Sater's application to this Court to (i) order the immediate return of certain confidential materials, much of which were previously sealed by this Court in connection with criminal proceedings before this Court; and (ii) conduct an inquiry into how certain persons acquired the materials and to whom the materials were distributed in order to ensure that all such materials are returned or destroyed.

**Background**

3.      Mr. Sater was the subject of criminal proceedings before this Court, which concluded on October 23, 2009, index number 98 CR 1101 (ILG) (the "Criminal Proceedings").

4.     This Court sealed the docket and filings in the Criminal Proceedings.

5.     In connection with the Criminal Proceedings, certain confidential materials were sealed including:

- a Cooperation Agreement dated December 10, 1998;

- A United States Department of Justice Financial Statement dated December 10, 1998; and

- a Pre-sentence Investigation Report dated June 18, 2004 (the "2004 PSR");

(together, the "Sealed Materials").

6.     In addition, Mr. Sater and the United States Attorney's Office entered into a confidential Proffer Agreement dated October 2, 1998 (together with the Sealed Materials, the "Sealed and Confidential Materials").

7.     The confidential nature of the Sealed and Confidential Materials is plain.  For example, the 2004 PSR states:  "It is the policy of the federal judiciary and the Department of Justice that further redisclosure of the pre-sentence report is prohibited without the consent of the sentencing judge."

8.     Mr. Sater was formerly affiliated with a real estate development firm known as Bayrock Group LLC ("Bayrock" and together with its subsidiaries, the "Bayrock entities").

9.     Mr. Sater has informed us that, while he was associated with Bayrock, he kept the Sealed and Confidential Materials in a personal file in his Bayrock office.

**The Delaware Court Dismissed an Action Filed by
Mr. Kriss and His Attorney, Fred Oberlander**

10.     Jody Kriss is a former employee of Bayrock.

11.     During the course of his employment, Mr. Kriss maintained an office adjacent to Mr. Sater's.  As noted above, Mr. Sater kept the Sealed and Confidential Materials in a personal file in his Bayrock office.

12.     Mr. Kriss was employed by Bayrock from 2003 to 2007 as Director of Finance.  In 2007, he took a leave of absence.  He returned from leave for a brief period in 2008 and then was terminated by the Company.

13.     In or around 2009, Mr. Kriss commenced an action in the Delaware Chancery Court against, inter alia, Mr. Sater, certain Bayrock entities and certain employees of Bayrock entities (the "Delaware Action").

14.     In the Delaware Action, Mr. Kriss was represented by several attorneys including Mr. Fred Oberlander.

15.     In the Delaware Action, Mr. Kriss alleged, inter alia, that the Bayrock entities constituted a racketeer influence and corrupt organization (RICO), that tax laws had been violated, and that Mr. Kriss – who was the Director of Finance at the time of the alleged violations – had been denied certain economic benefits to which he was entitled based on his association with Bayrock.

16.     Chancellor Strine dismissed the Delaware Action, finding, inter alia, that Mr. Kriss's disputes with Bayrock and the other defendants are the subject of an arbitration agreement.

17.     By order dated February 19, 2010, the Delaware court directed Mr. Kriss to file an arbitration and, in the event the arbitrator determined that the claims were

not arbitral, to file an action in court in New York.  A copy of the order and the hearing transcript are attached as Exhibit 1.

**Attorney Oberlander's Other Client**
**Admits Taking Emails and Documents**
**From Bayrock**

18.     In addition to the Delaware Action, another former employee of Bayrock, Joshua Bernstein, commenced an arbitration against Bayrock.

19.     In that action, Mr. Bernstein testified that, during the course of his employment, he downloaded files from the computers and servers of Bayrock and installed monitoring software which allowed him access to other Bayrock personnel's computers.  (See Ex. 2, Bernstein Deposition at 194-233).

20.     Mr. Bernstein further testified that when he left Bayrock, he took "thousands" of emails and hundreds of documents  (*Id.*)

21.     Mr. Oberlander represents Mr. Bernstein.

**Messrs. Kriss and Oberlander File**
**a New Action in the SDNY, Using the**
**Sealed and Confidential Materials**

22.     On Wednesday, May 12, 2010, Mr. Oberlander emailed to Ronald Kriss—a partner at the law firm Akerman Senterfitt and father of Jody Kriss—a draft complaint (the "SDNY Complaint") on behalf of Jody Kriss and another former Bayrock employee against Mr. Sater, Bayrock entities and numerous others.

23.     The SDNY Complaint is similar in nature to the Delaware Action.

24.     The SDNY Complaint references and attaches as exhibits thereto the Sealed and Confidential Materials.

4

25. In addition, the SDNY Complaint quotes numerous privileged communications between Bayrock and its counsel.

26. Mr. Oberlander's email to Ron Kriss stated as followed:

> **From:** fred55@aol.com [mailto:fred55@aol.com]
> **Sent:** Wednesday, May 12, 2010 12:33 PM
> **To:** Kriss, Ronald (Sh-Mia); Kriss, Ronald (Sh-Mia)
> **Subject:** Fwd: complaint, sdny, salomon, weinrich, & salomon & co.
> Ron --
>
> I recommend you forward this to Julius with the comment from me that
> there are three alternatives here:
>
> (a) I file publicly today.
>
> (b) I file under seal today.
>
> (c) He arrange a tolling agreement with EVERY defendant but nixon peabody.
>
> I don't care how many people he has to get on the phone and how fast
> he has to work. He had years to give back the money and now it's over.
> He can get Brian Halberg to help him.
>
> I believe it's possible to get this in under seal if Bayrock joins in a joint motion
> in part 1 to seal the complaint pending a redaction agreement with the
> assigned judge but there are never any guarantees.
>
> Thanks,
>
> FMO

A copy of this email is attached as Exhibit 3.

27. The "Julius" referenced in the above email is Julius Schwarz, an officer of Bayrock.

28. The above email, together with the draft SDNY Complaint and the exhibits thereto, were distributed by Ronald Kriss to Mr. Schwarz in the SDNY action. A copy was forwarded to Mr. Sater. We do not know how many times Mr. Oberlander's email was forwarded with the attachments.

29.     On Thursday, May 13, 2010, Mr. Oberlander filed the SDNY

Complaint in the Southern District of New York, and the matter was assigned to the Hon.

Naomi Reice Buchwald.

30.     The SDNY Complaint was made available to the public for

download through a paid online news service, "Courthouse News."  We do not know how

many people downloaded the SDNY Complaint from Courthouse News.

31.     Later that day, upon learning of the filing, my partner, Brian

Herman, and I called Mr. Oberlander to demand that the Sealed and Confidential

Materials be withdrawn and returned.

32.     Mr. Oberlander informed us that he had retained his own counsel,

an attorney named David Lewis, to address his disclosure of the Sealed and Confidential

Materials.

33.     Mr. Lewis refused to disclose how his client, Mr. Oberlander, had

obtained the Sealed and Confidential Materials and refused to return the Sealed and

Confidential Materials.

34.     Mr. Lewis also stated that Mr. Oberlander had made an

unsuccessful application to have the Materials filed under seal in the Southern District,

and that he was amenable to a joint application to Judge Buchwald.

35.     Mr. Lewis, Mr. Herman and I subsequently spoke with Judge

Buchwald on May 13, and Judge Buchwald immediately issued an order preventing

further dissemination of the SDNY Complaint, the exhibits thereto and the information

therein (the "First Order").  (Exhibit 4).  Judge Buchwald indicated during the telephone

conference that any application for return of the Sealed and Confidential Materials or inquiry into the disclosure should be directed to this Court.

36.     On information and belief, a copy of the First Order was sent by Mr. Oberlander to each person to whom he had previously sent the SDNY Complaint. However, we do not know whether the SDNY Complaint and the exhibits were distributed further.

37.     On May 14, 2010, at the request of Morgan Lewis, Courthouse News removed the SDNY Complaint from its website and sent a copy of the First Order to each person who had downloaded the SDNY Complaint.

38.     On May 14, 2010, Judge Buchwald issued a second order (the "Second Order") sealing the SDNY Complaint in its entirety pending further order of the Court.  (Exhibit 5).  Judge Buchwald further ordered that a redacted version of the original complaint, redacting any sealed documents or references to sealed documents, be filed by May 19, 2010.

39.     On May 17, 2010, Courthouse News ran a news story disclosing information from the SDNY Complaint.  At the request of Morgan Lewis, the story was taken down, but we do not know how many people read the story while it was still posted.

**Mr. Sater Seeks Relief**

40.     To summarize:

- Mr. Oberlander and one or more of his clients are in possession of the Sealed and Confidential Materials;

- Mr. Oberlander refuses to disclose how he obtained the Sealed and Confidential Materials and refuses to return them;

- Mr. Oberlander, aware of the confidential nature of the documents, has distributed the Sealed and Confidential Materials and the SDNY Complaint referencing the Sealed and Confidential Materials, and the recipients may have further distributed that information;

- As a direct result of Mr. Oberlander's actions, the SDNY Complaint referencing the Sealed and Confidential Materials was posted for download to the public and was used as the basis for a news article.

41.     Based on the foregoing, we respectfully request that this Court issue an order requiring Mr. Oberlander, his clients and anyone else who has received the Sealed and Confidential Materials or documents referencing the Sealed and Confidential Materials to immediately return all copies to Mr. Sater.  Further, in order to fully effectuate relief, we ask that the Court conduct a hearing to determine how this disclosure occurred and the extent to which the Sealed and Confidential Materials were disseminated.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.  Executed on May 18, 2010.


Kelly Moore

**COURT OF CHANCERY**
OF THE
**STATE OF DELAWARE**

LEO E. STRINE, JR.
VICE CHANCELLOR

New Castle County Courthouse
500 N. King Street, Suite 11400
Wilmington, Delaware 19801-3734

February 19, 2010

Stamatios Stamoulis, Esquire
Stamoulis & Weinblatt LLC
Two Fox Point Centre
6 Denny Road, Suite 307
Wilmington, DE 19809

Kathaleen St. J. McCormick, Esquire
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

John A. Elzufon, Esquire
Elzufon, Austin, Reardon
    Tarlov & Mondell, P.A.
300 Delaware Avenue
Wilmington, DE 19801

RE:     *Jody Kriss v. Bayrock Group, LLC, et al.*
        C.A. No. 4154-VCS

Dear Counsel:

To my chagrin, I realized that the final order in this case was never entered. No one

brought to my attention this omission. The order had been finalized but not entered some

months ago. Here it is. I regret the delay. In future, if a delay of this ever occurs and it actually

worries you, please contact my chambers. I do not like to create delay and this was an error of

omission in filing, as the order had been finalized by me in late September.

Very truly yours,

*/s/ Leo E. Strine, Jr.*

Vice Chancellor

LESJr/eb

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| JODY KRISS, for himself and derivatively on behalf of the Delaware limited liability companies Bayrock Spring Street LLC, and Bayrock Whitestone LLC, the Arizona limited liability company Bayrock Camelback LLC, the Florida limited liability companies Bayrock Merrimac LLC, and Bayrock Ocean Club LLC, and the New York limited liability company Bayrock Group LLC, | ) ) ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| BAYROCK GROUP LLC; RIF INTERNATIONAL GROUP, INC.; TEVFIK ARIF; JULIUS SCHWARZ; MEL DOGAN; DOGAN & ASSOCIATES; 2027 EMMON AVE LLC; FELIX SATTER (aka FELIX SATER); VICTORIA SATER; ALEX SALOMON; ALEX SALOMON & CO., PC; JOSEPH BENCIVENGA; BUENA VISTA ALARGA LLC; BAYROCK SPRING STREET LLC; BAYROCK WHITESTONE LLC; BAYROCK HOLDINGS LLC; BAYROCK NATURAL STONE LLC; BAYROCK SAPIR ORGANIZATION LLC; 246 SPRING STREET HOLDINGS II LLC; BAYROCK/SAPIR ORGANIZATION HOLDINGS LLC; BAYROCK/SAPIR ORGANIZATION REALTY LLC; 151-45 SIXTH ROAD WHITESTONE PARTNERS LLC; CAMELBACK DEVELOPMENT PARTNERS LLC; STILLMAN BAYROCK MERRIMAC LLC; SB HOTEL ASSOCIATES LLC; 550 SEABREEZE DEVELOPMENT LLC, | ) ) ) ) ) ) ) ) ) ) ) C.A. No.: ) 4154-VCS ) ) ) ) ) ) ) |
| True Defendants, | ) ) |
| And | ) ) |
| BAYROCK GROUP LLC; BAYROCK WHITESTONE LLC; BAYROCK CAMELBACK LLC; BAYROCK MERRIMAC LLC; BAYROCK OCEAN CLUB LLC; BAYROCK SPRING STREET LLC, | ) ) ) ) ) |
| Nominal Defendants. | ) ) |

**FINAL ORDER**

IT IS HEREBY ORDERED, this 19th day of February, 2010 for the reasons set forth in the September 16, 2009 bench ruling of the Court, that:

1. As to all Defendants, all claims pled in the Complaint are dismissed without prejudice for lack of subject matter jurisdiction, pursuant to Court of Chancery Rule 12(b)(1).

2. As to all Non-Resident Defendants named in the Complaint as defined in the Bayrock Defendants' Opening Brief, all claims pled in the Complaint are dismissed without prejudice for lack of personal jurisdiction, pursuant to Court of Chancery Rule 12(b)(2).

3. As to the Resident Defendants named in the Complaint as defined in the Bayrock Defendants' Opening Brief, all claims pled in the Complaint are dismissed without prejudice for failure to join indispensible parties, pursuant to Rule 12(b)(7).


    Plaintiff's Complaint is dismissed without prejudice, as opposed to with prejudice, solely so that the doctrine of *res judicata* does not preclude Plaintiff the opportunity to bring his claims before an arbitrator or, if certain claims are held not to be arbitrable, in a forum, such as the New York state courts, which can appropriately exercise jurisdiction over all Defendants and which is convenient. Of course, the reasons for dismissing this Complaint will retain their force into the future, and therefore an attempt by Plaintiff to bring these claims again in this Court will result in dismissal for the same reasons stated in the Court's bench ruling and which are summarized in this order.


