UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA, :
:
Plaintiff, : CR-98-1102
:
-against- : United States Courthouse
: Brooklyn, New York
SALVATORE LAURIA, :
Defendant. :
: February 5, 2004
: 10:00 a.m.

- - - - - - - - - - - - - - - X

TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE I. LEO GLASSER
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff: ROSLYNN R. MAUSKOPF, ESQ.
United States Attorney
BY: ERIC CORNGOLD, ESQ.
Assistant United States Attorney

For the Defendant: ROBERT G. STAHL, ESQ.

Court Reporter: FREDERICK R. GUERINO, C.S.R.
225 Cadman Plaza East
Brooklyn, New York
(781) 613-2503

Proceedings recorded by mechanical stenography, transcript produced by CAT.

THE COURT CLERK: Criminal cause for sentencing: United States of America v. Salvatore Lauria.

MR. CORNGOLD: Eric Corngold for the United States.

MR. STAHL: Robert Stahl on behalf of Mr. Lauria.

THE COURT: Ready to proceed?

MR. STAHL: Yes, Your Honor.

THE COURT: Have you reviewed the Presentence Report with your client?

MR. STAHL: I have, your Honor.

THE COURT: I think you have taken one exception to the Presentence Report, based on the Lauersen case.

MR. STAHL: Yes, Your Honor. Obviously we also certainly agree with the government's position on the money laundering, that there should not be the enhancement for managerial role in that. So that if we are looking at the government's footnote two of their sentencing memorandum, if I'm correct, your Honor, then it is one difference. I think the argument is made in the briefs.

What I would just like to emphasize briefly is that when you look at the cases affecting a financial institution, it talks about in some fashion now the cases have been construed broadly whether the bank -- there's been some cases whether bank loses interest is that affecting a financial institution, but we have White Rock and State Street that were created by Mr. Lauria and others for this. I don't

believe that is what Congress is looking for. I join that argument with the Lauersen analogy as well, and I think it is something for your Honor to at least take into consideration.

THE COURT: Mr. Corngold?

MR. CORNGOLD: Well, Judge, as I tried to express in our letter, I think the idea behind the guideline is the crimes that affect financial institutions, that involve financial institutions, are cases that the Sentencing Commission believes deserve this kind of enhancement, and given the effect of the numerous investors at White Rock and State Street, the other brokerage firms, we believe the guideline is appropriate.

THE COURT: I think so, too. Lauersen, I think, is a case which, as I read it, ought to be pretty much confined to its own facts. We will eliminate paragraph 99, and that would make paragraph 101 read 33. And that makes paragraph 36 read 33, and paragraph 108 becomes 35, and paragraph 110 becomes 32. Is that right?

MR. CORNGOLD: Yes, your Honor.

THE COURT: Mr. Stahl, do you want to be heard beyond that?

MR. STAHL: Not on the legal argument. On the sentencing, yes, Your Honor.

THE COURT: Go ahead.

MR. STAHL: Your Honor, obviously between the PSR,

probation did an excellent job, and the submission of Mr. Corngold, your Honor begins to get a fuller sense of Mr. Lauria, both his conduct involved in the fraud and his post-rehabilitative conduct.

Mr. Lauria is someone whose family is here in court today to show their support and it has not been easy. As your Honor is aware, Mr. Lauria cooperated fully with the government immediately and extensively in bringing upon not only himself, which is not a concern to Mr. Lauria in particular, but to his family, and to make amends for the acts that he did. Mr. Lauria cooperated not only against other brokers and money launderers, but also against organized crime, which I think is laid out in both our submissions. And that led to a number of threats against Mr. Lauria and his family, including against his young daughter.

But, in addition to that, Mr. Lauria was the person at White Rock, State Street Capital that had been legitimately involved in the stock market business, had signed all of the leases, and put his name personally responsible for all of the money, and has settled with every investor who has filed a suit. He has settled with the creditors of those companies, from the phone systems to the furniture leases, has not walked away from it, did not declare bankruptcy, and did not say I just can't do this. He saw that he had to live up to his responsibilities, that he

had completely gone off course from his upbringing from a very humble background, hard-working, family oriented, to live up to those financial responsibilities, as well as his family responsibilities. And he, unlike some other individuals involved in this, went out and did the best he could and settled with those people. So anyone that filed an action against the companies, or Mr. Lauria or others, Mr. Lauria has settled with, and has left him, as you can see from the financials, in difficult financial shape, and obviously leaving his family in difficult financial shape.

