1

<pre>
 1                   UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
 2
   - - - - - - - - - - - - - X
 3
   UNITED STATES OF AMERICA,    :
 4                               :
                  Plaintiff,  :      CR-98-1101
 5                               :
         -against-              :      United States Courthouse
 6                               :
                                 :      Brooklyn, New York
 7
   JOHN DOE,                    :
 8
                  Defendant.  :
 9                               :      October 23, 2009
                                 :      10:00 a.m.
10   - - - - - - - - - - - - - X

11                      TRANSCRIPT OF SENTENCING
                   BEFORE THE HONORABLE I. LEO GLASSER
12                 UNITED STATES DISTRICT SENIOR JUDGE

13   APPEARANCES:

14   For the Plaintiff:      BENTON J. CAMPBELL, ESQ.
                             United States Attorney
15                           BY:  TODD KAMINSKY, ESQ.
                                  MARSHALL MILLER, ESQ.
16                           Assistant United States Attorneys

17   For the Defendant:      KELLY MOORE, ESQ.
                             LESLIE CALDWELL, ESQ.
18

19

20

21   Court Reporter:         FREDERICK R. GUERINO, C.S.R.
                             225 Cadman Plaza East
22                           Brooklyn, New York
                             718-330-7687
23

24
   Proceedings recorded by mechanical stenography, transcript
25   produced by CAT.
</pre>

2

1          THE COURT CLERK:  Criminal cause for sentencing,

2    docket number 98-CR-1101, United States v. John Doe.

3          Counsel, please approach and state your name for the

4    record.

5          MR. KAMINSKY:  For the United States, Todd Kaminsky

6    and Marshall Miller.

7          Good morning, your Honor.

8          THE COURT:  Good morning.

9          MS. CALDWELL:  Your Honor, for Mr. Slater, Leslie

10   Caldwell and Kelly Moore.

11         THE COURT:  Good morning.

12         MR. KAMINSKY:  We are joined by probation officer

13   Michelle Espinoza.

14         MS. ESPINOZA:  Good morning, your Honor.

15         THE COURT:  Are you ready to proceed?

16         MR. KAMINSKY:  Yes, Your Honor.

17         MS. CALDWELL:  Yes, your Honor.

18         THE COURT:  Have you reviewed the presentence report

19   with your client?

20         MS. CALDWELL:  Ms. Moore will address the issues on

21   the presentence report.

22         THE COURT:  You took some exception to some aspects

23   of the presentence report.  Why don't we dispose of that

24   first.

25         MS. MOORE:  Yes, Your Honor.

```
 1        THE COURT:  I think for the most part the probation

 2   department was in agreement with your observations.  I think

 3   we start at paragraph 110.  23 should be changed to 20.

 4        MS. ESPINOZA:  Yes, Your Honor.

 5        THE COURT:  And in paragraph 115, 37 should be

 6   changed to 34.

 7        MS. ESPINOZA:  Correct.

 8        THE COURT:  Paragraph 117, 41 should now read 34.

 9        Paragraph 121, 45 should read 38.

10        MS. ESPINOZA:  Yes, your Honor.

11        THE COURT:  Paragraph 123 should now read 1 instead

12   of 0; paragraph 125 becomes 2 instead of 1; paragraph 126

13   becomes 38; paragraph 128 becomes 40; 130 becomes 37; and 192

14   should read 37 on the first line and 262 to 327 on the second

15   line.  On paragraph 201, the range should range from 20

16   instead of 25.

17        MS. ESPINOZA:  Correct, your Honor.

18        THE COURT:  I think that was all of it.

19        MS. MOORE:  That's right, your Honor.

20        THE COURT:  I take it you received a communication

21   that I found on my desk this morning.

22        MS. CALDWELL:  Yes, Your Honor.  We received that

23   yesterday.

24        THE COURT:  You want to be heard?

25        MS. CALDWELL:  Yes, Your Honor.  I will start with
```

FREDERICK P. SHERINO, C.S.R.        OFFICIAL COURT REPORTER

1   that, since the court raised the issue.

