UNITED STATES DISTRICT COURT
<u>EASTERN DISTRICT OF NEW YORK</u>

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> -against- <br><br> FELIX SATER, <br><br> Defendant | No. 98-CR-1101 (ILG) |

**MEMORANDUM OF LAW IN SUPPORT OF FIRST LOOK MEDIA WORKS, INC.'S MOTION TO INTERVENE AND UNSEAL**

Emery Celli Brinckerhoff & Abady, LLP
600 Fifth Avenue, 10th Floor
New York, New York 10026
212-763-5000


First Look Media Works, Inc.
114 5th Avenue
New York, New York 10011
646-784-3287

## PRELIMINARY STATEMENT

  First Look Media Works, Inc. publishes The Intercept ("TI"), a non-profit online news outlet with a mission to expose corruption and injustice wherever its journalists find it. It has been recognized for its award-winning coverage in areas such as national security, politics, criminal justice, international rights, and more. It is known for its fearless, adversarial journalism. Johnny Dwyer is a contributing writer to TI. Declaration of David Bralow ¶ 5 ("Bralow Decl."), dated March 25, 2019. He is also the author of an upcoming book on the New York federal courts, *The Districts*, (Alfred A. Knopf), and an adjunct professor at New York University's Arthur I. Carter Journalism Institute. *Id*. In a letter dated February 12, 2019, Mr. Dwyer asked this Court to unseal filings in the above-captioned case, *U.S.A. v Felix Sater*. Among other items, Mr. Dwyer asked for the unsealing of the 5k1.1 Letter concerning cooperation, removal of redactions in a transcript of proceedings on October 23, 2009 (Dkt. 202), and any other sentencing memoranda. Bralow Decl. ¶ 6.

  TI seeks to intervene for the limited purpose of supporting Mr. Dwyer's request. TI also seeks the unsealing of those documents, the removal of redactions in various filings, and other relief that this Court will provide to fully protect the public's constitutional and common law rights of access to judicial documents in this proceeding.

  As Mr. Dwyer notes, on January 23, 2019, this Court observed that "this case, in all of its iterations, has been one of extreme public interest." *See* Order Granting Motion to Unseal, Jan. 23, 2019 (Dkt. 245). The public's focus on Mr. Sater's criminal history and his cooperation with the federal government has become even more acute. Mr. Sater himself has enhanced this attention with multiple interviews, television appearances, and other public activities. To use his words, he desires to "sit down and tell the truth. After 20 years of work protecting our country, I

1

didn't want it to come out the wrong way." CNN Interview, March 16, 2018, *available at* https://www.youtube.com/watch?v=rdFmBd9BXKs.

Mr. Sater is scheduled to appear before the U.S. House Intelligence and Judiciary Committees this week.[1] The Court knows that an intense light of scrutiny shines on Mr. Sater's relationship with Russian oligarchs and organized crime, his association with President Donald Trump, his involvement in meetings concerning building a Trump Tower in Moscow, his role in a back-channel proposal for a Ukraine-Russia peace deal, and his connection with President Trump's (now-convicted) former attorney Michael Cohen. Neither Mr. Sater nor any other proponent of closure can justify the continued sealing of these judicial records, especially when Mr. Sater himself publicly discusses his record of being an "American asset."

## BACKGROUND

TI is aware that this Court has had long experience with requests to unseal records in this case. TI respects the previous decisions of this Court, knowing it has previously balanced the First Amendment and common law rights of access to judicial documents against other private and governmental interests. Furthermore, TI acknowledges that this Court has unsealed multiple documents. TI maintains that changed circumstances compel the release of the documents requested by Mr. Dwyer and support a finding that the interests asserted by the Government and Mr. Sater—protecting the safety of Mr. Sater and his family, preventing publication that may serve as a disincentive for other confidential informants, and preserving the confidentiality of the presentence report ("PSR")—have diminished.

---

[1] *See* "House panel interviews Sater, holds Russia probe," Reuters, March 21, 2019, https://kfgo.com/news/articles/2019/mar/21/house-intelligence-panel-holds-russia-probe-hearing-next-week/

What has changed is Mr. Sater's desire to discuss his "years of service to the country." For instance, on March 16, 2018, Mr. Sater appeared on ABC's *Nightline*, where he confirmed that he was working as a "confidential source" for the CIA, the Defense Intelligence Agency, and the FBI. Bralow Decl. Ex. A at 1-4. He publicly confirmed information that had been previously published about his clandestine activities. *Id.*

In addition, Buzzfeed reported that:

- "[Sater] obtained five of the personal satellite telephone numbers for Osama bin Laden before 9/11 and he helped flip the personal secretary to Mullah Omar, then the head of the Taliban and an ally of bin Laden, into a source who provided the location of al-Qaeda training camps and weapons caches."

