| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>FELIX H. SATER a/k/a SATTER | 98-CR-1101 (Glasser, J.) |

## STATEMENT OF NATURAL PERSONS OR POST-MORTEM ESTATES ERVIN TAUSKY, ERNEST GOTTDIENER, AND JUDIT GOTTDIENER IN SUPPORT OF PENDING MOTION(S) TO UNSEAL

### AND

### NOTICE OF APEARANCE

If it please the court, undersigned counsel hereby appears for the above persons for the limited purpose of filing this document in their behalf

### INTRODUCTION

Before this court, however informal some may be, are motions to unseal, in the most expansive case, the entirety of the record in this case to the extent it remains sealed. Because of recent events post-dating most of those submissions and because of what the undersigned persons (the Gottdieners) believe and wish to be heard about on the record in support of maximum possible unsealing, in some cases contradicting and in others perhaps making more clear and definite at least parts of those other submissions, the above-named persons submit this document through undersigned counsel, who appears in their behalf.

Counsel believes that, no Article III relief, direct or collateral, being sought by this filing, it solely a statement in support of the Article III requests of others, leave to intervene is not required; if the court disagrees, counsel asks it be deemed to incorporate such a motion.

## APPLICABLE LAW

The Gottdieners accept that the existing movants have adequately and correctly stated the law of public access, both the presumptive First Amendment right and the presumptive common law right, which is briefly that the rights are presumptive but qualified and the burden on the opponents to prove that by whichever test applies, there are, as established by clear and convincing evidentiary record, higher interests than that of access. Therefore, they will make no generic argument about such law(s), but confine themselves to arguing the application of that law to facts already in the record or which may be properly noticed.

## AS TO THE DWYER SUBMISSION

Turning to Mr. Dwyer, the Gottdieners believe one of his main arguments to unseal may be summarized as the presence of a especial need to investigate the implication of Donald Trump in the Sater case, which existed as an open criminal matter for eleven years, from its inception in 1998 through his conviction and the expiration of any right of appeal thereof which he had not already waived away. We address that shortly.

## AS TO THE VODICKA SUBMISSION

For the record, the Gottdieners (and counsel) do not either defend or condemn the tone and vehemence of Mr. Vodicka's submission. Neither they nor counsel were involved in it but, more important, rather than dissect its language they ask as the court as a courtesy to Mr. Vodicka, whose points should be taken with great care on their merits, that the court recognize that his vehemence may be explained by the years through which he has suffered personally by actions some of which may readily be related to and explained by actions of

2

Bayrock Group and relaed others. To be clear, we respectfully decline to come to the court's defense, having no duty to do so, while at the same time as we respectfully decline to adopt what he said in its entirety, its merits or its expression, but ask that, again, his anger be understood as overwhelming, as it was, and, to the extent we shall show, much of what he said, stripped of all invective, seems at least substantially correct factually and legally.

That said, a major thrust of Mr. Vodicka's argument is predicated on his insistence, in calmer language but nonetheless apparently true, that there were major violations of the Crime Victims Rights Act in the handling of the Sater matter underlying this docket. More simply, the Gottdieners believe that one major thrust of his arguments is, syllogistically, (1) "once an item is deemed relevant to the exercise of judicial power, "the weight to be given the presumption of access must be governed by the role of the material at issue in exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts"[1]; (2) there can be little doubt there was a clear violation of the CVRA in the Sater case; and (3) this makes the role, duty, obligation of citizens of a republic, choose your phrasing, to monitor its courts of absolutely overwhelming concern here and so to right to access all that went on in connection with it of absolutely overwhelming force.

The Gottdieners imagine the court won't disagree, at least with (1), as it is quoted directly from the most recent precedential ruling of the Second Circuit on the matter. See n. 1.

The Gottdieners respectfully assert that if put that way, Mr. Vodicka's argument is correct, and so in further support of the merits of that argument, they supply the following.

