

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

MM:TK
F.#1998R01996

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

August 27, 2009

**TO BE FILED UNDER SEAL**

The Honorable I. Leo Glasser
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

      Re: United States v. Felix Sater
           <u>Criminal Docket No. 98 CR 1101 (ILG)</u>

Dear Judge Glasser:

      The government hereby moves, pursuant to Section 5K1.1 of the United States Sentencing Guidelines (the "Sentencing Guidelines"), to permit the Court to downwardly depart from the defendant Felix Sater's Sentencing Guidelines range. The defendant is scheduled to be sentenced by the Court on September 18, 2009 at 10:30 a.m. As further discussed below, Sater's cooperation was of a depth and breadth rarely seen. For approximately ten years, Sater continuously worked with prosecutors and law enforcement agents to provide information crucial to the conviction of over twenty different individuals, including those responsible for committing massive financial fraud, members of La Cosa Nostra organized crime families and international cyber-criminals. Additionally, Sater provided the United States intelligence community with highly sensitive information in an effort to help the government combat terrorists and rogue states. Accordingly, the government hereby requests that the Court take into account Sater's extraordinary cooperation in imposing sentence. Because of the nature of the information provided herein, the government respectfully requests that this letter be filed under seal.

I. **Factual Background**

      On December 10, 1998, the defendant entered into a cooperation agreement pursuant to which he pleaded guilty to conducting and participating in the conduct of a RICO enterprise

through a pattern of racketeering activity, including fraud and money laundering, in violation of 18 U.S.C. § 1962(c). The RICO predicate acts consisted of securities fraud in connection with the fraudulent offerings and after-market manipulation of the securities of Country World Casinos, Holly Products, United States Bridge of N.Y., Cable & Co. and Fun-Tyme Concepts and the unlawful laundering of the proceeds of these schemes.

### Sater's Criminal Conduct

In 1993, the defendant joined with three other individuals, Salvatore Lauria, Gennady Klotsman and Walter Durchalter, to buy and run the brokerage firm White Rock Partners, later renamed State Street Capital Partners (hereafter "White Rock/State Street"). The business of White Rock/State Street consisted primarily of the sale of stock in small and start-up companies. The defendant, together with his partners, supervised all aspects of White Rock/State Street's business. The defendant and his partners secretly acquired ownership and control of substantial blocks of stock in these small and start-up companies. To hide their involvement in these stock purchases, they employed various methods such as using off-shore shell companies to purchase and hold these securities. Once the defendant and his partners controlled a large interest in these securities, they would then create an artificial demand for them by, among other things, paying brokers (from White Rock/State Street and from outside firms) to aggressively promote these securities to the public.

As part of this scheme, the defendant and others also sought to maintain the artificially-created price of these securities and illegally insulate them from regular market forces. Some of the techniques used by White Rock/State Street included: (a) issuing false and misleading statements to persuade investors to hold the securities; (b) purposely failing to take and execute customer orders to sell the securities; and (c) executing a sale of the securities only if the sale could be matched with a corresponding purchase of the same securities by another investor. When the price of these securities reached a desirable level, the defendant and others sold their secretly-held positions to unwitting customers of White Rock/State Street and other firms. These sales generated at least $40 million dollars in illicit proceeds, most of which was then carefully laundered though off-shore nominee bank accounts.

To protect and prolong these schemes, the partners relied upon organized crime ties. Sater, through his father, was associated with Ernest Montevecchi, a Genovese family soldier.

2

Lauria, through neighborhood connections, was associated with Daniel Persico, a Colombo family associate. Sater and his partners used their organized crime connections to counter various threats to White Rock/State Street's illegal enterprise. For example, Persico interceded and stopped an extortion of Andrew Bressman (the head of another corrupt brokerage firm), which threatened to keep Bressman from assisting in the fraud schemes. Additionally, Sater cultivated an association with Frank Coppa, a Bonanno family captain, who was paid to help keep short sellers from undermining the schemes, and to bring one of the schemes (involving Cable & Co.) to State Street.