                                              */s/ Leo E. Strine, Jr.*
                                              Vice Chancellor

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

JODY KRISS, for himself and              :
derivatively on behalf of the Delaware   :
limited liability companies Bayrock       :
Spring Street LLC and Bayrock             :
Whitestone LLC, the Arizona limited       :
liability company Bayrock Camelback       :
LLC, the Florida limited liability        :
companies Bayrock Merrimac LLC and        :
Bayrock Ocean Club LLC, and the New       :
York limited liability company Bayrock    :
Group, LLC,                               :
                                          :
                Plaintiff,                :
                                          :
           v                              :     Civil Action
                                          :     No. 4154-VCS
BAYROCK GROUP LLC; RIF INTERNATIONAL      :
GROUP, INC.; TEVFIK ARIF; JULIUS          :
SCHWARZ; MEL DOGAN; DOGAN & ASSOCIATES;   :
2027 EMMONS AVE LLC; FELIX SATTER         :
(a/k/a FELIX SATER); VICTORIA SATER;      :
ALEX SALOMON; ALEX SALOMON & CO, PC;      :
JOSEPH BENCIVENGA; BUENA VISTA ALARGA     :
LLC; BAYROCK SPRING STREET LLC; BAYROCK   :
WHITESTONE LLC; BAYROCK HOLDINGS LLC;     :
BAYROCK NATURAL STONE LLC; BAYROCK        :
SAPIR ORGANIZATION LLC; 246 SPRING        :
STREET HOLDINGS II LLC; BAYROCK/SAPIR     :
ORGANIZATION HOLDINGS LLC; BAYROCK/       :
SAPIR ORGANIZATION REALTY LLC; 151-45     :
SIXTH ROAD WHITESTONE PARTNERS LLC;       :
CAMELBACK DEVELOPMENT PARTNERS LLC;       :
STILLMAN BAYROCK MERRIMAC LLC; SB HOTEL   :
ASOCIATES LLC; 550 SEABREEZE              :
DEVELOPMENT LLC,                          :
                                          :
                True Defendants,          :


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                CHANCERY COURT REPORTERS
                New Castle County Courthouse
             500 North King Street - Suite 11400
                Wilmington, Delaware 19801-3768
                      (302) 255-0524

2

1        -and-                          :
                                        :
2    BAYROCK GROUP LLC; BAYROCK WHITESTONE   :
     LLC; BAYROCK CAMELBACK, LLC; BAYROCK    :
3    MERRIMAC LLC; BAYROCK OCEAN CLUB LLC;    :
     and BAYROCK SPRING STREET LLC;          :
4                                        :
                    Nominal Defendants.  :
5
                         - - -
6
                         Chancery Courtroom No. 12A
7                        New Castle County Courthouse
                         500 North King Street
8                        Wilmington, Delaware
                         Wednesday, September 16, 2009
9                        10:01 a.m.

10                       - - -

11   BEFORE:  HON. LEO E. STRINE, JR., Vice Chancellor.

12                       - - -

13   ORAL ARGUMENT ON DEFENDANTS' MOTION TO DISMISS AND
                    RULINGS OF THE COURT
14                       - - -

15   APPEARANCES:

16
         STAMATIOS STAMOULIS, ESQ.
17       RICHARD C. WEINBLATT, ESQ.
         Stamoulis & Weinblatt LLC
18               -and-
         FREDERICK M. OBERLANDER, ESQ.
19       of the New York Bar
            for Plaintiff
20
         BARRY M. WILLOUGHBY, ESQ.
21       KATHALEEN ST. J. McCORMICK, ESQ.
         Young, Conaway, Stargatt & Taylor LLP
22          for Bayrock Defendants

23       JOHN A. ELZUFON, ESQ.
         Elzufon, Austin, Reardon, Tarlov & Mondell, P.A.
24          for Defendants Alex Salomon, Alex Salomon & Co,
            PC, and Joseph Bencivenga

                   CHANCERY COURT REPORTERS

3

1              THE COURT:  Good morning, everyone.

2              ALL COUNSEL:  Good morning, Your

3    Honor.

4              THE COURT:  You may proceed.

5              MS. McCORMICK:  Good morning, Your

6    Honor.

7              THE COURT:  Good morning.

8              MS. McCORMICK:  My name is Katie

9    McCormick.  I'm an attorney with Young, Conaway,

10   Stargatt & Taylor.  I'm joined today with my

11   colleague, Barry Willoughby.  We represent a subset of

12   defendants in this action who we have referred to in

13   prior filings as the Bayrock defendants.  Today, to

14   make it easier on myself, I will refer to these

15   defendants simply as defendants.  So we do not argue

16   on behalf of all defendants in this action.

17             THE COURT:  Who are you not arguing

18   on?

19             MS. McCORMICK:  We are not arguing on

20   behalf of Mr. Salomon, the accountant; Mr. Salomon's

21   firm or Mr. Salomon's former employee, Mr. Bencivenga.

22             THE COURT:  Does he have counsel?

23             MS. McCORMICK:  He does.

24             MR. ELZUFON:  He does, Your Honor.  I

CHANCERY COURT REPORTERS

4

1   represent all three.

2               THE COURT:  Did anyone move on his

3   behalf?

4               MR. ELZUFON:  Your Honor, there's a

5   pleading filed on May 18th which gives my clients the

6   right to answer or otherwise respond 30 days after the

7   amended complaint was filed, because we've been

8   advised all along there's an amended complaint

9   forthcoming.  I don't know what docket sheet it is in

10   the Court, but it was e-filed on May 18th, and I have

11   it right here.

12               THE COURT:  Okay.

13               MR. ELZUFON:  Thank you, Your Honor.

14               MS. McCORMICK:  Thank you, Your Honor.

15               We're here today arguing defendants'

16   motion to dismiss.  Defendants were all engaged in

17   real estate development through subsidiaries managed

18   by defendant Bayrock Group LLC, a New York-based

19   limited liability company.  Mr. Arif, a defendant in

20   this action, a Turkish citizen and a New York

21   resident, is the managing member of Bayrock Group.

22   Many of the Bayrock Group subsidiaries are listed as

23   defendants to this action, and nine of those 18

24   subsidiaries are not Delaware entities.

5

1          Through his complaint Mr. Kriss seeks

2    to enforce a November 10th employment agreement, which

3    we'll refer to today as the November 10th contract, in

4    which he was promised certain membership interests in

5    certain subsidiaries of the Bayrock Group.  This

6    contract defines those entities as the company

7    entities.  The contract, however, does not catalogue

8    these company entities.  Various defendants have been

9    named in this suit by virtue of the plaintiff's claim

10   that they are, in fact, company entities under the

11   agreement.  We dispute this.

12          Mr. Kriss' claim ultimately boils down

13   to whether Mr. Kriss is entitled to any moneys from

14   any of these real estate entities and, if so, how

15   much, if any at all.  This question cannot be resolved

16   without turning to the November 10th contract which

17   governs when Mr. Kriss' membership interests, if any,

18   would vest and to what, if any, moneys in the form of

19   advancements or distributions Mr. Kriss would

20   ultimately be entitled.

21          This contract, which was negotiated in

22   New York and contains a New York choice-of-law

23   provision, contains a binding arbitration clause.

24   This makes sense, given that the uncatalogued entities

CHANCERY COURT REPORTERS

1   it was likely to affect were incorporated in a

2   multitude of different states.  Because the key

3   question in this case is whether Mr. Kriss will be

4   entitled to any moneys from any of the defendant

5   entities, because this question cannot be resolved

6   without turning to the substantive terms of the

7   November 10th contract and because the

8   November 10th contract contains a binding arbitration

9   clause, this Court lacks jurisdiction over this

10  dispute, and the case should be dismissed.

11              But even absent the arbitration

12  clause, this dispute could not be entirely resolved in

13  Delaware, because this Court lacks jurisdiction over

14  20 of the 29 defendants and because many of those

15  defendants, including, at the very least, Mr. Arif and

16  the Bayrock Group, both of whom are signatories to the

17  November 10th contract are indispensable to this

18  action.  For these reasons, the case should be

19  dismissed.

20              Defendants specifically have made

21  three arguments in support of dismissal.  First, the

22  November 10th contract giving rise to plaintiff's

23  claims contains a binding arbitration clause which

24  should be enforced and which deprives this Court of

CHANCERY COURT REPORTERS

7

1   subject matter jurisdiction over this action.  Because

2   the clear and unambiguous language of this clause

3   delegates the question of substantive arbitrability to

4   an arbitrator, we submit that this Court need not

5   consider whether plaintiff's claims are within the

6   scope of the arbitration clause at issue in order to

7   dismiss the action.

8                    THE COURT:  So we leave it to the

9   arbitrator.

10                   MS. McCORMICK:  Correct.  In any

11  event, the claims are, in fact, within the scope of

12  the arbitration clause.  And were this Court to

13  undertake the analysis, it would result in our favor.

14                   THE COURT:  What were your discussions

15  with the other side about this amended complaint?  Why

16  did they not bring it forward, is your understanding?

17                   MS. McCORMICK:  I have no

18  understanding as to why they haven't filed an amended

19  complaint, Your Honor.  It's, frankly, confusing to

20  us.

21                   Second, this Court -- second, this

22  Court lacks personal jurisdiction over 20 of the 29

23  defendants in this action.  Plaintiff bears the burden

24  of establishing a prima facie case for the exercise of

1    Group under Section 18-109 of the LLC long-arm

2    statute -- or LLC implied consent statute.  We don't

3    think the act in itself is enough to establish

4    jurisdiction over the Bayrock Group or Mr. Arif.  And

5    we don't think the allegations are specific enough to

6    support that claim.

7                        THE COURT:  Okay.  Do you have

8    anything else to add at this time?

9                        MS. McCORMICK:  I can continue, Your

10   Honor.  Our third argument is based on the fact that

11   this Court lacks personal jurisdiction over

12   indispensable parties to this action, specifically at

13   the very least Mr. Arif and the Bayrock Group, but

14   also the company entities who plaintiffs contend are

15   signatories to the contract.  We don't agree with this

16   assertion, but -- especially with respect to the

17   specific defendant entities; but because it's

18   plaintiff's contention and this motion is based on the

19   allegations in plaintiff's complaint, we don't think

20   that plaintiff can move forward without these

21   indispensable parties.

22                        THE COURT:  Okay.

23                        MS. McCORMICK:  Should I proceed on

24   the factual background, Your Honor?

CHANCERY COURT REPORTERS

1          THE COURT:   No.   I'm good with that.

2     That's fine.   Thank you.   Let me hear from the other

3     side.

4          MS. McCORMICK:   Thank you.

5          MR. STAMOULIS:   Good morning, Your

6     Honor.   Stam Stamoulis on behalf of Jody Kriss.   I'd

7     just like to introduce our side.   First with me is

8     Jody Kriss, the plaintiff in this matter; our New York

9     counsel, Fred Oberlander, and my partner Rich

10    Weinblatt.

11         THE COURT:   Good morning.

12         MR. STAMOULIS:   Now, Mr. Oberlander

13    will address the merits of arbitrability and the

14    employment contract and where our claim is coming

15    from.   I just wanted to give the Court a brief bit of

16    background of who Mr. Kriss is and why we're here.

17         THE COURT:   No, I don't need --

18         MR. STAMOULIS:   No?

19         THE COURT:   -- splitting an argument.

20    This is a motion to dismiss.   Either handle it

21    yourself or have Mr. Oberlander handle it.

22         MR. STAMOULIS:   Okay.

23         THE COURT:   And I don't want to hear

24    facts not in the complaint.

1              MR. OBERLANDER:  All right.

2              THE COURT:  So I don't want to hear a

3   history of the world.  This is a motion to dismiss.

4              For example, why was the motion -- why

5   is the amended complaint not on file?

6              MR. OBERLANDER:  The amended complaint

7   is not on file because our prior -- my prior local

8   counsel in Delaware specifically advised me when I

9   said to him during its preparation "I think we need to

10  file a books and records before we do an amended

11  complaint because it will be full of derivative

12  complaints."  And I understand from reading Your

13  Honor's transcript in a Bank of America hearing this

14  would be a very advisable thing to do.  And counsel,

15  prior counsel wrote back in an e-mail and said it

16  would just be very foolish.  Just rely on discovery

17  and go ahead and plead.  He subsequently filed a

18  request to leave the case a week later for

19  irreconcilable differences, of which that was one; and

20  within 30 days I replaced him with these gentlemen.

21  And they've been working on the case for 75 days.

22              We have produced a great deal of

23  documents that have been filed.  As to the specific

24  question of why the moment they came in we couldn't

13

1    file an amended complaint, it was their suggestion.

2    And the draft form of the amended complaint is quite

3    complex and very serious and implicates very many

4    serious charges against also new defendants who are

5    not before the Court and shouldn't be mentioned here,

6    that they said "No.  You know what.  We will argue the

7    motion to dismiss but make clear that we do want you

8    to file an amended complaint; No. 2, that the claims

9    in the amended" -- wait, wait --

10              THE COURT:  No.

11              MR. OBERLANDER:  He wanted a books and

12   records demand.  So we did a books and records instead

13   of --

14              THE COURT:  Okay.  Let me advise you

15   all.  You did exactly what the rule -- you stood on

16   what you did and you will live on what you did.  Books

17   and records -- what people are admonished to do is to

18   seek books and records before they file litigation.

19   You can't file an initial complaint, then use books

20   and records to get discovery.

21              So you've got a complaint before me.

22   You chose to stand on it.  Stand on it.  If you've got

23   issues with yourself and your legal judgment and those

24   of your Delaware counsel or prior Delaware counsel,

CHANCERY COURT REPORTERS

14

1  that's all in your sacred sweat lodge on your side of

2  the equation.  I don't want to hear about it, okay?