So since he started in 1998 cooperating with the government, he has lived a legitimate life. He's attempted several business ventures, earned legitimate money, has paid off the people he's owed to satisfy settlements. He has certainly regretted what has happened and has tried to make up for it as best he can.

In addition, I would just like to note, your Honor, that because of the length of the investigation, the length of the case, which certainly benefits Mr. Lauria as well, he has been living something akin to a sentence for the last five and a half years, never knowing what is going to happen, not being able to get your life completely squared away and move forward, and every day not knowing with the family what is going to happen, has added, of course, the stress to his already substantial health problems that are outlined in our

submission.

I would ask your Honor to take all of those factors into consideration when fashioning an appropriate sentence for someone that led a hard-working life before, completely veered from that, and came back and has done everything in his power to make amends for that, your Honor.

THE COURT: Who are all of these people that you say he settled with, who are they?

MR. STAHL: They were investors that filed lawsuits.

THE COURT: How many were those?

MR. STAHL: I would say about between 15 and 20.

THE COURT: That's just a minuscule percentage of the number of investors who were defrauded, who suffered substantial losses as a result of Mr. Lauria's activity. Fifteen to 20 is not even a drop in the bucket.

MR. STAHL: Your Honor, I understand. I'm not putting Mr. Lauria up for a commendation at all. Mr. Lauria committed a complicated stock fraud, as we have seen too many times in this courtroom, and when I have been before you on other matters, people who start out legitimately, become greedy. They go on a slippery slope and the next thing they know they are involved in this. That's not excusable. But my point to your Honor is, Mr. Lauria has done what he can within his own financial means, and the people that sought claims, people that lost money in the investments, and

companies that had leased equipment to Mr. Lauria's company is not just his companies, but the people who were involved with Mr. Lauria, and none of the other partners have taken any of this action. This is something Mr. Lauria has done in an effort to live up to his responsibilities.

Obviously, when you see numbers in the $30 million range, we know Mr. Lauria did not receive that amount of money individually. We know that the amount of money goes into the entire conspiracy and the payoffs, and the organized crime extractions, and the brokers, and things like that. So Mr. Lauria sold both his homes, divested the money, and returned it to the government as part of restitution.

In addition to that, he has settled with the people that came forward. Obviously Mr. Lauria could not go out and track down each and every individual investor and offer them a penny on each dollar that was lost. He was one part of a very large group of individuals. Most of them have been before your Honor, 24, I believe, individuals that the government directly, through Mr. Lauria's cooperation, was able to indict, in addition to all of the other cases, including ongoing cases that he has cooperated and still cooperates to this day with the United States.

THE COURT: Mr. Corngold?

MR. CORNGOLD: Well, your Honor, I think that the court is very familiar with this case. I don't think I have

to spend much time talking about the large extent of the fraud that was involved here, the number of people who were injured by the fraud, or Mr. Lauria's central role in the fraud. He was one of the three original partners.

I guess I would quibble a little with what Mr. Stahl said, only to the extent that this was not the kind of case we sometimes see where people start out legitimately, hoping to set up a legitimate business, and slip into criminality. I think it is clear, and I think Mr. Lauria will agree, that this enterprise was set up from the beginning to defraud people. Mr. Lauria knew that and was an active central participant in that, and the courts see numerous defendants involved, and Mr. Lauria was really at the top of the pyramid with his partners, Mr. Klotsman and Mr. Sater.

That being said, it is also important, and as I think I tried to lay out in the letter, it's important to recognize Mr. Lauria's cooperation was substantial. Because Mr. Lauria was at the top of the pyramid, he was able to give, maybe not sadly, but he was able to give a lot of cooperation for a number of people. He was always prepared to meet with us. He met with us willingly. We always found him to be an honest person in his conversations with us about his crime. He always admitted his crimes and he was prepared to testify.

There was no trial in this case, but Mr. Lauria

would have been one of the central witnesses in the trial, had he testified, and we believe that his testimony would have been credible and useful. So the court has to balance both the egregious harm involved here, but also the substantial assistance, in determining what the proper sentence should be.

THE COURT: Mr. Stahl made reference to threats which I see no reference to in your letter.

What do you know about that?

MR. CORNGOLD: The threats, your Honor, Mr. Lauria reported them. They are described in Mr. Stahl's letter. Agent Taddeo is here. I think the answer is, well, we were never able to identify who made the threats, and that doesn't mean that we don't believe that what he described didn't exist. We were just never able to track them down.

Is that fair?

AGENT TADDEO: That's correct.

MR. STAHL: Your Honor, first we know in particular there was the initial approach by a private investigator hired by Mr. Persico, and that was someone that Mr. Lauria had grown up in the neighborhood with. So that's one of the individuals that he was very concerned about, because Mr. Persico viewed as the ultimate act of betrayal.