2           Mr. Slater a couple of weeks ago was out with his

3   wife at a restaurant and had a little too much to drink and

4   was driving home.  Mr. Slater realized that he had too much

5   to drink and pulled over into a park and was actually sitting

6   in his car.  We have the police reports, which we could

7   provide to the court, if you like.  He was sitting in his car

8   with the engine running, but parked, thinking that if he sat

9   for half an hour or an hour he would be able to drive again.

10  He was only a couple of miles from his home.  The police

11  officer asked him to get out of the car, which he did, and he

12  failed the field sobriety test.  I believe he tested .9

13  and.829 was the state limit.  That case is pending in Nassau

14  County.  We really don't think that case has any bearing on

15  this case or should have any bearing on this case, in light

16  of all of the other circumstances of this case, which I would

17  like to address now.

18          THE COURT:  Go ahead.

19          MS. CALDWELL:  Unless the court has any questions

20  about the DWI.

21          THE COURT:  Does the government want to comment in

22  it now?

23          MR. KAMINSKY:  No, Your Honor, other than the fact

24  that we think this incident, while unfortunate, does not

25  reflect in any way the extraordinary cooperation Mr. Slater

1   provided starting in 1998 and continuing nearly up to the

2   present day.

3           THE COURT:  All right.

4           MS. CALDWELL:  Felix Slater was really a self-made

5   man, as you know from the presentence report and letters.  He

6   was an immigrant from Russia.  He worked his way to Wall

7   Street where he was very successful.  He was a young man who

8   was working at several at the time name brand brokerage

9   firms, including Shearson Lehman, until one unfortunate night

10  in 1991, at age 25, he went to a bar, had too much to drink,

11  and got into an altercation with another person.  The other

12  person suffered.  Mr. Slater hit that the other person, and

13  that impulsive act resulted in a criminal conviction for Mr.

14  Slater.  That had a cascade of consequences for him.  He lost

15  his Series 7 brokerage license.  As a convicted felon, he was

16  not really able to get legitimate work.  He was in need of

17  money.  He was married and had a young child.  He foolishly

18  connected with some friends from his boyhood who were

19  operating a securities brokerage firm.

20          As the court will recall in the mid-'90s there were

21  a lot of pump-and-dump type brokerage firms, and Mr. Slater

22  foolishly connected with those individuals.  He left that

23  business in 1996 of his own accord.  He has not engaged in

24  criminal activity since 1996.

25          Mr. Slater was working in Russia when in 1998 the

6

1    New York City Police Department happened to stumble upon a

2    mini storage box that contained a cash of documents, all

3    described in the government's letter, that were linked to Mr.

4    Slater.  Again, this was not an investigation that was

5    pending or ongoing.  There were no charges brought.  This was

6    a box of documents, to use the government's word,

7    "indecipherable," but connected to Mr. Slater.

8            Mr. Slater was in Russia working as a consultant for

9    AT&T at the time and heard that the F.B.I. was looking for

10   him.

11

12

13

14

15

16

17

18

19

20

21

22                                        Mr. Slater provided,

23   flew to the United States to surrender to F.B.I.  he began to

24   cooperate, pled guilty in 1998, and he's been cooperating

25   ever since.

FREDERICK P. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

1    His cooperation has included the type of cooperation

2  that the court often sees which is against traditional

3  criminals, including people who worked at the brokerage firm

4  where Mr. Slater worked.  Again, he surrendered in 1998.  No

5  one had yet been prosecuted in connection with the State

6  Street brokerage firm where he worked.  But the government

7  was able to prosecute more than 19 people at various levels

8  of that operation, ranging from the brokers, to the people

9  who were transferring money,

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

8



25  The government describes Mr. Slater's cooperation in

FREDERICK P. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

9

1    their letter as exemplary. He has worked with several F.B.I.

2    agents over the years. Four of those agents are here in

3    court today, and I understand, if the court permits, at least

4    one of them will address the court.