- "In 2004, [Sater] persuaded a source in Russia's foreign military intelligence to hand over the name and photographs of a North Korean military operative who was purchasing equipment to build the country's nuclear arsenal."

- "Sater provided US intelligence with details about possible assassination threats against former president George W. Bush and secretary of state Colin Powell. Sater reported that jihadists were hiding in a hut outside Bagram Air Base and planned to shoot down Powell's plane during a January 2002 visit. He later told his handlers that two female al-Qaeda members were trying to recruit an Afghan woman working in the Senate barbershop to poison President Bush or Vice President Dick Cheney."

- "[Sater] went undercover in Cyprus and Istanbul to catch Russian and Ukrainian cybercriminals around 2005. After the FBI set him up with a fake name and background, Sater posed as a money launderer to help nab the suspects for washing funds stolen from US financial institutions."

Bralow Decl. Ex. B.

Mr. Sater also appeared on:

- MSNBC with Chris Hayes, where he detailed how he became a Government informant and his relationship with President Trump. Bralow Decl. Ex. A at 7-11;

- CNN with Jim Hines, where he said he wanted to "tell the truth. . . . After 20 years of work protecting our country, I didn't want it to come out the wrong way and I wanted to give a full picture of everything I've done in protecting our country." *Id.* at 17-22.

3

- Fox News with Jesse Watters and Julie Banderas, where he described his meeting with a military intelligence officer who convinced him to be "an American asset." *Id.* at 23-24.

- Amazon Prime, "The Giant Beast That Is the Global Economy," where he described the mechanics of money laundering and diamond smuggling. https://www.amazon.com/Giant-Global-Economy/dp/B07MJDDG7W, beginning at 39:10.

Given Mr. Sater's recently found voice, the Government's and Mr. Sater's interest in secrecy diminish as the public's interest in disclosure waxes. Of significant importance is the public's right to evaluate Mr. Sater's history of criminality and clandestine service as this Nation considers the meaning of Mr. Sater's testimony before two House committees investigating the President's business and political ties to Russia from his candidacy to the present.

## ARGUMENT

### I. INTERVENORS HAVE STANDING TO INTERVENE FOR THE LIMITED PURPOSE OF ASSERTING THE PUBLIC'S FIRST AMENDMENT AND COMMON LAW RIGHTS OF ACCESS

TI, as a surrogate for the public, has standing and the right to intervene to protect the First Amendment and common law rights of access to judicial proceedings and records. In *Globe Newspaper Co. v. Superior Court for the County of Norfolk*, 457 U.S. 596, 609 n.25 (1982), the Supreme Court held that "representatives of the press and general public 'must be given an opportunity to be heard on the question of their exclusion'" from access to court proceedings and records. *Id.* (quoting *Gannett Co. v. DePasquale*, 443 U.S. 368, 401 (1979) (Powell, J., concurring)). The Second Circuit recognizes the appropriateness of allowing the public and the press to intervene in connection with the sealing of records or closure of court proceedings. *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 126-27 (2d Cir. 2006) (acknowledging that newspapers have right to intervene for access to sealed documents); *United States v. Aref*, 533

F.3d 72, 81 (2d Cir. 2008) (a motion to intervene is the proper procedural mechanism for the press and public to challenge sealing orders in criminal cases).

## II. THE PUBLIC HAS A FIRST AMENDMENT RIGHT OF ACCESS TO THESE SEALED RECORDS

The public and Mr. Dwyer have a presumptive, constitutional right to judicial records and transcripts concerning criminal sentencing proceedings and documents necessary for the judicial resolution of substantive motions. *Lugosch*, 435 F.3d at 120 ("[I]t is well established that the public and the press have a 'qualified First Amendment right to attend judicial proceedings and to access certain judicial documents.'" (quoting *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 91 (2d Cir. 2004)). That conclusion follows directly from applying the Second Circuit's methodology to determine when the constitutional right of access attaches.