---

[1] *Brown v. Maxwell v. Giuffre* (CA2 18-2868-cv at 15-16 and n. 29, July 3, 2019), citing *United States v. Amodeo*, 71 F.3d 1044, 1049 (CA2 1995) ("*Amodeo II*")

3

**ARGUMENT IN SUPPORT I:**
**APPARENT CVRA VIOLATIONS**

We assume the court's, parties', and other movants' or intervenors' familiarity with the recent events of the Jeffrey Epstein case. To the extent that we rely on matters of public record, no evidentiary hearing should be necessary to accept them as properly supported.

On or about February 21, 2019, Judge Kenneth Marra (SDFL) issued an opinion about the handling of the Epstein case, for this purpose the seminal passage of which explains his ruling that the government violated the CVRA in its concealment[s] from the victims:

"Particularly problematic was the government's decision to conceal the existence of the [non-prosecution agreement] and mislead the victims to believe that federal prosecution was still a possibility …

"When the government gives information to victims, it cannot be misleading … While the government spent untold hours negotiating the terms and implications of the NPA with Epstein's attorneys, scant information was shared with victims."

The Gottdieners agree. The government violates the CVRA when it acts to hide material information from victims. So it's important to examine what we know happened with Sater.

Sater was sentenced in the EDNY on October 23, 2009. According to an order of this court which then-Solicitor General Verrilli, with a concurrence by then-U.S. Attorney Lynch, sent the United States Supreme Court to dissuade it from granting a cert petition about the Sater case perpetual concealment, he was sentenced in open court. ECF According to a

4

recently revealed transcripts of ex parte conferences between your honor, Sater, his counsels, and the government, no one ever moved to seal the sentencing when it was over (not that it could have been granted if it had been made). See transcripts of conferences held on April 27, 2011, ECF 225, and January 10, 2012, ECF 230.

Thus, if all these representations, including those intended for and made too the Supreme Court, are accepted as true (which makes them judicial admissions, insofar as that court did then deny cert, which then estops their denial), Sater was sentenced in open court, period.

Of course, once he was sentenced in open court (as the law requires in any event, with a partial exception for 5K1 discussion in camera), there became perfected and vested a right, frankly the Gottdieners believe an indefeasible property right, for them to be told of the sentencing, invited to be heard there, and, if restitution not be ordered in full, for them to first petition this court for same, then if unsuccessful to sue for same in the Second Circuit by mandamus.

So, respectfully, unless this court holds that somehow Sater ran a racketeering operation that had no victims but managed to bilk them of $40M to $6t0M anyway, it is inexplicable that, as the transcript confirms, no victims were heard.

Interestingly, this court has now said no restitution was awarded because the government wrote a letter (or otherwise asked, but apparently not by public motion) asking the court to rule that numerosity presented a problem for the court of such dimension that its cost to the sentencing process overwhelmed the right of victims to restitution.

There are some problems with that. The first is that there is no record of such a finding ever having been made in this case, nothing on the docket, and no record of any facts that would support it, and § 3663A provides that it can only be ordered upon record findings.

The second is that while there was such a ruling in the related case of Coppa defendant Salaman, it was anything but consistent with that law, for the documents we have obtained, which were filed in United States v. Coppa , 00-196, show that the government was confident it could compute the losses in timely matter because as it said there were only 101 victims and it had the necessary trading records. It was only a week later that without explanation they said nevermind, they would join with the defendant Salaman in asking the court to find numerosity, not explaining how 101 victims became so intractable mere days later.

That is why, whether or not this procedure satisfied the law as it existed when Salaman was sentenced, pre-CVRA, it could not possibly satisfy it when Sater was sentenced in 2009, as the CVRA had already taken effect, the Second Circuit had held by 2008 that it did, and did properly, apply to pending sentencings and open cases, and the whole point of the CVRA was that the victims be able to know exactly what was going on, what the court held, why it held it, and then again to sue the court to overturn that holding. Those are, together, property rights which cannot be taken without due process, and even then, compensation.