In roughly September 1996, White Rock/State Street collapsed when, in response to relentless short selling, the price of securities manipulated by the firm fell sharply, and the partners were unwilling and unable to buy up sufficient shares to maintain their price. In September 1998, Sater self-surrendered to the Federal Bureau of Investigation ("FBI").

## II. Sater's Cooperation

In January 1998, the New York City Police Department received a call from the manager of a storage facility who was cleaning out a storage bin after its owners did not answer several delinquency notices. Inside the bin, the manager found loaded handguns and various documents related to White Rock/State Street which revealed Sater's role in the above-mentioned fraudulent schemes. Sater was overseas when he learned that law enforcement authorities were looking for him. In an effort to build a reserve of good will for the imminent prosecution he was to face in America, Sater contacted United States intelligence officers overseas and offered to provide them with information concerning Afghanistan's Northern Alliance. As will be discussed in detail below, during the spring and summer of 1998, Sater traveled to Central Asia where he gathered and passed on information to United States sources about the Northern Alliance's desire to resell Stinger missiles to the United States government as well as information about the Taliban and Osama Bin Laden, among other things. Sater contacted the FBI during this period and kept agents apprised of his activities overseas. In September 1998, Sater returned to the United States and surrendered.

When Sater returned to the United States, he was extensively debriefed about the White Rock/State Street schemes. He provided highly detailed information about the criminal activities at these and several affiliated firms. Sater's information proved to be, in all respects, truthful and highly

useful in explaining and corroborating the evidence gathered up to that time, consisting chiefly of the records found in the storage facility. These records were largely undecipherable until Sater explained their contents.



A. <u>United States v. Frank Coppa Jr., et. al</u>, 00 CR 196 (ILG)

On the basis of this information, in March 2000, a federal grand jury in this district returned a RICO, securities fraud and money laundering indictment against nineteen of the most important participants in White Rock/State Street's extensive fraud schemes. Each of these nineteen defendants eventually pleaded guilty. The defendants fall into several categories.

First, the government prosecuted several organized crime figures for their role in furthering the enterprise. Frank Coppa, a Bonanno Family captain, maintained inflated stock prices by threatening physical harm to stock holders if they sold short the stocks that White Rock/State Street promoted.[2] Ernest Montevecchi, a Genovese soldier, and Daniel Persico, a Colombo associate, intervened in disputes on behalf of the partners, particularly Sater and Lauria. In addition, the government charged Garafola, Joseph Polito (a Gambino associate) and Eugene Lombardo (a Bonanno associate) chiefly in connection with their involvement in the fraudulent sale of securities of United States Bridge of New York, a construction company owned by Polito in which the Gambino family had a substantial financial interest.

Second, the government prosecuted several securities industry participants who were extensively involved in White

---

[1] On the day Sater pleaded guilty to the RICO violation, Lauria and Klotsman also pleaded guilty to the same offense and entered into cooperation agreements with the government.

[2] Following his conviction, Coppa cooperated with the government and helped obtain convictions against several high-ranking members of the Bonanno Crime Family, including Joseph Massino, the head of the Bonanno Family.

Rock/State Street's fraudulent activities. Among those individuals were Walter Durchalter and John Doukas, partners of Sater, Klotsman and Lauria; Alfred Palagonia and John Cioffoletti, brokers from outside firms who unloaded large blocks of White Rock/State Street-owned stock to unwitting customers at inflated prices in return for kickbacks from Sater and his partners; and Rocco Basile, Jack Basile and Giuseppe Temperino, employees at White Rock/State Street who also unloaded large blocks of White Rock/State Street-owned stock at inflated prices to unwitting customers and later refused to execute customer orders to sell that same stock.