3  You had an opportunity in response to this to file an

4  amended complaint.  You did not.  So let's focus on

5  what's in your complaint.

6              MR. OBERLANDER:  All right.  But just

7  for the record, I wasn't intending to use books and

8  records as discovery.  Books -- I just wanted to be

9  clear.  Books and records -- since it's filed and been

10  in front of you already, just for books and records

11  runs to the new charges and a new complaint that --

12              THE COURT:  But the point is, once

13  you're in litigation, if you want information for an

14  amendment, you need to either get it through discovery

15  or you need to plead and plead the gateway.  That is

16  the way it works.  It's a sequential thing.  What

17  people who are stockholders are encouraged to do is

18  use their books and records right before they file a

19  litigation.  Once you file a litigation, you can't go

20  around under 220 or an LLC statute equivalent and seek

21  stuff to buttress your complaint.  And Rule 15(aaa) is

22  clear.  It's emphatically clear.

23              MR. OBERLANDER:  It was my

24  understanding that Rule 15(aaa) says that once they

CHANCERY COURT REPORTERS

15

1  file a responsive pleading, you no longer have the

2  right to amend.  You have to petition for leave to

3  amend.  Or is that 15(aa), if you forgive me?  But

4  that --

5                    THE COURT:  No.  What 15(aaa) clearly

6  says is if you want to defeat a motion to dismiss,

7  you're supposed to bring forward your amendment.

8                    MR. OBERLANDER:  Granted, if you --

9                    THE COURT:  If you wish to defeat --

10                    MR. OBERLANDER:  If you wish to defeat

11  it by an amendment.

12                    THE COURT:  By an amendment.

13                    MR. OBERLANDER:  Yes.

14                    THE COURT:  So you don't have your

15  amendment.  So you're standing on your complaint.

16                    MR. OBERLANDER:  All right.  As to

17  personal jurisdiction and conspiracy theory, all

18  right, the -- there has been an affidavit filed in

19  connection with the reply brief alleging acts

20  occurring both in 2005 and 2007 which support

21  conspiracy jurisdiction.  And once conspiracy

22  jurisdiction is established over all of the named

23  defendants, then while they may or may not be

24  necessary, none of them can be indispensable, because

16

1  by definition they would all be subject to

2  jurisdiction.

3              THE COURT:  Where in the complaint

4  is -- your -- your pleading in your complaint is that

5  from the get-go no one intended to honor this

6  contract; right?

7              MR. OBERLANDER:  No.  I'm sorry.  I

8  was going to get to that.  What my --

9              THE COURT:  So that's not in your

10 complaint.  So I -- I didn't read --

11             MR. OBERLANDER:  The way you phrased

12 it, I would have to say no.  I'm not being

13 pettifogging here.  The way you phrased it, I would

14 disagree.  That isn't my complaint.  I'm -- I --

15             THE COURT:  Okay.  Paragraph 57.  "at

16 the time of their execution of that contract" -- this

17 would be the November 10 contract -- "each and every

18 one of ... the Company; and ... the Company Entities;

19 had a secret intention never to honor those

20 obligations."

21             MR. OBERLANDER:  But -- but, Your

22 Honor, in the entire context of a complaint, I don't

23 believe -- I won't argue that it couldn't have be

24 written more clearly, but the complaint does state --

CHANCERY COURT REPORTERS

1    and I can state you the paragraph numbers to support

2    the following:   Here's what -- here's how that

3    complaint is structured.

4                    THE COURT:   Paragraph 71:   "Secretly

5    (and therefore unknown to Kriss), each and every one

6    of the sellers never intended to honor the rights

7    conveyed to Kriss by those securities ...."

8                    MR. OBERLANDER:   Absolutely.   But what

9    we're -- but there's a huge distinction here, a very

10   big distinction that -- that counsel for defendants

11   has glossed over, which is that there are -- to make

12   it simple, there are two separate contracts at issue

13   here.   There are actually 19 of them, but let's just

14   take two, one from the group of 18 and that agreement.

15                   What we have here is the equivalent of

16   a TowerHill situation whereby --

17                   THE COURT:   Will you stick to this

18   case and stick to your complaint?

19                   MR. OBERLANDER:   The complaint says

20   that we signed the contract -- my client signed the

21   contract with them in which they said "We are now

22   giving you membership interests in 18 limited" --

23   well, "in all the limited liability companies known as

24   the company entities.   We're giving you right now

CHANCERY COURT REPORTERS

1   membership interest in them."

2             The complaint then says we're suing

3   those companies issuing those interests because some

4   of those companies absolutely did issue the interest

5   but intended, after issuing them, never to honor the

6   obligations conveyed by those interests.  And the

7   obligations conveyed by those interests are running

8   through the limited liability company agreements of

9   those companies.

10            What we have here is Mr. Kriss signed

11  a subscription agreement, except he provided services

12  instead of money; but in return for that he was given

13  stock in some number of company entities.  Out of that

14  number a subset -- it was completely effective.  He

15  got the stock, but we claim that the companies giving

16  him the stock intended never to honor the dividend

17  rights.  Now, since it's an LLC, we'll say they gave

18  him membership interests, intending never to honor any

19  of the rights and obligations, including

20  distributions, but it would be the same concept.

21            So what that complaint doesn't say,

22  when Bayrock, the parent company, entered into this

23  contract, it had a secret conspiracy with its managers

24  and with its 18 controlled subsidiary-related

CHANCERY COURT REPORTERS

1  companies.  And pursuant to that conspiracy, it would
2  cause all 18 of them to issue stock to him, but the 18
3  of them would then -- excuse me; membership interest,
4  but the 18 would then, although he would now be bound
5  by their limited liability company agreements, the 18
6  of them would never honor them.
7            Now, at the time we assumed, because
8  of evidence that we would produce at trial, we assumed
9  that some of the 18, they legally ineffectively
10 couldn't actually make the transfer of interest
11 because they didn't have the power and some they did.
12 That complaint has been misrepresented.
13            Counsel in their opening brief in
14 support of the motion to dismiss says that we have
15 alleged in paragraph 39 that the document -- that the
16 November 10th subscription agreement, employment
17 agreement, call it what you will, they say that in
18 paragraph 39 we claim it was legally ineffective as to
19 convey membership interests in any of the other
20 companies.  That is absolutely not the case.
21            What happened is, I was advised we
22 cannot do fictitious pleading in Delaware.  So
23 paragraph 39 of that complaint says that there is a
24 group of companies, a subset of company entities --

20

1    and we will call that subset Class A.   As to those,

2    they had no power to convey the membership interests

3    and, therefore, perpetrated a fraud, and those

4    companies participated in the fraud along with

5    Bayrock.

6              As to all the other companies not in

7    Class A, they had the right, did give him -- and if

8    you look at paragraphs 108 and 110, I believe, you

9    will see that we affirmatively allege as to Bayrock

10   Whitestone and as to Bayrock Spring Street that he was

11   instantly made a member of them.   And that's why there

12   are derivative pleadings based on them.

13             So when Your Honor said to me are we

14   basically saying the November 10th contract was

15   intended not to be honored, the answer is absolutely

16   not.   Not only that, we are simply -- everything we

17   are doing in this Court -- that we intend to do in

18   this Court and that we want to do in this Court

19   relates to claims of breaches of the limited liability

20   company agreements and not of that November 10th

21   contract.   That's why I cite to Parfi, to TowerHill,

22   to all of the cases involving dueling contracts.

23             This case is about -- and secondly --

24   if you will forgive me, let me backtrack.   Secondly,

CHANCERY COURT REPORTERS

21

1  counsel for defendant has said that we are making a

2  claim for distributions we didn't get.  I'd appreciate

3  counsel showing me where in that complaint it is,

4  because under no circumstances does that complaint say

5  anything about distributions that he should have

6  gotten and didn't get.  We didn't make that complaint

7  in that -- there's no claim for such a thing in there.

8           THE COURT:  Well, you say -- what do

9  you mean by "cheated out of millions of dollars"?

10          MR. OBERLANDER:  Well, that's -- so

11 it's in terrorem.  It's part of the text of pleading,

12 but there's no claim.  There's claims for various -- I

13 didn't make a claim for money damages for

14 distributions he didn't get.  She said I did.  I

15 didn't.  There is no claim saying as a result of X,

16 when X happened, he should have got a distribution of

17 Y.  That's just not in the complaint.

18          THE COURT:  Right.  The fact that you

19 have an extraordinarily vague complaint and you're

20 seeking to take advantage of it?  You have a prayer

21 for relief including without limited -- limitation

22 money damages.

23          MR. OBERLANDER:  Well, this is a court

24 of equity.  And while I did ask for money damages, I

CHANCERY COURT REPORTERS

1   also asked -- pled in the alternative --

2                    THE COURT:  That isn't what you just

3   said.  You said it was unfair for your adversary to

4   indicate that one of your beefs was withheld

5   distributions, even though in the complaint you

6   specifically say -- you refer to millions of dollars

7   that your client supposedly didn't get.  Then you ask

8   for money damages.

9                    MR. OBERLANDER:  But it's pled with

10  absolute -- the pleadings, the pleadings -- and she

11  didn't object to failure to -- I don't see any motion

12  to dismiss for failure to state a cause of action.

13                   THE COURT:  It's not the point.  You

14  just said that your complaint was mischaracterized by

15  the -- indicating that somehow it encompassed a claim

16  for lack of receiving distributions or something like

17  that.

18                   MR. OBERLANDER:  A claim for

19  distributions due and not paid pursuant to a limited

20  liability company agreement would be a direct cause of

21  action for breach of the limited liability company

22  agreement.  And I don't have such a claim in there.

23                   What I claimed in there --

24                   THE COURT:  I'm sure that's helpful

CHANCERY COURT REPORTERS

23

1     for counsel to know.

2                    MR. OBERLANDER:  But I didn't claim

3     for it.

4                    THE COURT:  Okay.

5                    MR. OBERLANDER:  All right?

6                    THE COURT:  I would have thought when

7     you complained that you lost -- your client didn't

8     access to millions of dollars and sought money damages

9     and was saying that he --

10                    MR. OBERLANDER:  I understand that as

11    a matter of notice pleading that one could assume that

12    that's the beef; but, in fact, no -- no facts are

13    alleged in there, really, that took place after 2005.

14    That complaint is limited to facts that occurred in

15    2005 other than for background it explains that yes,

16    later on, he would wind up being cheated of millions.

17                    But, in fact, the amount of damages

18    based on the theory of fraudulent inducement or

19    restitution or whatever you want -- the amount of

20    damages that complaint would provide, if it went into

21    trial and went into judgment, the measure of damages

22    that the complaint would allow would be what -- for

23    example, under one theory, what is it which, had he

24    been given the interest that he couldn't have been

CHANCERY COURT REPORTERS

1   given because the Class A companies had no right to

2   give it to him, what would he have received.  So he

3   was cheated out of millions of dollars from the Class

4   A companies because they said "Here.  Here's your

5   stock in Class A companies."  They knew darn well that

6   they had no right to give it to him, that the

7   conveyance is ineffective; but had it been effective,

8   he would have had millions of dividends flowing

9   through the stock.

10                    In the LLC context, "Here are your

11   membership interests in six Class A companies."  Two

12   years later they're ready to pay off; but the answer

13   is nope, not to him, because they were ineffectually

14   transferred.

15                    So I can say that he was cheated out

16   of millions of dollars, but it doesn't mean that out

17   of distributions.  It means money -- there are

18   multiple theories by which he lost money that can be

19   compensable, none of which run to distributions.

20                    But the bigger --

21                    THE COURT:  Well, that's -- that's

22   good.  I'm glad that you've clarified that for

23   everybody so that people could know what you were

24   thinking when you said this.

CHANCERY COURT REPORTERS

1              MR. OBERLANDER:  Well, I made at least

2    eight separate attempts to talk to opposing counsel

3    during the last several months.  And it might have

4    come up had they been willing to talk; but we got

5    basically "Go away.  We don't want to talk to you"

6    comments from them at all times.

7              When you asked her "Did you ever speak

8    to him" -- I believe you asked counsel whether or not

9    they ever spoke with us about the amended complaint.

10   No, because they wouldn't simply speak with us.  Don't

11   answer phone calls.  My colleague there will explain

12   more, because he made more of the phone calls than I

13   did.  In fact, I only called once yesterday, and I

14   think everything else was e-mail.  I don't want to be

15   misquoted.

16             But if Your Honor would please look at

17   paragraph 39 of my complaint, paragraph 39 makes it

18   very clear that we are saying "There is a class of

19   companies in which you said" -- "you're giving him

20   stock and you legally couldn't do it, and you knew

21   that."

22             Now, it doesn't say it was ineffective

23   as to all the companies.  There are companies for

24   which the transfers were effective.  Those are the

CHANCERY COURT REPORTERS

1    ones not in Class A; but specifically alleged in there

2    in 108 and 110 are that two companies, Whitestone

3    and -- Whitestone and Spring Street, that it was

4    effective, and he became a member on November 10th.

5                    Now, Mr. Arif filed a sworn affidavit

6    in support of the opening brief for the motion to

7    dismiss.  And in that affidavit he says that he did

8    give -- or he caused these companies to give interests

9    to Kriss, and he said some of the company entities

10   were formed in Delaware; but other than that, nobody

11   on this group ever had anything to do with Delaware.

12                    So if he's in here stating under oath

13   that "We formed some company entities in Delaware and,

14   No. 2, that's all we ever did in Delaware," then it

15   should be obvious logistically that every company they

16   formed in Delaware is a company entity.  Whitestone

17   was formed in Delaware, and Spring Street was formed

18   in Delaware.  So as far as we're concerned, they've

19   now admitted as fact that Spring Street and Whitestone

20   are company entities.

21                    Now, we actually alleged in the

22   complaint that they're company entities.  And in the

23   answer that they filed two days after their motion to

24   dismiss so that we couldn't file an amended complaint

CHANCERY COURT REPORTERS

1   at the time, which is why it didn't get done with

2   prior counsel, what happened is that they filed a

3   motion to dismiss.  And then we said "Now, gee, why

4   did you do that?  We're still going to file an amended

5   complaint."  And it may be that there was a lot of

6   work done for nothing.  And he wrote back,

7   Mr. Willoughby, "Well, no, you can't do that because

8   under 15(aaa) we filed a responsive pleading."