Second, Mr. Lauria, the telephone call, I'm talking about to his wife talking about how cute their daughter is,

was traced to a phone booth a mile and a half away, and was reported to the local police, and of course was reported to Agent Taddeo and his squad at the time, and I believe that was all verified. Obviously, as Mr. Corngold said, they were never able to trace who made the call, but it was certainly a clear message to Mr. Lauria and his family.

THE COURT: Anything else?

MR. CORNGOLD: No, Your Honor.

THE COURT: Did you want to say something?

AGENT TADDEO: No, your Honor.

THE COURT: Mr. Lauria, what would you like to say to me this morning?

THE DEFENDANT: I have something I prepared.

First, I would like to apologize to you, your Honor, for being here today. On my behalf, I want to apologize to the people I hurt on Wall Street, my clients and former clients. I must apologize to my mother and father who came here to give us the American dream, and to watch her only son flush it down the toilet. It's been a devastating event for my family and myself. Your Honor, it was an opportunity that someone like me gets once in a lifetime and that's to get a chance on Wall Street. I came from a construction business, and it was the proudest moment of my life, knowing I was behind a desk at a job of this caliber. I failed everyone when I chose to take a shortcut to cheat, lie and steal.

I was aware of my actions and did them anyway, even though I knew the repercussions would be harsh. I take full responsibility for my actions and I knew I was wrong. I took advantage of the best opportunity someone like me could have, poor judgment, stupidity led me down the wrong path, which I was fully aware of in my heart.

Your Honor, it's been six years since I turned myself in and a decade since I committed the crime. In these years, I tried to be the best person I could be. I cooperated with the government and have done everything they asked of me and did more, including surrender material.

I have been scared for my life and my family that I love very much. I want nothing more than to change back time, especially when my youngest daughter was threatened. I learned the gravity of my crime went beyond money and put my family's lives in danger.

I cherish my every waking moment with my wife and daughters, and realize I want nothing more than to be around them and to be a great role model and to teach them to be hard-working citizens. I know I did bad things. I am really sorry. I brought shame and danger to my family. In addition to that, I now face time away from them, and the hardest is deportation, since I'm not an American citizen.

My family has endured tremendous humiliation and separation. Now they must either uproot their lives, leaving

behind friends and family, or leave me. I ask your Honor to take all of these things into consideration in sentencing me.

I tried to cooperate all of these years and tried to make amends for my wrong. I lived every day for the past six years in danger for my family and me, and fear of the unknown for today the sentence sought itself. I accept full responsibility for my actions, your Honor. That's all I have to say.

THE COURT: Well, I don't know how many defendants were involved overall in this case, but there were quite a few.

MR. CORNGOLD: There were 19 defendants in the indictment and four other defendants charged in separate counts.

THE COURT: I heard pretty much the same story over and over again. I don't suppose I will ever understand what it is that permits people like you and the other 18 or 19 people who have been involved in this case to embark upon that course of conduct and then continue with it for so long. I just don't know what happens to a moral compass, if such a compass exists in your universe, interest never ceases to absolutely confound me that day in and day out you and your colleagues knew that you were defrauding a lot of people, that you were inducing people to take money which they may have set aside for their children's education and for their

retirement, and it was all lost.

I'm also never capable of understanding the incredible goal ability of people who have invested or willingly give money to firms such as State Street Capital, and the others. I guess in a sense they are motivated by the same desire that motivates you or motivated your desire to get rich quick and to buy penny stocks, relying upon representations that they will become very rich in a short while.

I guess in most of us, thankfully, hopefully there's a little small voice which resides within us, which speaks to us when we are about to do something that is wrong, that little voice tells us not to do it, and we listen. And you and the others either didn't have that little voice, or if you did, you weren't paying any attention to it.

What troubles me about this sentence, you put it correctly, it troubles me all the time, these motions pursuant to 5K1 are terribly troublesome. They are troublesome. The trouble was compounded by the fact that it's been five and a half years since Mr. Lauria reported to the government and said, I'm ready to tell you everything I know. Why does it take or why did it take five and a half years? I guess in a sense the fault may be mine. I know what your answer was, Mr. Corngold, or will be, well, cooperating during this entire five and a half year period.

I really am a little skeptical about that. Most of the other defendants have pleaded and have been sentenced some time ago, most of them have.

MR. CORNGOLD: That's right.