5            The government also says that Mr. Slater's

6    cooperation was above and beyond what could be expected of a

7    cooperating defendant. If it is, that's an understatement,

8    but Mr. Slater is somebody who cooperated for ten years, your

9    Honor. He's somebody whose life has changed dramatically

10   since 1996. He is somebody who legally turned his life

11   around. He made a stupid mistake in a bar fight, and again

12   that had a ripple effect which caused him to make another

13   stupid mistake. But really since 1996 he has been working

14   legitimate jobs, cooperating since 1998 with the government.

15   He has a very stable and healthy family life, and his wife,

16   his mother, and sister are all present in court here today

17   with him and are very supportive of him. He has three young

18   school-aged daughters who he's very dedicated to.

19           This is an individual who really has turned his life

20   around. You have the letters from his Rabbi describing his

21   involvement with the community, and we really think, you

22   know, I'm hesitant to use the word in the context of a

23   criminal sentencing, I'm hesitant to use the word

24   "redemption," but I think it fits Mr. Slater. I think he has

25   redeemed himself. He has made many, many amends over the

1    last 13 years -- excuse me, the last eleven years since he's

2    cooperating.  He's not going to - notwithstanding the DWI

3    incident - he's not going to appear before this court or any

4    other court again in the context of a criminal case.

5            We understand that to ask for a sentence of no jail

6    term and no probation is extraordinary, but we think it is

7    warranted in this case where Mr. Slater really has been under

8    a sort of defacto probation for the last ten years.  As he

9    has worked very closely with the F.B.I. agents, the

10   government has not seen it necessary to impose any kind of

11   restrictions or conditions on Mr. Slater over the last ten

12   years.  He has been traveling freely and does travel to

13   Russia in connection with the real estate business he's

14   involved in, and the government has not imposed any reporting

15   requirement on him over those last ten years.

16           THE COURT:  You have to slow down a little bit for

17   the arms of our court reporter.

18           MS. CALDWELL:  As I always did before.

19           In any event, your Honor, I think Mr. Slater is

20   really deserving of the full measure of leniency that this

21   court can impose, given the extraordinary circumstances of

22   his cooperation and the fact he has really rehabilitated

23   himself in these last -- really since 1996.  Thank you.

24           THE COURT:  Mr. Kaminsky or Mr. Miller.

25           MR. KAMINSKY:  I will address the court first.

1    While the underlying criminal conduct involved was
2    serious and real, I don't think there's any question that
3    Mr. Slater has prevented far more financial fraud than he has
4    caused.  In a moment, your Honor, if the court permits, I
5    would like to ask Special Agent Leo Taddeo to address the
6    court.  He is a senior F.B.I. agent who first worked with
7    Mr. Slater.  What he could tell you and what he will tell you
8    is that Mr. Slater was really the F.B.I.'s entry into the
9    types of financial frauds that were being perpetrated at the
10   time in the mid to late '90s the criminal financial wizards
11   were one step ahead of law enforcement, and literally that
12   was until Felix Slater cooperated with the F.B.I.

13       The 19 other defendants in the United States v.
14   Coppa case that came before your Honor is certainly the most
15   concrete form of that.  But far and beyond those 19
16   defendants, Felix Slater explained to the F.B.I. how these
17   schemes operated.  And then there are instances far too
18   numerous to mention in a 5K letter, but they would take any
19   given investigation they were looking into at the time, bring
20   it in front of Felix Slater, and he would explain to them
21   what was going on.  He clearly illuminated and elicited
22   information to them which brought countless arrests and
23   halted the fraud at the time.  That would be enough, your
24   Honor, for us to stand here and tell you that Felix Slater
25   went above and beyond, but that was only the beginning.

12

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20    Time and time again all agents here, and numerous

21    others who couldn't be here today, have told the government

22    Felix Slater was one of the best cooperators we worked with.

23    There was nothing he wouldn't do.  No task was too big.  He

24    was really helpful and was the key to open a hundred

25    different doors that they couldn't open prior to that time.