There are two tests. *In re Application of N.Y. Times Co. to Unseal Wiretap & Search Warrant Materials*, 577 F.3d 401, 409 (2d Cir. 2009). First is the "history and logic" test. The public's right of access attaches to proceedings and documents "(1) that have historically been open to the press and general public, and (2) [when] public access plays a significant positive role in the functioning of the particular process in question." *Id* at 410. Second is the "necessary corollary" test. The public's constitutional right of access "protects access to judicial records that are 'derived from or a **necessary corollary** of the capacity to attend the relevant proceedings.'" *Id.* (emphasis added) (citation omitted).

Both methods apply here. The sealed records requested by Mr. Dwyer relate to the unique procedural history of Mr. Sater's case, including his sentencing and arguments among parties about whether motions and memoranda concerning the release of a PSR should remain

5

sealed. With the exception of the PSR itself, discussed below, the right of access attaches to all of the requested records.[2]

### A. Access to sentencing records satisfies the history and logic test.

The documents that relate to sentencing and plea agreements have historically been open to the public. *United States v. Alcantara,* 396 F.3d 189, 196 (2d Cir. 2005). Specifically, the right of access extends to sentencing memoranda and letters created under Rule 5k1.1, United States Sentencing Guidelines, evidencing a defendant's cooperation. *U.S. v. Eppinger*, 49 F.3d 1244, 1250-51 (7th Cir. 1995); *United States v. Doe*, 2019 U.S. LEXIS 36605 (D. Conn. 2019). *See Oregonian Pub. Co. v. U.S. Dist. Court*, 920 F.2d 1462, 1465 (9th Cir. 1990) (plea agreements and related documents); *In Re Washington Post (Soussoudis),* 807 F.2d 383, 390-91 (4th Cir. 1986) (sentencing proceedings and submissions); *United States v. Santarelli*, 729 F.2d 1388, 1390 (11th Cir. 1984) (evidence at sentencing hearing).

The logic prong is also satisfied. As stated in *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995), access "to testimony and documents that are used in the performance of Article III functions" is critical to ensuring public "confidence in the conscientiousness, reasonableness, [and] honesty of judicial proceedings."

### B. The right of access to records extends to documents that are necessary to a judicial proceeding.

The other documents requested by Mr. Dwyer are subject to the constitutional right of access because they were made part of and were relevant to the proceedings before this Court. The public's constitutional right of access extends to records that are "derived from or [are] a

---

[2] TI acknowledges and does not challenge the fact that the Second Circuit and this Court have held that the First Amendment and common law rights of access do not attach to PSRs. *In re Civil Contempt by Doe*, 2016 U.S. Dist. LEXIS 80882 (E.D.N.Y., June 21, 2016), citing *United States v. Charmer Indus., Inc.*, 711 F.2d 1164 (2d Cir. 1983).

6

necessary corollary of the capacity to attend the relevant proceedings." *Lugosch*, 435 F.3d at 120 (citation omitted). Thus, "the constitutional right of access . . . appl[ies] to written documents submitted in connection with judicial proceedings that themselves implicate the right of access." *In re N.Y. Times Co.*, 828 F.2d 110, 114 (2d Cir. 1987). This right of access to documents "relevant to the performance of the judicial function and useful in the judicial process" is even more robust with respect to motion papers where a court rules on the papers without a hearing. *Lugosch*, 435 F.3d at 115, 119.

### C. Neither the Government nor Mr. Sater can meet the burden of demonstrating that the records should remain permanently sealed.

The Government and Mr. Sater cannot meet the demanding burden necessary to justify continued closure. *ABC v. Stewart*, 360 F.3d 90, 98 (2d Cir. 2004). "[C]ontinued sealing of the documents may be justified only with specific, on-the-record findings that sealing is necessary to preserve higher values and only if the sealing order is narrowly tailored to achieve that aim." *Lugosch*, 435 F.3d at 124. Changed circumstances arising from the passage of time and the actions of the trial participants argue against continued sealing of these records. *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 140-41 (2d Cir. 2004).

Any compelling interests for closure that may have existed before have eroded with Mr. Sater's repeated public appearances about his cooperation with the Government and his relationship with the President Trump and his associates. The sealing of these documents no longer protects most, if not all, of the interests enunciated by the Government.