Finally, the Gottdieners note that then-U.S. Attorney Lynch testified under oath to the Senate during her nomination process that she wished she could explain why there had been no restitution in Sater's case but she could not because your honor had placed under seal all the documents in the case pertaining to restitution. We don't see how that could ever possibly be permissible under the statutes, but would your honor please help the public

6

dissuade itself that Ms. Lynch defrauded her way into office by unsealing whatever it was that she was talking about when she stated to Senator Hatch and his committee, because to keep material relevant if not dispositive as to restitution from the victims would seem to fly in the face of the clear intention of the CVRA to treat them fairly:

> In terms of restitution, there has been speculation that my Office pursues restitution from cooperating defendants differently than it does from other defendants. It does not. With respect to Sater's case, the information in the record that concerns the issue of restitution remains under seal. As a matter of practice, however, the prosecutors in my Office work diligently to secure all available restitution for victims, whether the defendants convicted in their cases cooperate with the government or not.

In closing, the Gottdieners respectfully point out that about a year or so ago, the Second Circuit in *Federal Insurance Co. v. United States*, No. 16-2967 (CA2 2018) held:

> Where the [CVRA] provides a crime victim the right to be heard at a sentencing, for instance, *the district court has no discretion to deny that right. If the right is arbitrarily denied, immediate resort to the court of appeals for prompt resolution is appropriate to ensure that the victim who has the right to be heard can be heard before the defendant has been sentenced*; at the same time, that petition would not seem to transfer jurisdiction to the court of appeals, or deprive the district court of jurisdiction, to make any substantive decisions about the disposition of the criminal case or any particular aspect thereof. [Emph. Add.]

Surely the court can see that this holding, in the context of why Congress provided for relief by writ of mandate to this or other recalcitrant court, that the court has no discretion to deny the victims the right to be heard, coupled with this court's (and others') representations to the Senate, directly enough, and to the Supreme Court, that all was proper even including that Sater was sentenced in open court, yet no victims were told even though

7

numerosity runs only to restitution and absolutely not to notification of victims, is problematic. We ask that so much be unsealed as can possibly reconcile all this.

### ARGUMENT IN SUPPORT II:
### IMPLICATIONS *IN RE* TRUMP

This court has responded, apparently in pure dictum as it wasn't attached to any order, that can be dismissed out of hand because none of the documents remaining under seal contain Trump's name.

With respect, that is constitutional error. If and to the extent Mr. Dwyer is a professional journalist (and putting aside the fact that it shouldn't matter any way, that the rights of access and speech are the public's, not that of the organized media [no Supreme Court decision ever held that media have the slightest priority claim to freedom of expression]), because it would place this court in the position of a newspaper editor deciding what might or might not implicate the President; it has to be the sole discretion of Mr. Dwyer, so long as his petition in that respect is not frivolous.

And it isn't, as we easily show, *without* use of sealed material and without the presence of Trump's name anywhere.

The Gottdieners respectfully direct the court's attention to *Oster v. Kirschner*, 77 A.D.3d 51 (AD1 2010). The question there was whether plaintiffs had sufficiently pled a cause of action for aiding and abetting fraud against defendant law firms. The gravamen of plaintiffs' complaint against the firms was that (1) a certain firm, Cobalt, was a criminal enterprise defrauding its investors; (2) plaintiffs were some of those defrauded investors; (3) one of the frauds perpetrated against them was the concealment of the fact that two persons at Cobalt, who they had been told were mere "worker bees," were really key control persons, but had their governance roles concealed because they were also convicted felons who had been hiding their prior convictions as part of an overarching scheme of fraud.

9

The Appellate Division held that they had indeed well-pled such a claim, not only because the attorney-defendants had sufficiently helped draft private placement memoranda which had induced the investments, omitting from them mention of the men's roles or criminal pasts, as well as done other legal support tasks which afforded a well-enough pleading by which the plaintiffs could establish colorable actual knowledge or "blind eye" avoidance.

Of course, nothing in its holding is limited to attorney-defendants, and nothing in the law makes a special exception for cooperators.