Finally, the government prosecuted several individuals who had more narrowly defined roles in various of the White Rock/State Street schemes, but were nonetheless important. These individuals included Abraham Salaman, a long-time promoter of stocks in fraudulent schemes; Aleks Paul, who laundered many millions of dollars of fraud proceeds; and Larry Ray, who helped arrange the United States Bridge of New York, Inc. ("USBNY") deal.

Each of these defendants' guilty pleas can be attributed, in some significant part, to the cooperation of Sater and his partners. Although he was not called as a witness due to the guilty pleas of all those charged, Sater was prepared to testify, and we believe that he would have been an effective and important witness if a trial of the case had been required. Based on the numerous hours the government spent with Sater, we believe that his testimony would have been truthful, precise and compelling.

B. 

5



C. <u>United States v. Cirillo</u>, 05-CR-212 (SLT)

In April 2005, based in part on Sater's information, the government charged Lawrence Dentico, a high-ranking Genovese family member who served in the Genovese administration, along with three other high-ranking members of the Genovese family, in <u>United States v. Cirillo</u>. Sater provided information regarding one of the predicate acts charged against Dentico, pertaining to his role in resolving a dispute between the Genovese family and the Gambino family.

In sum, the dispute arose out of a scheme to use fraudulent means to secure financing for the USBNY initial public offering ("IPO") mentioned above. Sater and his partners launched the IPO expecting that USBNY would function as a profitable construction company. A Gambino-associated company was one of the secret investors who partnered with White Rock/State Street in this venture. Prior to the IPO, it was determined that USBNY would require long-term financing to make it a viable company with the ability to attract outside investors. To guarantee this financing, and therefore the success of the IPO, a bribe of $100,000 was to be paid to the head of a lending institution. Gambino soldier, Edward Garafola, claimed that he was the individual who paid the bribe money. When the lending institution did not follow through with the financing, Garafola thought he was being swindled and threatened Sater. Sater turned to Ernest "Butch" Montevecchi, a Genovese soldier, for protection, which precipitated high-level negotiations between the families for the return of the funds.

In connection with this predicate act, Sater met with the government and provided important background information regarding USBNY and the organized crime figures involved in the dispute. If Dentico had chosen to go to trial, it is likely that the government would have called Sater as a witness. Dentico ultimately pled guilty, however, and was sentenced to 51 months, which sentence represented the high end of an agreed-upon sentencing range.

6

D. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓ From 2004 through 2008, Sater was central to the investigation and identification of key individuals in two separate international money laundering and access device fraud schemes, both of which originated in Russia. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ In order to identify the perpetrators, Sater traveled to Cyprus and, under agents' supervision, arranged a meeting with the suspects. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Sater played a crucial role in this investigation and the government would not have sought or obtained an indictment without his assistance.

▓▓▓▓▓ Sater helped dismantle a second, similar scheme. This time, Sater traveled to Turkey, where he arranged a meeting with the unknown suspects. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Here too, Sater played a crucial role in this investigation, and the government would not have obtained an indictment ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ without his assistance.



### E. Foreign Intelligence

The defendant, who was born in Russia, used his connections with several high-ranking Russian military or former military and KGB officers to provide the United States intelligence community with key information, particularly concerning the Middle East. Beginning in 1998, Sater was in frequent contact with a former high-ranking KGB officer and arms dealer who possessed information about potential threats to the United States emanating from Afghanistan and certain Central Asian republics. Sater relayed specific, detailed information to the Central Intelligence Agency ("CIA"), FBI and other agencies from this individual. In 1998, for instance, before he was arrested in connection with the case at issue, Sater passed on information that certain leaders of the Northern Alliance in Afghanistan wanted to resell Stinger missiles to the United States government. Sater even provided the serial numbers for each of the missiles. During the same period, Sater also passed on specific information about Osama Bin Laden, including what were believed to be Bin Laden's satellite telephone numbers and information about who was supplying arms to Bin Laden.