9           And my counsel at the time wrote back

10  and said "That's news to us.  Please enlighten us why

11  a motion to dismiss is a responsive pleading."

12          So two days later they filed a

13  perfunctory -- you talk about perfunctory -- they

14  filed a perfunctory answer.  There's no reason they

15  filed that answer other than to stop me from being

16  able to file an amended complaint without leave.

17          But --

18          THE COURT:  They filed an answer?

19          MR. OBERLANDER:  Yes.  They filed an

20  answer two days after the motion to dismiss.  And if

21  you look at the e-mail trails that are in our reply

22  brief, you will see that it was specifically done just

23  to stop me from filing an amended complaint as of

24  right.  They filed a motion to dismiss on May 13th, I

1    think, and then on May 16th filed an answer.

2              But if I may, you know, and standing

3    on this complaint, I would be perfectly willing to do

4    the following:  I will be -- first of all, in their --

5    in their reply brief -- I'm sorry.

6              In their reply brief they

7    affirmatively allege that they did transfer the

8    interests in all company entities.  That's in there.

9    It specifically says in order to effectuate the

10   profits' interest in the Bayrock enterprise or

11   whatever you want to call them, in order to effectuate

12   them, the limited liability company agreements of all

13   of the company entities were modified and amended to

14   incorporate the provisions of Section 4.  That's a

15   paraphrase of three consecutive sentences.

16             Since they allege that all the company

17   entities were properly modified as to their limited

18   liability agreements, we stipulate to that.  We

19   withdraw the entire Class A section of the complaint;

20   and, therefore, we stipulate to their allegation that

21   all of the limited liability company agreements of all

22   of the company entities were, indeed, amended.  And

23   every cause of action with which we wish to proceed is

24   for breach of those limited liability company

1   agreements, absolutely none of which have arbitration

2   provisions in them.  And in their own argument they

3   say -- in their own opening brief they say that

4   Section 4, which has -- of the employment agreement,

5   which has to do with the rights of the membership

6   interests, that section and no other section was

7   incorporated into those LLC agreements.  We now

8   stipulate to that and agree that the LLC agreements of

9   every single company entity were modified on

10  November 10th to incorporate exactly Section 4 and no

11  other section.

12                  THE COURT:  Okay.  Thank you, sir.

13                  Tell me about this answer.

14                  MS. McCORMICK:  We filed an answer in

15  May, Your Honor.

16                  THE COURT:  Why didn't you say that

17  when I asked you about this thing about the amended

18  complaint?

19                  MS. McCORMICK:  We understand -- first

20  of all, it's our understanding, Your Honor, that

21  filing an answer does not preclude a party from

22  seeking leave to file an amended complaint.  We don't

23  know why they haven't filed the motion for leave to

24  file an amended complaint.  And that was the nature of

30

1    my response to Your Honor.

2                    THE COURT:   So you were just trying to

3    do it so that they wouldn't necessarily be able to

4    file a motion with leave as of right?

5                    MS. McCORMICK:   Right.   Your Honor we

6    wanted to preserve our opportunity to oppose the

7    motion for leave to file an amended complaint.   We

8    wanted the opportunity to review the complaint and,

9    based on the same frivolity that they filed their

10   initial complaint, argue to Your Honor, you know, on

11   the basis that you can oppose the filing of an amended

12   complaint.

13                   THE COURT:   Thank you.

14                   MS. McCORMICK:   It's our

15   understanding, Your Honor, that even if you assume

16   everything that -- that counsel for plaintiff has

17   stated with respect to what he intended when he

18   drafted the complaint to be true, even if you assume

19   all of those things, that you still can't escape the

20   November 10th contract's arbitration clause, because

21   the issue of standing is still contested and because

22   that clause itself governs substantive rights with

23   respect to any of the company entities it purportedly

24   vests membership interests in.

CHANCERY COURT REPORTERS

31

1           And the reason for that is, in the

2   contract itself, which Your Honor was provided a copy

3   of in the form of Exhibit A to our opening brief, the

4   contract states that plaintiff is entitled to certain

5   advancements immediately and separately and later he

6   would be vested with membership interests, and any

7   distributions in the interests in those entities that

8   he was entitled to would be counted against any

9   advancement he had received.

10          So the issue of what money plaintiff

11  would ultimately be owed in any of those entities

12  cannot be considered without looking at the

13  November 10th contract.

14          And even if it wasn't pled that that

15  is a breach of action, it's our understanding that

16  that would factor into any award this Court was to

17  give Mr. Kriss, if any at all.

18          It's for that reason that we say that

19  the arbitration clause cannot be avoided.

20              THE COURT:  Okay.  Thank you.

21              MS. McCORMICK:  Thank you, Your Honor.

22              THE COURT:  No.

23              MR. OBERLANDER:  No?  I'm sorry?

24              THE COURT:  I ... We're not doing sur

1   replies here today.

2                I have to say, this is an astonishing

3   circumstance for many reasons.  But I'm going to give

4   you my ruling.  Then I'll give you some advice.

5                It may well be at the bottom of this

6   that some serious wrong has been done to Mr. Kriss.  I

7   have no idea.  What I do know is that there are

8   multiple reasons why this -- the complaint before me

9   needs to be dismissed.  Start with the first reason

10  that the other side advances, which is the arbitration

11  clause.  A reading of the complaint brings everything

12  back to the November 10th agreement.  The complaint

13  itself alleges that the company entities are parties

14  to that agreement.  That agreement has a broad

15  arbitration clause.  Rather than grapple with the

16  governing law, the plaintiffs cited Delaware law,

17  which is inapplicable.  Frankly, the Delaware law that

18  they cited doesn't help them.

19                After the Willie Gary decision of the

20  Delaware Supreme Court, it's been very clear that when

21  parties incorporate the AAA rules, they reverse the

22  presumption that arbitrability is for the -- for the

23  Court and it is for the arbitrator.  In the McLaughlin

24  decision reported at 942 A. 2d 616 -- and I believe

1    it's the Carder -- I think it's C-a-r-d-e-r.  I think

2    it's the decision of Vice Chancellor Parsons just

3    issued within the week -- it's made emphatically clear

4    that if there's any colorable dispute about

5    arbitrability in the event of the incorporation of the

6    AAA rules, that dispute is decided by the arbitrator.

7    Our Supreme Court made very clear in Willie Gary that

8    it was adopting the federal majority view, and that is

9    an efficiency-based view.

10                   The point is not that arbitrability

11   goes only to the arbitrator when there's no dispute

12   about arbitrability.  That's a silly rule.  The idea

13   is, in the event that there's a dispute about

14   arbitrability, who makes the call.  Willie Gary says

15   when you incorporate the AAA rules, it's the

16   arbitrator, except in some unusual circumstances.

17                   New York is even more powerful, and

18   that's what matters here.  Willie Gary and Delaware,

19   Parfi, TowerHill, memories of mine, are irrelevant,

20   irrelevant.  The contract at issue here is a New York

21   law contract, specifically New York law without regard

22   to choice of law.  The issue of arbitrability is then

23   one of New York law.

24                   The New York cases are clear.  They

34

1  adopt the federal majority standard.  When you pick

2  AAA, arbitrability is for the arbitrator.  Here, you

3  have a broad arbitration clause which in court --

4  keeping with the New York authority, which was cited

5  in the defendants' briefs and cited accurately -- if

6  you have a broad arbitration clause -- and this is a

7  broad arbitration clause -- and you incorporate the

8  AAA rules, there's clear and unmistakable evidence

9  that arbitrability is for the arbitrator.

10              There is some quibbles about

11 arbitrability made by the plaintiffs.  One of them

12 relates to a clause which does have some -- some color

13 to the argument, which is this idea about who is --

14 who has to arbitrate.  They have an argument about how

15 it's read.  There's another reasonable way to read it,

16 however.  And that's the point.  Which is if -- there

17 may be certain nonsignatories you don't have to

18 arbitrate against, but there are doctrines in law,

19 well-recognized in New York and federal law, in which

20 signatories are bound to arbitrate against

21 nonsignatories.

22              The key issue -- and it is the central

23 issue -- I don't make that call.  The arbitrator does.

24 And if you don't like what the arbitrator says, then

CHANCERY COURT REPORTERS

1  you appeal under the FAA.

2                   What we clearly have is a signatory to

3  a broad arbitration provision who is seeking --

4  frankly, there's no excuse for evading the clause as

5  to the company entities or the parties that you

6  concede are signatories, none.  None pled.

7                   Clearly also on the -- if you want to

8  get into the merits of stuff, arbitrability, but it

9  goes to the colorability -- what I'll say is the clear

10 colorable claim that there's -- that all these claims

11 are arbitrable.  The complaint itself links everything

12 to the agreement.  Mr. Kriss was supposed to provide

13 certain services under the agreement.  In exchange he

14 got certain rights, rights in these LLCs, which were

15 denied to him.

16                   Despite counsel's -- counsel may want

17 to say that there were certain things given; for

18 example, that he got his interests in certain of the

19 LLCs.  Well, his pleading, the pleading is

20 emphatically clear that Mr. Kriss was denied his

21 rights under these agreements on a continuing basis.

22 And it is alleged that the defendants never intended

23 to honor the contract rights, such that it is alleged

24 that they breached the contracts, they breached the

36

1    November 10th contract, and there's even an implied

2    covenant claim under those contracts.  It's also made

3    plain that the contract rights are intertwined with

4    the receipt rights.  He was supposed to get money in

5    certain phases and other sorts of things.  It's a

6    complicated arrangement.

7                    There's also an evident reason why you

8    use an arbitration clause with respect to a

9    multiplicity of entities incorporated or domiciled, as

10   the case may be, since they're not necessarily

11   corporations, in different jurisdictions.  So that

12   everybody could come together, which is why Mr. Kriss

13   alleges that the company entities are, in fact,

14   parties to the agreement.  People could read it

15   otherwise, but his allegation is that they are parties

16   to the agreement.  And his contractual promise, if he

17   had a dispute about it or relating to his agreement,

18   that he would arbitrate that.

19                    All of which is -- in terms of getting

20   to the merits of substantive arbitrability, I'm not

21   making a call on that, because it is chosen by the

22   parties that the arbitrator does it.

23                    Alternatively, there's another basis

24   to dismiss it.  This complaint does not plead any

1  viable basis for jurisdiction over the nonresident

2  defendants.  To the extent that there are some

3  Delaware entities involved, they preexisted in the

4  complaint, they preexisted the contract.  All that

5  Mr. Kriss says is that among the company entities were

6  certain Delaware entities, and he was supposed to get

7  interest in those.  Well, among the many of the

8  entities were Florida entities.  He was supposed to

9  get entities in -- he was supposed to get interest in

10  them.  Those entities preexisted this contract.  They

11  weren't formed.  And this complaint doesn't plead

12  anything about later events.  I'll get to some of the,

13  you know, musings about what might be in an amended

14  complaint some day; but this complaint pleads none,

15  nothing.

16         Also, what it doesn't do is identify

17  really anything except it says that Mrs. -- you know,

18  Mrs. ... is it Sharif?  Arif was in cahoots, the

19  accountant was in cahoots, the lawyer was in cahoots.

20  Doesn't tie anything to any act in Delaware.

21         The thing that was used was the

22  long-arm statute.  I'm extremely well-versed in it.

23  I'm happy -- I contributed to the jurisprudence to

24  this state on many times about 3104 and the agency

CHANCERY COURT REPORTERS

38

1   theory and how it works in concert.  You have to have
2   an act in Delaware.  None -- and it has to be a
3   substantial act in furtherance of conspiracy.  Nothing
4   like that is pled.
5                   And, in fact, I think constitutionally
6   here, the exercise of jurisdiction is highly suspect.
7   Usually when someone tries to invoke the conspiracy
8   theory of jurisdiction, it's because there's been an
9   act, formation of a Delaware entity or something in a
10  transaction where Delaware law is the focus of what's
11  going on.
12                  What's astonishing here is the
13  invocation of this Court's forum -- the forum of this
14  state in a case that's so redolent of the Gotham
15  state.  Sorry.  This is New York, New York, New York.
16  And you read in the complaint Mr. Kriss, is he a
17  Delawarean?  No.  He resides in New York.  In fact,
18  his address under the contract is 75th Street.
19  Bayrock Group, the key central entity, New York
20  limited liability company with its principal place of
21  business in New York.  Mr. Arif, identified as a
22  Turkish national residing in New York.  Sater, a
23  resident of New York.  Schwarz, he's in New Jersey, I
24  suspect the part of New Jersey closer to New York than

1   to Delaware, because what?  He's an attorney licensed

2   in New York and represents Bayrock.  Dogan &

3   Associates, law firm, principal office, New York.

4   Dogan, attorney licensed to practice in New York.

5   Salomon, New York professional corporation.  Alex

6   Salomon, CPA, New York.  Bencivenga, CPA, New York.

7   Mrs. Sater -- Sater, Arif's -- is the wife of Sater.

8   I suppose she lives with her husband in New York.

9               If you look at the company entities,

10  their principal places of business, even the Florida

11  and Delaware entities, the principal place, a business

12  of all of them is -- where it's identified is New

13  York.  The contractual choice of law is New York.

14               So this contract is all about New

15  York.  All of the rights that go forward are linked

16  into the contract.  And I don't know how it would give

17  anybody a reasonable basis, if I were in New York

18  entering into a New York law contract as to the fact

19  that there was some interest given in preexisting

20  Florida and Delaware entities, how I would know that I

21  would be hauled in to court on this complaint.  I

22  don't believe it's -- it's constitutionally fair

23  notice, and there's no proper statutory basis for

24  service.