THE COURT: And I suppose to some extent the fault also lies with us. I keep getting letters from you, from Jonathan Sack, telling me to please postpone the sentence because Mr. Lauria still is assisting us. So the sentence gets put off year in and year out, and during that period of time in a sense I guess the sentence is really being served to some extent by the defendant, really in a state of limbo or uncertainty.

What's going to happen since 1998? Will I be separated from my family? If so, for how long?

Could I start a new career? Could I embark upon a new venture.

Does the government think about that? Don't answer. I don't want to hear it. I guess to some extent it is our fault. Maybe we should say when we get these letters, no, it is enough, too much time has gone by, it shouldn't have taken all of that long. How much more information could you have gotten? He probably gave you everything you needed to pursue a very successful prosecution within six months after he began to cooperate with you. What did you have to know? He told you what Sater was doing, what Klotsman was doing, what

all of the others were doing. How the fraud was perpetrated.

What else did you have to know?

Why did it take five and a half years?

I'm not a prosecutor. I don't prepare these cases. But just common sense would tell me that you know pretty much everything you had to know a long time ago in order to pursue a successful prosecution, particularly if Mr. Lauria is willing to cooperate and testify against all of these people. That compounds the difficulty which I have, because in a sense it is not inappropriate for me to take into account five and a half years during which Mr. Lauria was living in a state of limbo. He wasn't separated from his family, that's true. He wasn't spending all of that time in a federal correctional facility, that's true. But there are all kinds of confinements, some are physical, some are psychological. I don't know which is worse. Maybe I would like to hear from you, Mr. Corngold.

Why did it take five and a half years?

MR. CORNGOLD: Well, your Honor --

THE COURT: I don't think you were involved from the beginning. I think this is Mr. Sacks.

MR. CORNGOLD: I think that the general point that the court is making is actually correct, and I do find it troubling, I think in this instance with Mr. Lauria and a couple of his other codefendants whose haven't been sentenced

yet, there are still two, there are still three more, the reason is the specific one which is that there were other matters that the government felt that Mr. Lauria had potentially contributed to that were serious and significant that in this instance didn't pan out to the degree that it deserved discussion in the letter, but that we felt we had a good reason to think that it was useful to let Mr. Lauria continue to try to work on those matters. I think in general the court is right, though. I think in general the government and I let these things drag out too long, but I do think in this instance if the court wants me to describe in more detail what I'm talking about --

THE COURT: No.

MR. CORNGOLD: In this instance with Mr. Lauria and codefendants, it was actually appropriate, but I do take the court's point, which I do think is right.

THE COURT: I am going to grant the government's motion pursuant to 5K1.1, and for the reasons which have been indicated in the letter on behalf of the defendant, which I won't bother spreading on the record. I think they have been alluded to.

I'm going to put Mr. Lauria on probation for a period of five years. As a condition of probation, I'm going to direct 12 months of home confinement, 300 hours of community service, $100 special assessment, and a $20,000

fine.

For the reasons indicated in the government's letter, with which I fully agree, regarding restitution, restitution in not appropriate in this case for the reasons which will be found in 3664(a) and 3663(a)(C)(3) of Title 18 of the United States Code.

I don't think there was an underlying indictment here, was there?

MR. CORNGOLD: No, Your Honor.

THE COURT: This was a plea to an Information?

MR. CORNGOLD: That's correct.

THE COURT: Mr. Lauria, the relative leniency of the sentence which I'm imposing today should not for a minute give you the slightest suggestion that the sentence reflects a forgiving view of what you were involved in back in the early '90s. I don't think there's anything more for me to say which would add to what I have already said in connection with this case. There's nothing else?

MR. CORNGOLD: No, Your Honor.

MR. STAHL: No, Your Honor.

THE COURT: These proceedings are concluded.

MR. STAHL: Your Honor, I just have one point --

THE COURT: Before we go any further, there was a Cooperation Agreement, right?

MR. CORNGOLD: Yes, Your Honor.

THE COURT: And there was no waiver in that agreement that generally isn't those pleas.

MR. CORNGOLD: That's correct.

THE COURT: So I'm obliged Mr. Lauria that he has a right to appeal this sentence, only God knows why he would, but you have that right, and if you can't afford to fund an appeal, you can make an application to have the fees waived.

If there's nothing else, these proceedings are concluded.

Is there something else?

MR. STAHL: Your Honor, I just have one brief point of clarification. I don't know how it works in the Eastern District, I apologize.

THE COURT: The question is, can you he continue to work? The answer is yes.

MR. STAHL: Yes.

THE COURT: Anything else?

MR. STAHL: No, Your Honor.

MR. CORNGOLD: Thank you very much.

(The sentencing is concluded.)