FREDERICK P. GUERINO, C.S.R.          OFFICIAL COURT REPORTER

1          So, your Honor, if the court permits, at this time I

2     would like to ask Special Agent Leo Taddeo, who from the

3     inception worked with Felix Slater, address the court and

4     tell you about that experience.

5               THE COURT:  All right.  Let him come up.

6               A VOICE:  Good morning, your Honor.

7               THE COURT:  Good morning.

8               State your name.

9               A VOICE:  Leo Taddeo.  I'm the Assistant Special

10    Agent in the City of Baltimore's Field Office.

11          Good morning, your Honor.  First I would like to

12    corroborate and confirm the 5K letter and statements made by

13    Mr. Kaminsky and add a view observations, if I could.

14          I worked with Mr. Slater from the outset of this

15    stock fraud investigation and he was the epitome of

16    professionalism in our efforts to not only uncover the

17    scheme, but all of the different individuals involved. He

18    answered every single phone call I made to him.  He answered

19    every question honestly.  He did his best to be truthful and

20    not exaggerate.  A person in his situation would have easily

21    believed that he could get more favor from the F.B.I. by

22    making a bigger story than what was already apparent, but he

23    didn't exaggerate or try to make himself anymore important

24    than he already was.

25          I also observed his interaction with his family and

1    other individuals, and I can say he's a dedicated family man

2    and actually a pleasure to work with.

3           In terms of the effects of his cooperation, in

4    addition to what is in the 5K letter, I just want to add in

5    the mid-'90s, the F.B.I. was facing the probability of seeing

6    organized crime on Wall Street, but not being able to do much

7    about it.  And given between success and failure for us is

8    often an effective cooperating witness.  Felix Slater was

9    that cooperating witness.

10           THE COURT:  He had Frank Coppa at one point, too.

11           AGENT TADDEO:  Your Honor?  Your Honor, he was

12    instrumental bringing Frank Coppa in, and as a result of his

13    cooperation, caused further damage to the Bonnano family.

14    Without his cooperation, it would have been a few more years

15    where the F.B.I. would have effectively removed La Cosa

16    Nostra from the penny stock business.  And I would easily

17    credit Felix not only his efforts, but the cascading efforts

18    of bringing other witnesses in to basically eliminate the

19    threat on Wall Street.

20           Once again, I know he worked with other agents, and

21    I heard nothing but similar comments from them about the

22    nature of his cooperation and his personality and

23    professionalism, and I'm here today on his behalf.  I hope

24    that his family can get on with their lives, and he can go on

25    to be prosperous and a good dad and husband.  I know he is.

1   Those are my comments, your Honor.

2          I'm happy to answer any questions.

3          THE COURT:  Thank you.  Mr. Miller.

4          MR. MILLER:  Your Honor, I don't want to try the

5   court's patience by repeating what has already been said by

6   Ms. Caldwell, Mr. Kaminsky, and Agent Taddeo, but I did want

7   to underline two things.  One was Mr. Slater's cooperation to

8   the office and the many investigations he participated in.

9   The length of his cooperation is extraordinary.  And I wanted

10  to be here to express from the office's perspective just how

11  capable a cooperator he was, how important a cooperator he

12  was, and how effective he was.

13

14

15

16

17

18

19

20                         So those are the two points I wanted to

21  make.

22          THE COURT:  All right.

23          Mr. Slater, what would you like to say to me this

24  morning?

25          THE DEFENDANT:  I have been writing what I am going

16

1    to say for eleven years, but I don't want to read it.

2           I'm not proud of what I have done.  I felt I was

3    trapped at the time I agreed to do it.  I had a bar fight,

4    went to jail which something I never thought I would ever do

5    nobody ever thought I would go to jail for a bar fight.  I

6    had to find money for an appeal that my lawyer was trying to

7    file and I didn't have a job.  I had a four-month-old

8    daughter at that moment, legal bills mounting, personal

9    bills, and a childhood acquaintance approached me with this

10   scheme, which I subsequently pled guilty to in front of your

11   Honor.
                            KYA o - SANIAN
12           THE COURT:  Is that Clarkson?

13           THE DEFENDANT:  Yes.  Prior to that I never had any

14   run-ins with the law.  I worked with very legitimate firms,

15   very honest.  I had one complaint in the entire time I worked

16   on Wall Street prior to my criminal activity.