Previously, the Government put forward the following interests to justify closure: 1) the need to protect the safety of cooperating witnesses and their families; 2) the need to protect the Government's ability to continue to attract cooperating witnesses in the future; and 3) the need to

7

keep a defendant's PSR and its contents under seal.  Sealed Report of Special Master, *Roe v. United States of America*, No. 10-2905, Dkt. 472 (2d Cir. 2017).

These interests are no longer served by keeping these records sealed.

It is clear from his public appearances that Mr. Sater no longer thinks closure is necessary to protect his or his family's safety.  He has extolled his cooperation as an "American asset."  He has publicly discussed his activities as an "Bin Laden" hunter.  He has disclosed his other clandestine activities on news programs broadcast throughout the country and world.  While a Court may continue sealing for an inadvertent disclosure, Mr. Sater has publicly announced he wants "to sit down and tell the truth."  This Nation should not be forced accept the mere say-so of a person who is appearing before the House Judiciary Committee to provide testimony concerning the nature of the business relationship between the President, Russian oligarchs and the Kremlin before and during the 2016 campaign.  It should have complete information—including information about this person the Government has presented to a federal court.  Given that "the cat is out of the bag" and Mr. Sater wants to reveal his "20 years of work" for the country, there is no need for continued secrecy.  Similarly, release of this information should not serve as a disincentive for others to act as cooperating witnesses.  Mr. Sater's recent volunteerism is *sui generis*.

The only interest left is the Government's reflexive insistence that the PSR must be kept under seal.  The underlying reasons to protect a PSR from public disclosure are 1) to protect sources of information such as family members, the defendant, law enforcement agencies, and others; 2) to protect the disclosure of information provided in confidence and to preserve the ability to obtain information from sources; and 3) in recognition that the defendant may not have

8

had the ability to rebut inaccuracies and hearsay. *U.S. v. Charmer Industries, Inc.*, 711 F.2d 1164, 1170-72 (2d Cir. 1983).

While it is recognized that a PSR is not a judicial document upon which the right of access attaches, *Alcantara*, 396 F.3d at 197 n.6, information *derived from* the PSR and submitted to the Court in support of substantive motions are subject to access rights and require a demonstration that those interests are still compelling. If the information submitted was "relevant to the performance of the judicial function and useful in the judicial process," *Lugosch*, 435 F.3d at 119, the public should have the right to evaluate this material. *See also Amodeo*, 71 F.3d at 1050 (even documents that play a negligible role in the performance of Article III functions are subject to the right of access). At a minimum, the Court must review the requested information to determine that the reasons for continued confidentially are compelling.

Finally, the public has a compelling interest in obtaining these records. *Charmer Industries*, 711 F.2d at 1175. Mr. Sater is in the center of a full-blown investigation concerning his activities for the Trump Organization and his communications with Russian officials, among other things. His testimony may be helpful to Congress. The public has the right to fully review his record to form an impression of his credibility. That is the fundamental value that arises from the First Amendment.

### III. THE RECORDS ARE SUBJECT TO THE COMMON LAW RIGHT OF ACCESS

The requested records are also subject to the common law presumption of access for any "document which is presented to the court to invoke its powers or affect its decisions." *Amodeo*, 71 F.3d at 1050; *see also Lugosch*, 435 F.3d at 119. Under the common law analysis, the Court must balance the privacy interests of those resisting disclosure, the efficient administration of justice and significant interests in disclosure. *Newsday LLC v. Cty. of Nassau*, 730 F.3d 156, 165

9

n.10 (2d Cir. 2013). For the reasons set forth above, the common law presumption of access compels the disclosure of the records requested by Mr. Dwyer.

## CONCLUSION

For the reasons above, TI respectfully asks that this Court grant this motion to intervene and order disclosure of the documents requested by Mr. Dwyer.[3]

EMERY CELLI BRINCKERHOFF
& ABADY LLP

/s/
Andrew G. Celli, Jr.
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

FIRST LOOK MEDIA WORKS, INC.
David Bralow, Esq.*
First Amendment Counsel and Secretary
114 5th Avenue
New York, New York 10011
(646) 784-3287

*Attorneys for Proposed Intervenor First Look Media Works, Inc.*

*Application for EDNY admission pending

---

[3] TI wishes to thank the Media Freedom & Information Access Clinic, its staff attorney John Langford and Yale Law School students Eric Brooks ('19), Brandon Sadowski ('18), Meenakshi Krishnan ('18), and Adam Pan ('19) for their prior contributions this effort.