For the former proposition, the Gottdieners note that it is well-settled law in this circuit that a case concealed for a cooperator, even one concealed for a decade, is not a license to lie, rob, steal, or defraud. Indeed, in a case from the EDNY which cuts very close to home because its "heroes" were involved at much the same time in much the same frauds as was Sater and were prosecuted much the same way, the trial court, at the request of the very same EDNY U.S. Attorney Loretta Lynch, declined to give cooperator Myron Gushlak acceptance credit because, they argued and the court agreed, he used the secrecy of his conviction while cooperating to defraud his investors and others by hiding his conviction. *See United States v. Gushlak*, 03-CV-833 (NGG) (EDNY), aff'd No. 12–1919 (CA2 2013).

For the latter proposition, see *Smith v. Berg*, 247 F. 3d 532 (CA3 2)001 a seminal case in RICO, since followed by many courts in this circuit, holding that where a plaintiff claimed that a title company, with culpable knowledge that another defendant was running a title and mortgage fraud, kept on supplying title services, it became liable in RICO conspiracy.

And if we step out of the concept of private civil damages, *United States v. Marino*, 654 F.3d 310 (CA2 2011), tells us that where someone on the inside of a massive fraud like Bayrock

10

learns of the fraud and neither walks away entirely, clean break, is not heard from again, or reports the fraud to the authorities (which would include a federal judge), but stays in his association with the firm, even if not criminally charged with the substantive offenses, if charged with misprision, the fact that he kept quiet and continued working on firm matters while taking firm money as payment is enough to assess restitution against him for the entire time that he could have blown the whistle and thus stopped further victim losses.

Therefore, respectfully, the presence or absence of Trump's name on anything dating to the Bayrock period, beginning no later than 2001 and going on throughout and thereafter, is a matter of disinterest and irrelevance to the presence or absence of a Trump involvement of potentially epochal severity, especially since for the later years of the ongoing bank and mortgage frauds perpetrated by the concealment of Sater's conviction from banks and other investors and lenders while Trump was being paid in cash and on papers tens of millions of dollars for his services to and with the firm too place when the statute of limitations on such frauds – RICO predicates – for both stand-alone and predicate acts was ten years, thus remains open.

Because this is not a motion, counsel believes it would be improper to proffer evidence, but the court should know that should the court maintain that there ,ist be a factual showing of colorable (that is, non-frivolous) reason to examine everything for a possible Trump connection, counsel asks the court, in scheduling the hearing that would be necessary, consider:

First, counsel can and will introduce the equivalent of private placement memorandum that written and authored with, in behalf of, Donald Trump in which he *personally* describes to potential lenders or investors that Trump SoHo is his project in partnership with Bayrock.

11

Second, Donald Trump's own lawyers and others have confirmed that he knew the truth about Sater by 2010, yet he did not walk away or report the obvious extant frauds on at least the banks, if not the investors (and bank fraud occurs not on the application, but on the withdrawal of each tranche from the bank during construction).

And third, any threshold showing of "colorability" to justify such a hearing is already baked in the cake, if the court would consult the transcript of Sater's sentencing where he admits starting and building Bayrock with his own two hands, then complains that while he was able to use the secrecy of his conviction to borrow from banks (what had to be hundreds of millions of dollars) because they didn't know "there was a criminal involved," now that the truth was coming out, he was being forced out of his own company. *In other words, a confession that, supra, was made in open court and never asked to be sealed thereafter.*

The court's attention to this filing is greatly appreciated. We ask, therefore, that as the court has itself stated that the entirety of that sentencing took place in open court and was never sealed thereafter (nor, again, could it legally be sealed thereafter, once released into the public domain), the first item unsealed is the entirety of the transcript. The Gottdieners note that statute requires the reporter to have kept and made available for public inspection the entirety of that transcript anyway.

*****

For the record, the Gottdieners express no opinion on existing sealing or absence thereof; they were not parties or in any way involved with prior litigation in this court on that matter, and while affidavits and statements of third parties like Captain Giannini and the National Archivist seem dispositive that nothing was ever sealed, they take no position but do insist they are not bound by any purported finding that anything ever was ever sealed.

12

Montauk, New York
July 15, 2019

Counsel for the Gottdieners
/s/ Frederick M. Oberlander