Sater also established other intelligence contacts, including a precious stones dealer who himself had contacts inside both the Taliban and the Northern Alliance in Afghanistan. The FBI provided money for a satellite telephone that Sater shipped to this individual so the two could remain in constant contact. Through this individual, Sater relayed information to the United States intelligence community, especially following September 11, 2001. The information included, but was not limited to, (a) Osama Bin Laden's whereabouts following September 11, 2001; (b) the internal structuring and the financial capabilities of Al Qaeda; (c) the whereabouts of Taliban leader Mullah Omar; (d) ground reports on who was killed by United States air-strikes; (e) the details of an assassination plot against President Bush; and (f) information on North Korea's nuclear capabilities.

Of course, Sater did not report this information from first-hand knowledge and cannot be held responsible if not all of it was actionable. Sater, acting in good faith, simply made this intelligence available to those who were in a position to determine its value. Sater should be credited with the efforts he made in making those sources available to the intelligence community. Additionally, Sater gathered much of this information while traveling to dangerous areas in Central Asia. Moreover, individuals in the intelligence community with knowledge of the

8

information Sater provided told the government that this information was taken very seriously and was carefully analyzed.

### F. Other Cooperation

Throughout the period of time that Sater was working with the government on the above-mentioned cases, he also provided information on various subjects that was useful and important, though it did not directly result in any specific prosecutions. To begin with, Sater provided law enforcement authorities with a working knowledge of modern stock manipulation schemes and the mafia's involvement in the maintenance of those schemes. In the mid 1990's, these schemes were widespread on Wall Street where they were known under the general terms of "Boiler Room" or "Pump and Dump" schemes. Federal investigators knew that many complex financial deals appeared suspicious, but could not uncover how they worked. Sater explained in detail how these sophisticated boiler room scams operated and opened investigators' eyes to a whole new brand of financial theft. As a result, agents were able to use this information generally to spot and then investigate other similar, illegal transactions.

One such example was Sater's assistance in building the government's case against Philip Abramo, known in organized crime circles as "The King of Wall Street." Sater had come into contact with Abramo during the White Rock/Street period when Abramo demanded cash payments in return for his promise not to short White Rock/State Street stocks. Sater provided the government with background information on Abramo, such as how Abramo's financial schemes worked, how he laundered his money and the identities of his closest associates. This information enabled the government to sharpen the focus of its investigation, which eventually lead to Abramo's arrest and conviction in the Southern District of New York.[3] This assistance is illustrative of the kind of cooperation that Sater provided in scores of other cases.

Sater also provided information about the identities of organized crime leaders in Russia and the roles they occupied in the organized crime hierarchy. He provided information about the American business interests of Russian oligarchs and the ties these individuals had to organized crime figures. Additionally, Sater explained to law enforcement officials how contemporary accident insurance scams worked. In each of these areas, the agents who worked with Sater found him to be dependable, insightful and hard-working.

---

[3] Abramo was convicted after trial and sentenced to a term of life imprisonment. (U.S. v. Riggi et. al, 1:00 CR-1118 (S.D.N.Y.))

9

## III. Conclusion

As discussed above, Sater's cooperation was extensive and greatly assisted the government's efforts in fighting crime in multiple arenas. Sater went above and beyond what is expected of most cooperators and placed himself in great jeopardy in so doing. Throughout the near ten-year period that Sater cooperated with the government, he worked continuously with a number of agents who supervised his activities. Without exception, every one of these agents has told the government that Sater was an exemplary cooperator who worked diligently to further the aims of the missions to which he was assigned. For these reasons, the government respectfully requests that the Court take Sater's extensive cooperation into account in imposing sentence. Because of the nature of the information provided herein, the government respectfully requests that this letter be filed under seal.

Respectfully submitted,

BENTON J. CAMPBELL
United States Attorney
Eastern District of New York

By: _____
Todd Kaminsky
Assistant United States Attorney
(718) 254-6367

cc: Leslie R. Caldwell, Esq.
    Kelly A. Moore, Esq.