40

1         Given that, these are clearly

2  indispensable parties.  One of the reasons why, again,

3  people do dispute resolution clauses like arbitration

4  clauses, when you have people in different places, is

5  to bring them altogether.  There are Florida law

6  entities here.  There are entity -- there are people

7  who live exclusively in New York.

8         I also say the complaint is wholly

9  devoid of specific evidence of involvement of these

10  people.  Basically just throwing professionals into

11  the mix by saying there is one contract -- there is

12  one paragraph that I guess gets a little bit more

13  specific.  There's some -- "November ... 2005 ...

14  communications between Issuers and their counsel and

15  such other persons and ... Salomon ... in which they

16  [were] warned of the absence of such authority"; but

17  they "[weren't] known to Kriss at that time."

18         That's about it.  Most of the stuff is

19  very vague, and it certainly doesn't -- if you -- if

20  you have a fraud standard under Rule 9 and you want to

21  use the agency theory of jurisdiction, there's nothing

22  linking these people to any formative activity.

23         So arbitration under New York law,

24  established New York law in this context is for the

41

1 arbitrator.  Alternatively, there's no personal

2 jurisdiction pled for the nonresident defendants,

3 either, as a matter of statutory law or constitutional

4 due process.  And in the absence -- and -- and there

5 are also -- this Court also, therefore, would not be

6 able to have indispensable parties.

7                     Now, let's talk about going forward.

8 I am going to dismiss this without prejudice through

9 the institution of a complaint in New York if the

10 arbitrator determines that there are claims that

11 aren't arbitrable.  It is with prejudice as to any

12 filing in this Court.

13                     I make that judgment -- I -- I don't

14 necessarily applaud what the defendants did with

15 respect to filing an answer, but it did not preclude

16 the plaintiffs from seeking to amend.  And the

17 plaintiffs, if they wish to amend, should have

18 amended.  There's a sprawling, complicated,

19 difficult-to-follow recitation in an answering brief

20 of some new theory.  I don't believe it's actually

21 that distinct from the old theory.  I think the old

22 theory was "We basically told this guy he would get

23 interest in these things."  The contract spelled out

24 what those interests were and how it worked with his

CHANCERY COURT REPORTERS

42

1   draw and other kinds of stuff.  And they never really

2   intended to honor it.  And certainly when things went

3   well, they didn't.

4                     And then there's some example in this

5   new thing of how -- you know, the point is that some

6   of the entities may have actually given him a

7   membership interest.  I don't know.  It's hard to tell

8   whether anybody got any certificates or anything

9   noticing an interest or anything from what's pled.  I

10  mean, it's not -- "pled" is the wrong word.  Not

11  "pled"; put in a brief.

12                    Why you put in an amended complaint

13  and why AAA is the way it is, so that you can take

14  your shot.  If you don't like the first shot you did

15  when they compiled their motion to dismiss, they give

16  you -- in their brief they give you what their

17  concerns are.  You have the chance to obviate, you

18  know, those concerns and to address them by bringing

19  forth a new pleading.  You don't get the chance to say

20  in your brief what a pleading might look like.

21                    Honestly, counsel sitting there

22  telling me that the other side was supposed to

23  interpolate what he meant by his pursuit of monetary

24  damages, what he meant by his accusation that

43

1    obligations owed to Mr. Kriss allegedly under the

2    November 10th agreement, that -- remember, under the

3    November 10th agreement -- and this is why the

4    arbitrability point is colorable -- those -- that

5    contract said you get certain rights in entities and

6    entities would do certain things to give Mr. Kriss

7    rights.   Well, how anyone's supposed to know, when the

8    complaint refers to -- refers to millions of dollars

9    that he was not given and seeks monetary damages that

10   somehow in this first complaint it wasn't dealing with

11   distributions he was denied; only some other category?

12   Who's supposed to know that?   Most plaintiffs would

13   stand up and say "Of course it encompassed all the

14   elements of denial."   Now it's "Oh, no.   We were

15   waiting for later to bring that on."

16              This kind of guessing game is not

17   going to be useful to Mr. Kriss going on or to any

18   tribunal trying to make sense of this.   And you have

19   your shot to bring an amended complaint.   You didn't

20   use it.   I could dismiss it with prejudice entirely in

21   some ways, but I'm -- the condition is going to be,

22   you can take your shot in New York if you're going to

23   bring another case back in court, but not here.

24              And I will also say in terms of --

44

1   this forum non conveniens is not easy to establish in
2   Delaware; but if there's -- this is the kind of case
3   where I believe our Supreme Court would be highly
4   sensitive to inclination of this Court to grant a
5   motion to dismiss for lack of proper forum.
6           Why do I say that?  Well, what -- why
7   we usually give credence to plaintiffs is because our
8   state has some real nexus to what's going on.  Our law
9   is really at stake, for example, in the business
10   context.  That is not what is going on here.
11           The root of the wrong pled is that
12   Mr. Kriss was contractually promised interest in a --
13   in a real estate empire that operated through multiple
14   entities, and then from the get-go the intention of
15   the people who lured him in to give his services was
16   to not honor that promise.  The holding company,
17   ultimate holding company is a New York company.  The
18   core contract is a New York law contract.  Mr. Kriss
19   is a New Yorker.  The people he dealt with were New
20   Yorkers.  He dealt with them in New York.  The fact
21   that some of the subs were in Delaware really doesn't
22   drive the analysis.
23           They are also in Florida.  We have
24   blue crabs.  They do that stone crab thing.  I don't

CHANCERY COURT REPORTERS

1    really understand it.  New Yorkers do oysters.  And --
2    but the point is, Delaware doesn't have much to do
3    with this.

4                    And then I hear that in the
5    unspecified amended complaint there's going to be a
6    holy host of others joining us.  Well, there's one
7    state where it's very obvious the parties centered
8    their activity, where all the defendants -- there's
9    not one defendant in here, if it's not arbitrable, who
10   can't be subject to service in New York, not one.
11   From what's pled, all the Delaware entities and all
12   the Florida entities had their principal place of
13   business in New York.  The accountants practice in New
14   York.  The lawyer practices in New York.  The wife's
15   in New York.

16                    The law at issue is going to be New
17   York.  The fraud law is New York.  The contract law,
18   the tort law, it's all New York.  Entity -- what we're
19   going to do is say a subsidiary -- some subsidiary
20   denied Mr. Kriss rights?  That's not even the theory;
21   right?  The theory is that these were subs to shells
22   of the holding company, right, and that the dude who
23   controlled the holding company, Arif, made all the
24   decisions.  That's the theory.

CHANCERY COURT REPORTERS

1    The holding company is a New York

2   company.  The contract that gave Mr. Kriss rights in

3   any of these entities is a, by its express terms, a

4   New York contract.

5    So I want you all to work on

6   scrivening the thing.  You need to take your shot in

7   arbitration.  And if you -- if it doesn't go in New

8   York -- arbitration, you can file in New York; but

9   this case is going to be dismissed in total, because

10   the reasoning for it applies, frankly, to the

11   defendant who has not moved.  And I'm sorry if there

12   were misunderstandings with counsel.  I don't know

13   what that's about, I really don't.  I don't understand

14   how anybody reasonably could read the rules of this

15   Court or the procedural context that this is in, even

16   given the filing of an answer, and not know that if

17   you wish to bring on an amended complaint, you do it.

18    But one of the things here is, there's

19   absolutely no explanation for why the arbitration

20   clause doesn't apply against Mr. Arif, why it doesn't

21   apply against the company entities as to the core

22   issue pled in this complaint, which is clearly a

23   breach of contract action.  Also, all the other

24   things, clearly there's a colorable argument that

47

1    they're related and swept in by the arbitration

2    clause.

3                    So with respect to the signatory

4    versus signatory issues, there's absolutely no

5    explanation of why those are not in arbitration.  And

6    so I really don't get why, you know, we got to where

7    we are.  But I'm not, frankly, doing Mr. Kriss any

8    favors.  He's pled substantial claims on the merits.

9    If this is real, there's some -- and I have confidence

10   the New York courts or the arbitrator will be

11   sensitive to them.

12                   But there are choices in life you

13   make about where, you know, things are filed.  And you

14   have to respect that.  And that's what I'm saying.

15   This action -- or in New York, if I were keeping this

16   action, this action would be immediately stayed until

17   the arbitration is completed, even if there was

18   nonarbitrable claims.  Why?  It's pretty obvious, that

19   the core issue here of whether there was a breach of

20   the -- of the 2005 agreement, whether that was

21   fraudulently induced, whether there was anything, is

22   central and ought to be determined first and that

23   there's a risk of inconsistent judgments.  Most -- a

24   lot of the individuals brought here are essentially

CHANCERY COURT REPORTERS

48

1    aiding and abetting the primary things.

2                  I won't even comment on -- I don't

3    believe -- nobody attacked this.  I also don't believe

4    that the Arizona or Delaware securities laws apply

5    every time a share of stock or an interest in a

6    Delaware or an Arizona entity is sold.  It would be

7    astonish -- I mean, we could, you know -- Eliot

8    Spitzer could look like a piker in comparison to our

9    Attorney General, then.  I had actually thought -- you

10   talk about sales of securities within the borders of

11   states when you're talking about blue sky laws, you

12   know, because essentially every time a Delaware -- you

13   know, General Motors stock was sold anywhere, you

14   could, you know -- maybe that's the case and our blue

15   sky laws apply.  I just hadn't heard that before.  I

16   would think New York, right --

17                  MR. OBERLANDER:  We don't have any.

18                  THE COURT:  Well ... you don't have

19   any.  You don't have any securities laws?  I mean ...

20                  MR. OBERLANDER:  Not for private

21   rights of action.

22                  THE COURT:  Okay.  But it just seems

23   really odd.

24                  And so I probably said too much.  But

CHANCERY COURT REPORTERS

49

1    I want to -- I respect the fact that there are serious

2    concerns here by -- that Mr. Kriss has.  I think,

3    honestly, take -- take these words to heart.  And I

4    think if you do, you can be getting on with the merits

5    in arbitration of pursuing your claims or certainly

6    have the fight about arbitrability and then see what

7    comes out of that.

8              But in any event, what ought to come

9    out of it is that this case ought to proceed either --

10   as to the signatories, it seems pretty clear the

11   arbitrator is going to make you go at least forward

12   with some of the claims in arbitration or you're going

13   to have to renounce those claims in some binding way.

14   And then with respect to the rest, it all happened in

15   New York.  And I don't see any reason why it makes any

16   sense to be here, honestly, given that -- it would be

17   one thing if this was -- Delaware law was the focus

18   and was critical and where all the entities were.

19   It's quite to the contrary.  There's one place -- and

20   I love that place.  I'm a big New York -- fan of New

21   York.  And so, you know, it's -- it's a great -- it's

22   a great state.

23              And so get -- confirm -- confer with

24   each other.  Get in a simple order.  I think the one

CHANCERY COURT REPORTERS

50

1    thing that will have to be nuanced is how you do the

2    interaction of the arbitration, because it really --

3    you ought to be going to arbitration.  It could be

4    just as simple, again, without prejudice to filing in

5    New York.  You may have to go -- if they file in New

6    York and they go around the arbitrator again, you may

7    have to get another ruling or something like that.

8    But I think what I would encourage is that you all

9    talk to each other.  Come up with an order and move on

10   and -- because you're clearly going to move on and

11   have the fight somewhere.  And I'm assuming that

12   that's what Mr. Kriss most wants is to get his remedy,

13   if he's entitled to one.

14            So I say please accept everything I

15   said in that spirit, because it's really meant in a

16   constructive spirit for all.  I'd rather you

17   concentrate your resources on the central battle

18   rather than on where you're going to have it.

19            Thank you all.

20            MR. STAMOULIS:  Your Honor, just one

21   question with regard to your ruling.  Does it apply to

22   the books and records action that we filed yesterday

23   with regard to Mr. Kriss seeking access to books and

24   records on Spring Street and Whitestone, the two

CHANCERY COURT REPORTERS

1   Delaware companies?  I just -- I don't want to be

2   pursuing an action in Delaware --

3                    THE COURT:  You filed a complaint

4   yesterday?

5                    MR. STAMOULIS:  Yes, Your Honor.

6   We -- we had served -- we -- we discussed going

7   forward with a books and records action.

8   Mr. Oberlander mentioned it during his presentation.

9   We served a demand on the Bayrock company for books

10  and records.  They responded to the demand by saying

11  our purpose was improper and pretextual.

12                   And -- and, Your Honor --

13                   THE COURT:  What I would do if I were

14  you, is, I would withdraw that complaint.  I'm not

15  going to sit from the seat of my pants when I never

16  heard about that before.

17                   What I will tell you is, I think if

18  you look at the law, once you put it in, once you put

19  it in play, which is by a complaint, you can't use

20  books and records, then, as discovery.  And by

21  discovery, what I mean is buttressing your claim.  You

22  chose to sue.  If you think you have enough to sue

23  either in arbitration or whatever, then you should go

24  do it.  And you have done it.  And the fact that you

CHANCERY COURT REPORTERS

52

1   filed your complaint while this litigation is pending,

2   I mean, again, I'm not dismissing it from the seat of

3   my pants.

4                    What I would suggest is, I would

5   withdraw it, if I were you.  Rethink your strategy.

6   What -- you know, I don't -- I'm not being paid to be

7   your lawyer.  But I would file the strongest darn

8   arbitration complaint I could.  And I would seek the

9   best arbitrator I could under the AAA and an

10  experienced person and I'd get to fighting for the

11  remedy.  But that's what you have to decide.

12  Having -- I had no idea -- I'm sure this got assigned

13  to me as a related case; right?

14                    MR. STAMOULIS:  Yes, Your Honor.

15                    THE COURT:  Yeah.  And it's related in

16  the sense that you wanted books and records so you

17  could have discovery, you could have information that

18  you could use in this case.

19                    MR. OBERLANDER:  No.  No.  I'm sorry.

20                    MR. STAMOULIS:  My New York counsel

21  will answer that.