17           During the two and a half years that I was involved

18   in this activity, I spent a year of those in jail.  I hated

19   myself, despised myself for doing the things I was doing

20   while I was doing them, because my parents did not sacrifice

21   what they sacrificed to have me come to this country and

22   become a criminal.  The acts that I committed were

23   despicable.  They just weren't financial fraud.  I took

24   ability and opportunity and flushed them down the toilet.

25   The bar fight and the acts that I took afterwards are not a

1    justification.  I'm just merely trying to explain the
2    circumstances under which I engaged in that activity, what
3    was happening to me at the time.

4         I quit of my own accord, approximately two years
5    before the government asked me, until I found out that there
6    was a case getting started or investigation.  I quit.  I did
7    not want to be involved in criminal activity.  I went to
8    Russia to work in telecommunications to get away from what I
9    was involved with here. ███████████████████████

10   ████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████

13   ████████████.  But more importantly because why I have
14   continued all of these years, why I was asked many times by
15   various agents, by various prosecutors, is it time yet to get
16   sentenced?  I said no, I'm willing to continue working.  I
17   did it because I want some redemption.  Yes, I am a criminal.

18        Yes, I am guilty of the things that I have done.
19   The worse thing that could happen, your Honor, despite
20   whatever sentence you impose upon me, I went into real estate
21   development and I built a very successful real estate company
22   right up the block, a Trump project, built the whole thing.
23   Years ago they wrote an article in the newspaper, "executive
24   with ties to Donald Trump has a criminal past"  the next
25   month I had to leave my company, the company that I built

FREDERICK P. GUERINO, C.S.R.          OFFICIAL COURT REPORTER

 1   with my own two hands, otherwise the banks would have said

 2   there's a criminal involved.  I had to get out.  At that

 3   moment I thought my life was over.  Here I am trying to

 4   rehabilitate myself and keep getting the rug pulled out from

 5   under me.  I thought that was the case until a week later my

 6   daughter came home and said the kids at school said my Dad is

 7   a terrorist.

 8          I guess the worst thing that is going to happen and

 9   is happening is the blight I put on my children, and I will

10   now in the past and in the future try to do good deeds, try

11   to be a positive member for my family and for my community to

12   in some way hopefully balance out the mountain of garbage I

13   heaped on my own life.

14          In closing, your Honor, I'm guilty of the things I

15   have done and I stand before you with no justification, and

16   I'm ready to accept any punishment you feel is deserving for

17   me to fulfill anything that I have done.

18          THE COURT:  I frequently hear a phrase that Ms.

19   Caldwell used, literally hundreds of persons who stand before

20   me that do use, "I made a terrible mistake."  The word

21   "mistake" always intrigues me.  Given what you have done over

22   the past eleven years raises a question as how is it

23   possible, given the character that you exemplified those

24   eleven years, how is it possible that you became involved in

25   an enterprise, which is what the RICO prosecution was all

1  about, calculated a massive series of securities frauds,
2  which were conceived by a cadre of callous, corrupt venisons *villains*
3  of the security industry, who also enlisted the assistance of
4  the likes of Garafalo and Cochlin (ph), the Persico and the
5  Colombo families, and I have asked myself countless times how
6  has that happening?  And I have been able to answer that
7  question by assuming and believing that most of us have a
8  little voice inside us which speaks to us when we think of or
9  about to do something wrong.  It says to us, don't do it, it
10  is wrong.  And there were times that I have come to know that
11  there are some persons who don't have that little voice.
12  They never hear it, never listen to it.  And there are some
13  who do.  I guess you exemplify that category; you heard that
14  voice.  You weren't listening to it at the time when Clarkson
15  invited you to join them.