22                    MR. OBERLANDER:  Just for the

23  record -- and I have the utmost respect for books and

24  records proceedings -- Mr. Kriss filed a books and

53

1   records action for several proper purposes.  I will

2   not argue that investigation of mismanagement, which

3   you will see in that complaint, the books and records

4   complaint, mind you, that cites activities in 2007 and

5   2005.  You could fairly argue, Your Honor, and say

6   that that could certainly look like we were attempting

7   to use it for discovery.  So I'm not going to argue

8   that that could look like that.  Certainly that wasn't

9   our intent, but it could certainly look like.

10              But we have other proper purposes

11  stated.  There is a very significant proper purpose in

12  the books and records which has nothing to do -- it

13  could be inconceivable to link it to that complaint,

14  which is that since they themselves have said in every

15  document they filed here that they gave him profits'

16  interests in company entities that made him a tax

17  partner, those company entities have transacted, to

18  our knowledge, $87 million worth of sales, loans,

19  financings, and distributions; and he has never

20  received one K-1, nor will they provide any tax

21  returns or any other information.  Tax returns are a

22  statutory item under 18-305.  It's specifically

23  written requesting them, with very exquisitely

24  detailed explanation of why he needs them line by line

CHANCERY COURT REPORTERS

54

1    as a matter of partnership tax law, why he needs to

2    know why there are problems, inconsistent position

3    reports that have to be filed.  And all of that,

4    obviously, relates to valuation.

5              So since they have already rejected

6    the books and records demand the same day we filed the

7    action claiming our action was pretextual, there isn't

8    one single thing anywhere in that complaint or in

9    anything we talked about to file later that relates to

10   taxes.  His tax returns are absolutely -- not his;

11   partnership tax returns are clearly contemplated by

12   statute as absolutely a right to him.  And in US v

13   Somerville or is it Somerville v US, in one of the

14   interim --

15              THE COURT:  I told you --

16              MR. OBERLANDER:  Okay.

17              THE COURT:  -- I wasn't getting rid of

18   this.  You've heard what I have to say.  You make your

19   own judgment and I'll address it.  If you want to

20   pursue a 220 action, you pursue it, and I'll handle it

21   in the ordinary course.  Just be mindful of the

22   distinctions between 220 and Rule 26.

23              I'd also be mindful of -- I don't know

24   how much money in the world the parties have.  But,

55

1   you know, sometimes you concentrate -- I mean,

2   sometimes wise people concentrate their resources.

3                   But -- I appreciate you bringing it

4   up, but I have no idea.   I don't monitor by the minute

5   what cases come in.   So I'm focused on this particular

6   civil action.

7                   So try to get me an implementing order

8   by next Tuesday at the latest.   Thank you.

9                   (Court adjourned at 11:03 a.m.)

10                          -   -   -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

CHANCERY COURT REPORTERS

56

1                    <u>CERTIFICATE</u>

2

3             I, NEITH D. ECKER, Official Court

4  Reporter for the Court of Chancery of the State of

5  Delaware, do hereby certify that the foregoing pages

6  numbered 3 through 55 contain a true and correct

7  transcription of the proceedings as stenographically

8  reported by me at the hearing in the above cause

9  before the Vice Chancellor of the State of Delaware,

10  on the date therein indicated.

11             IN WITNESS WHEREOF I have hereunto set

12  my hand at Wilmington, this 18th day of September

13  2009.

14

15

16                      /s/ Neith D. Ecker

17             -------------------------------
                    Official Court Reporter
18                    of the Chancery Court
                        State of Delaware
19

20

21  Certificate Number:  113-PS
    Expiration:  Permanent
22

23

24

CHANCERY COURT REPORTERS

```
 1
 2     SUPREME COURT OF THE STATE OF NEW YORK
       COUNTY OF WESTCHESTER
 3     - - - - - - - - - - - - - - - - - - X
          JOSHUA BERNSTEIN,
 4                          Plaintiff,
 5                  - against -              Index No:
                                             02579/09
 6        BAYROCK GROUP, LLC,
                            Defendant.
 7     - - - - - - - - - - - - - - - - - - X
 8
                         11 Martine Avenue
 9                       White Plains, New York
10                       March 8, 2010
                         10:04 a.m.
11
12
13              EXAMINATION BEFORE TRIAL OF
14     JOSHUA BERNSTEIN, the Plaintiff herein,
15     taken by an attorney for the Defendant,
16     pursuant to Notice and Order, held at the
17     above place and time before Apryl S.
18     Montero, a Stenotype Reporter and Notary
19     Public within and for the State of New
20     York.
21                  *     *     *     *
22
23
24
```

Joshua Bernstein

Page 194

1    A.    Most do, yes.
2    Q.    Did you ever take that hard
3  drive, download any of it for any reason
4  whatsoever?
5         MR. OBERLANDER:  Compound
6  question.  Objection.
7    Q.    Did you ever take out that
8  hard drive physically?
9    A.    No.
10   Q.    Did you ever download
11 portions of the hard drive?
12   A.    I believe so.
13   Q.    Could you explain that when,
14 how, what did you download, for what
15 purpose?
16   A.    At the direction of Felix
17 Satter I downloaded regularly files from
18 that hard drive and the server.
19   Q.    What drives, what files?
20 Particular files or groups of files?
21   A.    Groups, various.
22   Q.    What directions did Felix
23 give you as far as --
24   A.    To keep them offsite, an

Page 195

1  archival copy as much of the server as I
2  could.  This was on or about December 17,
3  2007, I think well before, when he was
4  afraid that the firm was going to screw
5  him, that he wouldn't be able, you know,
6  to make his profits of his half of the
7  ownership of the firm.
8    Q.    And did you follow his
9  instructions?
10   A.    Yes.
11   Q.    So you downloaded files from
12 what computers or what servers?
13   A.    There was only one active
14 server within the firm.
15   Q.    What files?
16   A.    Various e-mail files.
17   Q.    Of whose?
18   A.    Of various users.
19   Q.    Okay.  I'm going to ask you
20 about that in a couple of minutes.  I
21 want to finish with this exhibit.
22        Please turn to page 11.  Did
23 you receive an e-mail from Felix Satter
24 on September 8th saying, "Where are you?"

Page 196

1  It's September 8, 2008, on page 11?
2    A.    Yes.
3    Q.    And on page 12 did you
4  receive another one from him on
5  September 4th -- these may be -- I tried
6  to keep them chronological, but I see
7  that September 4th comes after September
8  8th.  "Where are you?"
9    A.    Yes.
10   Q.    So both on September 4th and
11 September 8th he, Felix, asked you where
12 you were?
13   A.    Sure, which he would
14 regularly send to the employees who
15 worked for him, including Dan Ridloff,
16 and we'd correspond about where we were
17 at the time.
18   Q.    And on September 4th on
19 page 13 he says, "Where are you?  Answer
20 now."
21        Did you receive that?
22   A.    Yes.
23   Q.    Does that indicate to you
24 that he was impatient to hear from you?

Page 197

1    A.    Yes, because I was sleeping
2  at this time.
3    Q.    You were in Europe?
4    A.    Yes.
5    Q.    Let's go back to the --
6         THE WITNESS:  Can I take a
7  break, a bathroom break.
8         MR. DOMB:  Sure.
9         (Whereupon, a short recess
10 was taken.)
11        MR. DOMB:  Let's mark the
12 next exhibit.  I think it's a
13 multipage exhibit which I've
14 numbered 1 through 24.
15        MR. OBERLANDER:  Off the
16 record.
17        (Whereupon, a discussion was
18 held off the record.)
19        (Whereupon, Defendant's
20 Exhibit S, a 24-page document, was
21 marked for identification as of
22 this date.)
23   Q.    Exhibit S.
24   A.    Yes.

50 (Pages 194 to 197)

Joshua Bernstein

Page 198

1    Q.    That is a composite exhibit
2  which is consists of e-mails and maybe
3  e-mail attachments.
4        Did you sign the e-quote
5  with Greenhouse, that's the first page,
6  Greenhouse IT.
7    A.    I believe that's my
8  signature.
9    Q.    And that's July of '07;
10 there's a date right under your
11 signature?
12   A.    Yes.
13   Q.    And what were you
14 contracting to get from Greenhouse IT?
15   A.    Software installation.
16   Q.    What kind of software?
17   A.    Spector CNE and configure
18 Trend anti-spyware.
19   Q.    Can you explain in layman's
20 terms what that software does?
21   A.    That's a monitoring
22 software.
23   Q.    What does it enable you to
24 do?

Page 200

1    Q.    Was he the only one?
2    A.    No.
3    Q.    Who else could?
4    A.    I had the ability to as
5  well.
6    Q.    You had the ability.  Did
7  you actually monitor what people looked
8  at?
9    A.    When asked by Felix, yes.
10   Q.    Did you monitor when, on
11 your own, when not asked by Felix?
12   A.    Not that I recall.
13   Q.    But you had the ability do
14 that?
15   A.    Yes, given my administrative
16 rights, yes.
17   Q.    When you signed up for this
18 software on line one it says on five
19 workstation, do you see that, the first
20 page?
21   A.    Yes.
22   Q.    And then if you look through
23 these e-mails you'll see that at some
24 point additional workstations were added;

Page 199

1    A.    It enables the administrator
2  to monitor activities on computers.
3    Q.    Does it enable the
4  administrator to see what people are
5  seeing on their monitors and at their
6  workstation computers?
7    A.    I believe that's a function
8  of it.
9    Q.    Well, does that apply to,
10 let's say, web pages that they may be
11 looking at on the Internet?
12   A.    I believe anything that's on
13 the screen.
14   Q.    So it includes e-mails, for
15 example?
16   A.    I believe anything that's on
17 the screen.
18   Q.    And if you put up a contract
19 that would also be capable of being
20 monitored?
21   A.    Anything on the screen.
22   Q.    And who was the
23 administrator that could monitor this?
24   A.    Felix Satter.

Page 201

1  correct?
2    A.    I don't see that.
3    Q.    Well, let's look at page 8,
4  at the bottom you e-mailed --
5        Simon Binder was from
6  Greenhouse; correct?
7    A.    Yes.
8    Q.    You e-mailed Simon Binder,
9  and you said, "Here are five other
10 users -- "
11       And you gave initials;
12 correct?
13   A.    Yes.
14   Q.    Who is D. R.?
15   A.    Dan Ridloff.
16   Q.    J. K.?
17   A.    Jody Kriss.
18   Q.    J. S.?
19   A.    Julius Schwarz.
20   Q.    R. L.?
21   A.    Ray Lee.
22   Q.    And K. S.?
23   A.    (No response.)
24       MR. FEINBERG: K. S.?

51 (Pages 198 to 201)

Joshua Bernstein

Page 202

1    A.   I don't recall who K. S.
2  was.
3    Q.   As a result of --
4      Was this software, in fact,
5  installed, at least on these monitors?
6    A.   I don't recall whether these
7  additional ones were ever completed.
8    Q.   Well, I think if you look
9  through, we're going to look through and
10 be able to determine that.
11      Look on page 11.  There's a
12 list of computer users for this software;
13 correct?
14   A.   Yes.
15   Q.   And I count ten here; is
16 that right?
17   A.   Yes.
18   Q.   And were all these installed
19 in those ten?
20   A.   I believe so.
21   Q.   Look on page 13.
22 Greenhouse, is writing, someone from
23 Greenhouse writes to you and says that,
24 "I think that in order to get J. S.

Page 203

1  working we need to reboot his laptop."
2      Do you see that?
3    A.   Yes.
4    Q.   And then he suggests that
5  the computer has to be shut down, and if
6  it's not shut down you have to schedule a
7  reboot to occur overnight, which will
8  force any work he leaves open to close.
9      Do you see that?
10   A.   I do.
11   Q.   Do you recall whether this
12 was done in order to get Julius Schwarz'
13 computers under this software?
14   A.   I don't recall.
15   Q.   Well, look on page 22,
16 please.  On October 9th, middle of the
17 page, you e-mailed someone at this
18 company and say, "Please let me know
19 about user J. S."
20      Do you see that?
21   A.   Yes.
22   Q.   That's Julius Schwarz, isn't
23 it?
24   A.   Yes.

Page 204

1    Q.   And then the answer is to
2  you, "I founded activity for user J. S.
3  from 9/6/07 to 10/9/07.
4      Do you see that?
5    A.   Yes.
6    Q.   And this e-mail was written
7  on October 9, '07, 10/907; correct?
8    A.   Right.
9    Q.   So this person had said that
10 the software was, in fact, operating on
11 Julius Schwarz' computer, at least from
12 September 6th to October 9th of '07?
13   A.   That's what this e-mail
14 says.
15   Q.   And none of these e-mails
16 are copied to Felix, Felix Satter, are
17 they?
18   A.   Not unless they are blind
19 carbon copied, no.
20   Q.   It's just between you and
21 Greenhouse, isn't it?
22      MR. OBERLANDER:  Objection.
23   It's calling for a conclusion.  He
24   couldn't possibly know.  No one

Page 205

1    could know because a blind copy
2    won't show up.
3      MR. FEINBERG:  It's --
4  BY MR. DOMB:
5    Q.   Apart from blind copies, no
6  one else from Bayrock is copied; isn't
7  that true?
8    A.   Not on these e-mails.
9    Q.   And from your recollection
10 did you copy Felix Satter on these
11 e-mails?
12   A.   Not on these, although Felix
13 Satter sent an e-mail to Greenhouse
14 authorizing this.
15   Q.   How do you know that?
16   A.   Because he told me he did.
17   Q.   Did you see it?
18   A.   I did.
19   Q.   Did you tell Julius Schwarz
20 about this?
21   A.   No.
22   Q.   You never copied him on any
23 of this?
24   A.   No.