16        I'm required, although it is an oxymoron, to
17  consider the guidelines which are unconstitutional, but I'm
18  to be guided by them, and if I do disregard them drastically,
19  an appellate court will tell me I did something unreasonable,
20  although semantically I never understood why if a judge has
21  discretion, how could it be abused by definition.  He has the
22  privilege of doing whatever he believes to be right.

23        One of the greater judges of our country, Judge
24  Friendly, attempted to resolute that years ago and concluded
25  when the Court of Appeals says a district court judge abuses

FREDERICK P. CUERRINO, C.S.R.        OFFICIAL COURT REPORTER

1   discretion, all they are saying is we disagree with him.

2   That becomes relevant in connection with your sentence

3   because I'm obliged to consider the nature and circumstances

4   of the offense and the seriousness of the offense.  The

5   seriousness of offenses I guess for most people who

6   automatically define offenses which inflict serious physical

7   harm, murder, rape, burglary, assault, but the offense with

8   which you were involved was also extremely serious because

9   one can't measure how many, literally hundreds of persons,

10  bought Fun Time, Hydrock, Holly, United States Bridge,

11  worthless stock, lost money which they have set aside for

12  retirement.  Lost money which they set aside for their

13  children's education.  And the harm with which that kind of

14  crime, characterized as white collar crime, is in many

15  respects far more serious than the floating infliction of a

16  serious act.  So I'm obliged to consider the seriousness of

17  the offense.

18          I'm obliged to consider the sentence achieving

19  promotion and respect for the law.  It is a rather curious

20  factor for the court to consider, promote respect for the

21  law.  What does that mean?  Obviously it doesn't mean that I

22  can administer a credible injection into your head and

23  instantaneously instill respect for the law.  What it means

24  is to convey an understanding - which at this point I believe

25  is irrelevant for me to covey - convey an understanding that

FREDERICK P. GUERINO, C.S.R.          OFFICIAL COURT REPORTER

1   when the law makes certain conduct illegal, it means it.

2   That's what promoting respect for the law means, believe what

3   the law means when it says securities fraud is a crime.

4   Don't do it. And the arm of the law is pretty long. It

5   eventually will catch up to you.

6         The most difficult task of that statute, 3553(a),

7   which the court is obliged to consider imposing just

8   punishment, and there is no mathematical, scientific, or any

9   other guide to determine what just punishment is, I sometimes

10   like to think of a question that somebody said was asked

11   about God. Somebody asked whether God prays. And the

12   response was, that's a remarkable silly question, God prays?

13   What would God pray for? And the answer was that God prays

14   that his sense of mercy will overcome his desire for justice,

15   and naturally would be factored into what is just punishment

16   in your case.

17         What is interesting and difficult about your case,

18   literally hundreds of cases like it, judges tend to become

19   cynical and mindful. So with cooperators. We understand in

20   most instances there's a very quick cost benefit analysis

21   which is made. A person is apprehended for having committed

22   a crime, and rather quickly decides that perhaps the best way

23   to minimize my sentence is to begin to cooperate. And the

24   other troublesome and interesting aspect of this phase of

25   sentencing in this case is the more sophisticated and

1   knowledgeable the criminal, the more valuable is his

2   cooperation, and the more benefit he can obtain, and offset

3   the punishment which might otherwise have been imposed.  We

4   see that all of the time, low-level drug dealers, couriers,

5   have no information they can give to the government which

6   would provide any assistance, so they suffer the sentence

7   which the law requires.  A person who was higher-up on the

8   ladder, drug trade or a securities fraud has a lot of

9   knowledge and information to convey to the government, is

10  obviously in a much better position.

11       So really getting down to the crux of this, to what

12  extent should your very valuable cooperation offset the

13  guideline sentence, which statutorily for RICO is 20 years,

14  and for guideline, 262 to 300-some-odd-months, to what extent

15  does your cooperation offset that enormous amount of time?  I

16  don't think anybody truly suspects that a sentence of 20

17  years or 262 months would be imposed, except the newspapers

18  like to trump the numbers, facing a jail term of 120 years

19  and so on.