52 (Pages 202 to 205)

Joshua Bernstein

Page 206

1       Q.   In fact, it was your
2  intention not to tell Julius Schwartz;
3  correct?
4       A.   It was Felix's intention to
5  not tell Julius Schwarz.
6       Q.   And it was your intention
7  also?
8       A.   To follow my instructions,
9  yes.
10      Q.   And you were aware that
11 Julius Schwarz was company counsel who is
12 an attorney for the company; correct?
13      A.   I was aware, but I believe
14 at this time he was acting --
15           Yes.
16      Q.   And he was superior to you
17 in the company or senior to you, was he
18 not?
19      A.   Yes, he was.
20      Q.   And you had the ability to
21 look at everything that he looked at on
22 his computer?
23      A.   I believe I had the ability.
24      Q.   And, in fact, you did look

Page 207

1  at what, from time to time at what was on
2  his computer?
3       A.   I don't believe I did.
4       Q.   You don't believe you did?
5  Are you a hundred percent certain of
6  that?
7       A.   Not a hundred percent.  This
8  is three years ago, two years ago.
9       Q.   So you may have looked at it
10 and you just don't remember right now?
11      A.   I don't remember.
12      Q.   Did you ever copy things --
13           Did you have the ability to
14 copy, not just look, but copy things on a
15 screen?
16      A.   They were generated in the
17 log filed.  They were automatically
18 copied.
19      Q.   So you could go to the log
20 and pull up whatever the person had
21 looked at and get a copy of it or forward
22 it to some other place electronically?
23      A.   Yes.
24      Q.   Do you recall doing that?

Page 208

1       A.   I don't recall do that.
2       Q.   Is it possible that you did
3  and you just don't recall right now?
4       A.   It's possible.  I don't
5  recall doing it.
6       Q.   Do you think it was proper
7  for somebody without Julius Schwartz's
8  knowledge to monitor what he was looking.
9  In the computer?
10      A.   Absolutely.  Felix Satter
11 owned the firm, so he told me to do
12 things and I was listening to the boss.
13      Q.   And did he tell you this
14 verbally?
15      A.   Yes, and then he wrote an
16 e-mail confirming the software should be
17 put on.
18      Q.   To your knowledge, did you
19 produce a copy of that e-mail in this
20 litigation?
21      A.   Perhaps, but I can double
22 check.
23      Q.   Did he copy you on that
24 e-mail?

Page 209

1       A.   I don't recall.
2       Q.   If he did then that should
3  be in your inbox?
4       A.   It should.
5       Q.   Around what time did Felix
6  send the e-mail that you say he sent to
7  Greenhouse?
8           (Whereupon, the Witness
9            conferred with his attorney.)
10      A.   Please repeat the question.
11      Q.   Around what time did Felix
12 send Greenhouse the e-mail authorizing
13 the e-mail that you say he sent?
14      A.   I don't remember the time.
15 Before this date.
16      Q.   On or around July 2007?
17      A.   Yes.
18      Q.   To your knowledge did Felix
19 ever monitor the, what these various
20 computer users were looking at on their
21 computers?
22      A.   I believe so.
23      Q.   What's your basis for
24 believing so?

53 (Pages 206 to 209)

Joshua Bernstein

Page 210

1    A.    Because he had the
2  administrative rights and the ability to
3  do.  That's what it was installed for,
4  his use.
5    Q.    Did he ever tell you that he
6  did this?
7    A.    Yes.
8    Q.    Did he ever tell you what
9  things he looked at?
10   A.    No.
11   Q.    Did he ever tell you
12 anything else about what he looked at or
13 why or when?  Do you recall any specifics
14 about what he told you?
15   A.    No.
16        MR. OBERLANDER:  Which?
17        THE WITNESS:  ABC.
18        MR. OBERLANDER:  All of
19 them?
20        THE WITNESS:  Yes.
21        MR. OBERLANDER:  Wouldn't
22 that be a massive amount of
23 storage; right?
24        THE WITNESS:  I'll tell you

Page 211

1  later.  I'm good.
2        MR. DOMB:  You gentleman are
3  speaking on the record.  Do you
4  want to share with us what you're
5  talking about?
6        MR. FEINBERG:  No.  There's
7  no question posed, and we can talk
8  whatever we want to talk about.
9        Pose your question and we'll
10 stop talking.
11 BY MR. DOMB:
12   Q.    Please look at page 11 of
13 this exhibit, Exhibit S.
14        (Whereupon, the Witness
15 conferred with his attorney.)
16   Q.    I'm sorry, 18.  If I said 11
17 I meant 18.
18   A.    Okay.
19   Q.    There's an e-mail here on
20 September, in September 2007 from
21 Greenhouse.  It says, "Josh Bernstein
22 would like a list of all admin passwords
23 along with the IP address of the servers
24 and the firewall."

Page 212

1        Do you see that?
2    A.    Yes.
3    Q.    And then it goes on to say,
4  "We collected the requested information
5  and e-mailed it to Josh as per his
6  request."
7        Do you see that?
8    A.    Yes.
9    Q.    What was the purpose in
10 requesting all admin passwords?
11   A.    I was asked to keep a record
12 of everything, because when Greenhouse
13 was brought in they had changed
14 passwords, and we didn't have them on
15 site.  So we didn't know the passwords.
16   Q.    Did you need the passwords
17 in order to monitor the individual
18 computers?
19   A.    No.
20   Q.    So what, this was just --
21        Why did you need it then?
22   A.    Recordkeeping.  We didn't
23 have access I think -- maybe a day before
24 this we had some problem.  We couldn't

Page 213

1  access the server, and Greenhouse wasn't
2  able to fix it and I needed to go into
3  it, but I didn't have the password.
4    Q.    So sometime in middle, in
5  the second half of 2007, based on you and
6  Felix Satter, you installed spyware on an
7  a number of individuals' computers at
8  Bayrock; correct?
9    A.    I'm not sure that's the
10 appropriate term of art.
11   Q.    Well, it was a spyware
12 software.  You described it yourself.
13   A.    No, I did not.
14   Q.    Well, okay.  You installed
15 spyware that enabled the administrator to
16 look at the contents of the screens of
17 all of the users that are mentioned here?
18 I think we went over this --
19        MR. FEINBERG:  Object to
20        just the form, your
21        characterization.  It is what it
22        is.  Just take out the word --
23   A.    Here's what's happening.
24 You're misspeaking.

54 (Pages 210 to 213)

Joshua Bernstein

Page 214

1          There's two parts to what
2 you're looking at in the document. The
3 first part is a piece of software that
4 enabled the administrator to view.
5          The second part is Trend,
6 it's anti-spyware, which is the second
7 piece of software, which is specific.
8     Q.   I'm focusing on the first
9 piece of software, the Spector CNE.
10    A.   CNE, yes.
11    Q.   And that enables the
12 administrator to look at the various
13 computer screens --
14    A.   Yes, yes.
15    Q.   -- as we just discussed.
16    A.   Correct.
17    Q.   And how long was this
18 software operating at Bayrock, to your
19 recollection?
20    A.   I believe from inception
21 until --
22    Q.   Until the time you left
23 Bayrock?
24    A.   I don't know the end date of

Page 215

1 it.
2     Q.   But as far as you know when
3 you left Bayrock it was still
4 operational?
5     A.   As far as I know.
6     MR. DOMB:  Please mark
7 Exhibit T, another composite of
8 e-mails and et cetera, numbered 1
9 through 21.
10     (Whereupon, Defendant's
11 Exhibit T, a 21-page document, was
12 marked for identification as of
13 this date.)
14     MR. OBERLANDER:  There's no
15 question now; correct?
16     MR. DOMB:  No, but there
17 soon will be.
18     MR. OBERLANDER:  I
19 understand that, but I want to
20 check something.
21     1&1 is the web hosting
22 company, right?
23     THE WITNESS:  (Indicating.)
24 BY MR. DOMB:

Page 216

1     Q.   Looking at Exhibit T, and I
2 notice you're leafing through it.  Maybe
3 we can go a little quicker on this one.
4          Do you remember ordering
5 some services and equipment from 1&1
6 Internet Team in or around July of 2008?
7     A.   Sounds about right.
8     Q.   What were you ordering?
9     A.   Service for website hosting
10 and e-mail.
11    Q.   For different domains?
12    A.   Yes.
13    Q.   Which domains?
14    A.   MiraxUK.com and
15 Bayrockinc.com and SwissCIB.com.
16    Q.   Were those companies related
17 to Bayrock?
18    A.   Yes.
19    Q.   Mirax was the one that you
20 mentioned before that was a joint venture
21 with Russian entities?
22    A.   Yes.
23    Q.   What's Bayrockinc?
24    A.   That was a, I believe a

Page 217

1 Delaware company that then Felix Satter
2 took over to transfer his ownership
3 shares of Bayrock into or out of Bayrock
4 Group, LLC.
5     Q.   Was that while he was still
6 working at Bayrock or after he left?
7     A.   He was still employed.
8     Q.   And what about Swiss CIB?
9 What is that?
10    A.   That was the name under
11 which the company that Felix was trying
12 to start, Swiss Capital Investment
13 Banking, CIB.
14    Q.   So these were websites that
15 each of these companies were setting up?
16    A.   Yes.
17    Q.   And you did this under whose
18 instruction?
19    A.   Felix Satter.
20    Q.   Was anyone else from Bayrock
21 involved in these entities other than
22 Felix, to your knowledge?
23    A.   Yes.
24    Q.   Who?

55 (Pages 214 to 217)

Joshua Bernstein

Page 218

1     A.    Alina Gorbachev, Yuiliya
2  Gashapova, Stan Tolstinov, Paul McKewan
3  or Paul Mozlitz, I don't know which name
4  is legal, and at various times Julius
5  Schwarz.
6        MR. FEINBERG: I'm sorry,
7     what was the question that was
8     posed?
9        MR. DOMB: Who else at
10    Bayrock was involved in these
11    entities.
12       Give me a minute and I'll
13    get these in order.
14       THE WITNESS: Do you mind if
15    I grab bottle of water?
16       (Whereupon, a brief recess
17    was taken.)
18    Q.    When your employment at
19 Bayrock ended, did you take with you or
20 retain any Bayrock documents?
21    A.    Yes.
22    Q.    What documents?
23    A.    Various documents.
24 Thousands of different e-mails and such.

Page 219

1     Q.    Well, did you keep them in
2  paper form or electronic form?
3     A.    Both.
4     Q.    What did you keep in paper?
5     A.    Hundreds of documents,
6  various things that were printed out.
7     Q.    Do you still have them?
8     A.    I believe so.
9     Q.    And in general, you say
10 hundreds of documents?
11    A.    Mainly e-mails.
12    Q.    So they were printouts of
13 e-mails?
14    A.    Mainly.
15    Q.    So you printed out e-mails,
16 hundreds of them, and kept them?
17    A.    Yes.
18    Q.    And you printed them while
19 you were employed at Bayrock?
20    A.    Yes, and after.
21    Q.    Where did you keep them?
22    A.    In my files.
23    Q.    At home?
24    A.    Yes.

Page 220

1     Q.    Any particular topics of
2  e-mails that you chose to print? How did
3  you choose which e-mails to print and
4  keep?
5     A.    I don't recall. Usually
6  expenses.
7     Q.    Is it fair to say if there's
8  anything important you were more than
9  likely to keep it than if it was wasn't
10 so important?
11    A.    That's fair to say.
12    Q.    Did you ever, to your
13 knowledge during your employment, write
14 an e-mail to someone at Bayrock
15 confirming a verbal discussion that you
16 had had about your compensation or bonus
17 or benefits?
18    A.    Yes, but only parts of it.
19    Q.    I mean, we looked at one
20 before where you wrote to Julius Schwarz,
21 remember, and I questioned you about
22 that? Let's just get a number.
23       That was Exhibit G, your
24 e-mail to Julius Schwarz.

Page 221

1     A.    Oh, yes, the one where Felix
2  threatened me if I didn't write the
3  e-mail.
4     Q.    Apart from that, do you
5  recall ever writing to someone at
6  Bayrock, for example writing to Felix and
7  saying, "Felix, I want to confirm our
8  conversation where you promised to do, to
9  pay me X or Y."
10       Did you write any such
11 e-mails?
12    A.    You provided one here where
13 I said that you confirm our agreement
14 from yesterday, in exhibit --
15    Q.    You mean the one about your
16 trip, your cancelled trip?
17    A.    Yeah, and severance,
18 correct.
19    Q.    Okay. Other than what we've
20 seen today, do you recall, specifically,
21 recall any other times when you wrote --
22       For example, did you write
23 an e-mail to Felix saying, "I want to
24 confirm that you promised to pay me

Joshua Bernstein

Page 222

```
1    $200,000, not $100,000, in connection
2    with the Loehmann's deal"?
3         A.   No.
4         Q.   Did you write an e-mail to
5    Tevfiq Arif saying that you expected to
6    be paid the equivalent of a broker, a
7    broker's fee on the Loehmann's deal,
8    which would be about million dollars?
9         A.   No.  Tevfiq Arif did not
10   have e-mail.
11        Q.   Did you write such an e-mail
12   to anyone else at the company to let them
13   know what deal that you say he had
14   promised you?
15        A.   No.  They were all verbal.
16        Q.   Now, getting back, you said
17   you took paper files and you also took
18   some electronic files with you when you
19   left Bayrock?
20        A.   Yes.
21        Q.   What other electronic files?
22        A.   Backup files of my e-mail
23   and anything else that was available on
24   my computer.
```

Page 223

```
1         Q.   Well, did you have a backup
2    file of all your e-mails, incoming and
3    out-going?
4         A.   No.
5         Q.   How did you --
6              What is in that backup
7    file -- well, let me withdraw that.
8              Whatever you took in a
9    backup file do you still have it, from
10   Bayrock?
11        A.   Yes.
12        Q.   So it hasn't changed, you
13   haven't deleted things from it?
14        A.   I don't believe so.
15        Q.   So you still have that --
16             Is it in a thumb drive?
17   What kind of a --
18        A.   Portable hard drive, thumb
19   drive.
20        Q.   And you still have it in the
21   same condition containing the same items
22   that it had before you left Bayrock?
23        A.   Hard to answer the question,
24   the condition or containing the same
```