20       But there's another factor which I regard as quite

21  relevant, in a very real sense, I think, and you said it.

22  You have be writing your little allocution to me for eleven

23  years.  I've often wondered why it takes the government

24  eleven years or twelve years to bring a cooperator in for

25  sentencing.  In your case they were aware of your assistance,

FREDERICK P. CUERRINO, C.S.R.          OFFICIAL COURT REPORTER

1   the quality and extent of it.  They didn't have to wait to

2   call upon you to testify, have your sentence first, and

3   thought maybe you would refuse to testify in a case

4   thereafter because you had already been sentenced.

5         For eleven years I would suspect you had gone to bed

6   every night or every other night sleeping a little restlessly

7   and wondering what your sentence is going to be.  Then when

8   the day of punishment comes, what will be my fate?  For a

9   period of eleven years, and it's true of cooperating

10   generally, there is a kind of psychological imprisonment and

11   burden which they carry over that long period of time.  Their

12   life is not quite the same.  They don't have that same

13   carefree double mint care sense of life because they are

14   worried about when will that end.  So in effect there has

15   been a sentence which already has been imposed.

16         It's interesting in thinking about what I would do

17   this morning, I will use the word "redemption."  That in a

18   sense the remarkable assistance you have given to them, which

19   they told me about in a letter, Agent Taddeo just elaborated

20   on, in effect manifested a desire in you, the harm you caused

21   a lot of harmless people who were thwarted by the likes of

22   you and Aleks Paul and Clarkson, Salamon, the whole group of

23   thieves, that's essentially what they were.  And the extent

24   of your cooperation overall of those years clearly manifests

25   that you have a very sincere and deep respect for the law, at

1  least to this essence would suggest would be an appropriate

2  inference.

3       I'm not going to impose a term of incarceration, and

4  I'm not going to impose a sentence, but the statute, it is

5  interesting, the RICO statute provides that the penalty shall

6  be a fine or imprisonment.  It doesn't say probation and it

7  doesn't make imprisonment mandatory.  It could be a fine or

8  imprisonment.  I have a duty not only to you, Mr. Slater, to

9  see that justice is done to you, I have that obligation, and

10  I also have an obligation to the community which has in a

11  sense put you here, and some form of punishment, although it

12  comes very late, I think it is appropriate in the discharge

13  of my duty to put someone on some degree of punishment, and

14  I'm going to impose a fine of $25,000.  I've listened to and

15  looked at the factors one should consider in imposing the

16  fine.  They all clearly justify a fine in that sum, which

17  given the enormity of what you did, although many years ago,

18  I think is appropriate.

19       I think there's only one count in the indictment.

20       MS. CALDWELL:  That's correct, your Honor.  It was a

21  one count information.

22       THE COURT:  According to the statute, the fine

23  should be paid immediately to the clerk of the court.  If for

24  some reason during the time it would be inappropriate and an

25  application is made to that, I will consider it.

25

1         I think I'm also obliged to advise you that you have

2    a right to appeal the sentence.  If you cannot afford to pay

3    the cost of that appeal, you can make an application to have

4    the cost waived.

5         I think there's a forfeiture charge which was agreed

6    upon.

7         MS. CALDWELL:  Your Honor, Mr. Slater forfeited a

8    house in the Hamptons as part of his cooperation agreement.

9         THE COURT:  In Hampton Bays?

10        MR. CALDWELL:  Yes.

11        THE COURT:  I think it was provided for the

12   cooperation.

13        I don't think there's anything else for me to do in

14   connection to this proceeding.

15        MS. CALDWELL:  No.  Thank you, your Honor.

16        MR. KAMINSKY:  No, Your Honor.

17        THE COURT:  I wish you well next time you go to

18   dinner with your wife drink more miserly, modestly

19        I think these proceedings are concluded.

20

21

22

23

24

25