Page 224

```
1    items.
2         Q.   Containing the same items?
3         A.   I believe so.
4         Q.   And what was in it
5    generally --
6              Did you go through a similar
7    process where you selected what to put in
8    there, or did you just download large
9    numbers of files indiscriminantly?
10        A.   Indiscriminantly.
11        Q.   What period of time?
12        A.   From approximately
13   December 2007 to the end of my
14   employment.
15        Q.   Well, were you able to
16   download things through September 16th or
17   through some date earlier when you were
18   in the office?
19        A.   Through September 16th.
20        Q.   So we discussed before that
21   for some reason unknown to me and unknown
22   to Bayrock, four months of e-mails from
23   your sent box couldn't be found at
24   Bayrock.
```

Page 225

```
1              Are they in your backup
2    drives that you've maintained all this
3    time?
4         A.   I don't believe so.
5         Q.   Why not?
6         A.   Because I don't believe they
7    are there.
8         Q.   But you, it was the
9    intention when you left Bayrock to
10   download all these files and put them
11   into this portable hard drive; correct?
12        A.   Correct.
13        Q.   So you didn't get them
14   either?  Just like Bayrock doesn't have
15   them you don't have them either?
16        A.   I don't believe so.
17        Q.   Do you have any explanation
18   for where they are or what happened to
19   them?
20        A.   Yes.  Bayrock deleted them.
21        Q.   Well, the period --
22             That's your belief.  Do you
23   have any --
24        A.   That's my belief.
```

57 (Pages 222 to 225)

Joshua Bernstein

Page 226

1      Q.    Do you have any hard
2   evidence or hard basis for saying that
3   other than your belief?
4      A.    Not at this point.
5      Q.    Do you, the period -- I
6   think we went over this -- the period of
7   missing sent e-mails was roughly May
8   through August or September of 2008?
9      A.    I don't have it offhand.
10     Q.    Approximately.  I won't hold
11  you.  Give or take a month; is that
12  right?
13     A.    I will give that, yeah.
14     Q.    So during that period did
15  you download any of your files or all of
16  your files to this portable hard drive?
17     A.    During that period I did
18  download files.
19          THE WITNESS:  Can I use the
20  bathroom real quick.
21          (Whereupon, a short recess
22  was taken.)
23          MR. DOMB:  What's the last
24  question please.

Page 227

1          (Whereupon, the requested
2   question was read back by the
3   reporter.)
4      Q.    And you said, I believe that
5   you keep these in a portable hard drive?
6      A.    What are these?
7      Q.    The electronic files from
8   Bayrock that you took with you?
9      A.    I did.
10     Q.    And you still have it?
11     A.    I don't have that drive,
12  that specific drive, no.
13     Q.    You transferred it to a
14  different drive?
15     A.    Yes.
16     Q.    So the contents are still
17  there?
18     A.    Yes.
19     Q.    Does the drive have things
20  on it other than Bayrock-related items?
21     A.    Does the current drive or
22  the --
23     Q.    Well, how many do you now
24  have?

Page 228

1      A.    I don't know.  I don't keep
2   count.
3      Q.    Do you have the more than
4   one external drive containing Bayrock
5   materials?
6      A.    I don't believe so.
7      Q.    So you have one?
8      A.    Yes.
9      Q.    Does that, what do you call
10  that, an external drive?  Is that a good
11  term for you to use?
12     A.    It works.
13     Q.    Does that drive contain
14  items other than Bayrock-related items?
15     A.    I believe so.
16     Q.    Is there a way for you to
17  separate out the Bayrock from the
18  non-Bayrock?
19     A.    Should be.
20     Q.    How would you do it?
21     A.    Manually.
22     Q.    One by one?
23     A.    Absolutely.
24     Q.    How many different e-mails

Page 229

1   or files are in it?
2      A.    I don't know.
3      Q.    When you produced documents
4   in this case you did not produce all the
5   Bayrock-related items in that portable
6   hard drive, did you?
7      A.    It's all relevant documents.
8      Q.    And you made the decision as
9   to what is relevant or not?
10     A.    (No response.)
11     Q.    Who made that decision?
12          MR. FEINBERG:  You served a
13  documented request.  He responded
14  to the document request.
15          MR. DOMB:  I'm asking a
16  simple question.
17     Q.    Who made the decision as to
18  what to produce from that drive?  Was it
19  you?
20     A.    Between my counsel and I.
21     Q.    So did you, are there some
22  Bayrock-related materials that you did
23  not produce?
24     A.    Yes.

58 (Pages 226 to 229)

Joshua Bernstein

Page 230

1    MR. DOMB:  Do you have any
2  objection to producing all
3  Bayrock-related materials that you
4  have not yet produced from that
5  portable hard drive.
6    MR. FEINBERG:  I guess if
7  you make a request specifically
8  we'll take it under advisement
9  whether we have a problem with it
10  or not.
11    MR. DOMB:  From my review of
12  the document request I thought it
13  was very broad and it was already
14  requested.
15    But, for the record, we do
16  request that you produce promptly
17  all Bayrock-related items from
18  that drive.
19    And as you know there's been
20  a dispute.  We also request the
21  ability for an independent
22  computer expert to review that and
23  make sure that that happens.  So
24  we do make that request, and

Page 231

1  please mark that.
2    MR. OBERLANDER:  That's
3  bilateral, isn't it?  I think we
4  made the same request.  I'm just
5  saying that it can be coordinated.
6    MR. FEINBERG:  You made the
7  request, because you made missing
8  documents that we were going to
9  access to try to find out why or
10  in what manner they were deleted,
11  okay.  We've never indicated that
12  we have files that have been
13  deleted or other materials that
14  require --
15    You don't get access
16  automatically to someone's
17  computer just because you want to
18  see what they have.  You made your
19  request and we'll take it under
20  advisement.
21    MR. DOMB:  The record says
22  what it says.  There are
23  Bayrock-related materials that
24  your side made a decision not to

Page 232

1  produce some and not others, and
2  we are entitled to see all of
3  them.  So we make that request.
4    MR. FEINBERG:  And we'll
5  verify to see whether the request
6  that you made in terms of the
7  document response has been
8  complied with.
9    And there may be documents
10  other than those which were
11  responsive to your request, which
12  is what I assume you're asking
13  for.
14    In other words, just so
15  we're clear, you have a document
16  request --
17    MR. DOMB:  I'm making two
18  requests.  If we requested it and
19  it hasn't been produced, obviously
20  we want it.
21    MR. FEINBERG:  Obviously.
22    MR. DOMB:  And if you did
23  not read our request broadly
24  enough, we now request all

Page 233

1  Bayrock-related items in that
2  portable hard drive, whether you
3  deem them to be within our
4  document request, or whether
5  anyone deems them to be --
6    MR. FEINBERG:  That's a new
7  request, and we'll take that under
8  advisement.
9  BY MR. DOMB:
10    Q.   Have you now described
11  fairly all of the Bayrock-related items
12  that you took with you after you left
13  Bayrock, that is, paper and electronic
14  files?
15    A.   All of what I -- there was a
16  Blackberry that I sent back to Bayrock,
17  that I retained or sent back.
18    Q.   Okay.  On the Blackberry,
19  you had a Blackberry that was issued to
20  you or provided to you by Bayrock?
21    A.   Correct.
22    Q.   And after you left Bayrock
23  you sent it back?
24    A.   Yes.

59 (Pages 230 to 233)

**From:** fred55@aol.com [mailto:fred55@aol.com]
**Sent:** Wednesday, May 12, 2010 12:33 PM
**To:** Kriss, Ronald (Sh-Mia); Kriss, Ronald (Sh-Mia)
**Subject:** Fwd: complaint, sdny, salomon, weinrich, & salomon & co.

Ron --

I recommend you forward this to Julius with the comment from me that
there are three alternatives here:

(a) I file publicly today.

(b) I file under seal today.

(c) He arrange a tolling agreement with EVERY defendant but nixon peabody.

I don't care how many people he has to get on the phone and how fast
he has to work. He had years to give back the money and now it's over.
He can get Brian Halberg to help him.

I believe it's possible to get this in under seal if Bayrock joins in a joint motion
in part 1 to seal the complaint pending a redaction agreement with the
assignedm judge. but there are never any guarantees.

Thanks,

FMO

CHAMBERS OF THE
HON. NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK
PHONE # 212-805-0194
FAX #:     212-805-7927

# FAX COVER SHEET

**DATE:**     5/13/10

**TO:**   Frederick M. Oberlander, Esq.  212.202.7624

Kelly A. Moore, Esq. / Brian A. Herman, Esq.  212.309.6001

**FAX#:**  David L. Lewis, Esq.  212-964.4506

**FROM:**   **Judge Buchwald's chambers**

**PAGES TO FOLLOW:**   3

**RE:**     10 CV 3959 (NRB)

Kriss + Ejekam, et al. v. Bayrock Group LLC, et al.

**MESSAGE:**  Please see enclosed Order, per today's teleconference with Judge Buchwald.  Thanks, Mike O'Neill

**CONFIDENTIALITY NOTE:  This facsimile is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential, or otherwise protected from disclosure.  Dissemination, distribution, or copying of this facsimile or the information herein by anyone other than the intended recipient is prohibited.  If you have received this facsimile in error, please notify us immediately by telephone or return the facsimile by mail.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------X
JODY KRISS and MICHAEL EJEKAM, et al.,

                Plaintiffs,             **O R D E R**

       - against –             10 CV 3959 (NRB)

BAYROCK GROUP LLC et al.,

                Defendants.
------------------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

    **WHEREAS**, the complaint in this case attaches and otherwise makes reference to documents which were sealed in a federal criminal case brought in the Eastern District of New York; and

    **WHEREAS**, plaintiffs' counsel has disseminated the complaint and the exhibits thereto to certain named defendants and others, it is hereby

    **ORDERED** that no further dissemination of the complaint and exhibits thereto or the sealed information contained therein be made pending further order of the Court; and it is further

    **ORDERED** that plaintiffs' counsel immediately contact all persons who have received a copy of the complaint and inform them of this Court's order that there be no further dissemination of the complaint and exhibits thereto or the sealed information contained therein pending further order of the Court.

Dated:    New York, New York
          May 13, 2010

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

-2-

Copies of the foregoing Order have been sent on this date to the following:

Frederick M. Oberlander, Esq.
Law Office of Frederick M. Oberlander
28 Sycamore Lane, Box 1870
Montauk, NY 11954
Fax: 212.202.7624

Kelly A. Moore, Esq.
Brian A. Herman, Esq.
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178
Fax: 212.309.6001

David L. Lewis, Esq.
Lewis & Fiore
225 Broadway, Suite 3300
New York, NY 10007
Fax: 212.964.4506

CHAMBERS OF THE
HON. NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK
PHONE # 212-805-0194
FAX #:     212-805-7927

# FAX COVER SHEET

**DATE:**   5/14/10

**TO:**   Frederick M. Oberlander, Esq.  212.202.7624

Kelly A. Moore, Esq. / Brian A. Herman, Esq.  212.309.6001

**FAX#:**   David L. Lewis, Esq.  212.964.4506

**FROM:**   **Judge Buchwald's chambers**

**PAGES TO FOLLOW:** 3

**RE:**   10 CV 3959 (NRB)

Kriss + Ejekam, et al. v. Bayrock Group LLC, et al.

**MESSAGE:**   Please see enclosed Order, per today's teleconference with Judge Buchwald. Thanks, Mike O'Neill

CONFIDENTIALITY NOTE:  This facsimile is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential, or otherwise protected from disclosure.  Dissemination, distribution, or copying of this facsimile or the information herein by anyone other than the intended recipient is prohibited.  If you have received this facsimile in error, please notify us immediately by telephone or return the facsimile by mail.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
JODY KRISS and MICHAEL EJEKAM, directly
and derivatively on behalf of BAYROCK
GROUP LLC, BAYROCK SPRING STREET LLC, and
BAYROCK WHITESTONE LLC,

              Plaintiffs,

      - against -

BAYROCK GROUP LLC, TEVFIK ARIF, JULIUS
SCHWARZ, FELIX SATTER, BRIAN HALBERG,
SALVATORE LAURIA, ALEX SALOMON, JERRY
WEINRICH, SALOMON & COMPANY PC, AKERMAN
SENTERFITT LLP, BRUCE STACHENFELD, DAVID
GRANIN, NIXON PEABODY LLP, ADAM GILBERT,
ROBERTS & HOLLAND LLP, ELLIOT PISEM,
MICHAEL SAMUEL, MEL DOGAN, BAYROCK SPRING
STREET LLC, JOHN DOES 1-100, BAYROCK
WHITESTONE LLC, BAYROCK CAMELBACK LLC,
BAYROCK MERRIMAC LLC, BAYROCK GROUP INC,
and NATIONAL UNION FIRE INSURANCE CO. OF
PITTSBURGH, PA,

              Defendants,

      - and -

BAROCK GROUP LLC, BAYROCK SPRING STREET
LLC, and BAYROCK WHITESTONE LLC,

            Nominal Defendants
            (Derivative Plaintiffs).
----------------------------------------X

**O R D E R**

10 CV 3959 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


    **WHEREAS**, the complaint in this case attaches and otherwise

makes reference to documents which were sealed in a federal

criminal case brought in the Eastern District of New York; it is

hereby

**ORDERED** that the original complaint be sealed pending further order of the Court; and it is further

**ORDERED** that a redacted version of the original complaint, redacting any sealed documents or references to sealed documents, be filed with the Clerk of the Court by May 19, 2010, to be followed by an electronic (.pdf) version of the redacted complaint.

Dated:      New York, New York
            May 14, 2010

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

Copies of the foregoing Order have been sent on this date to the following:

Frederick M. Oberlander, Esq.
Law Office of Frederick M. Oberlander
28 Sycamore Lane, Box 1870
Montauk, NY 11954
Fax: 212.202.7624

David L. Lewis, Esq.
Lewis & Fiore
225 Broadway, Suite 3300
New York, NY 10007
Fax: 212.964.4506

Kelly A. Moore, Esq.
Brian A. Herman, Esq.
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178
Fax: 212.309.6001