Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060
Tel: 212.309.6000
Fax: 212.309.6001
www.morganlewis.com

Leslie R. Caldwell
Partner
212.309.6260
lcaldwell@morganlewis.com

Kelly A. Moore
Partner
212.309.6612
kelly.moore@morganlewis.com

# Morgan Lewis
COUNSELORS AT LAW

October 19, 2009

**TO BE FILED UNDER SEAL**

The Honorable I. Leo Glasser
United States District Court
225 Cadman Plaza East
Brooklyn, New York 11201

Re: <u>United States v. Felix Sater (98-CR-1101-01)</u>

Dear Judge Glasser:

We represent Felix Sater, the defendant in the above matter, who is scheduled to be sentenced by Your Honor on October 23, 2009. We write to advise the Court of the unique and extraordinary nature of this case, and to ask that the Court sentence Mr. Sater, who pled guilty nearly 11 years ago, to a term of no jail and no probation.

### Introduction

As set forth in the government's letter to the Court pursuant to Section 5K1.1 of the United States Sentencing Guidelines (the "5K1.1 Letter"), for a decade, Felix Sater has been an extraordinary asset to the United States government, in both the federal law enforcement and intelligence arenas. His cooperation has covered a stunning array of subject matter, ranging from sophisticated local and international criminal activity to matters involving the world's most dangerous terrorists and rogue states. Unlike many defendants, Felix began to provide important and valuable information to the U.S. government before being charged with criminal activity, at a time when he was living and working in his native Russia and had no assurance that he would receive any leniency whatsoever. Also unlike most defendants, Felix's cooperation continued and even widened well after he had far surpassed the obligations of his plea agreement and plainly was eligible for a strong 5K1.1 motion for leniency at sentencing.

As the government notes, Felix worked under the supervision of various FBI agents assigned to investigate a wide range of criminal conduct, including securities fraud, Italian and Russian organized crime, sophisticated identity theft, money laundering, and counterterrorism.



The Honorable I. Leo Glasser
October 19, 2009
Page 2

To a person, every agent and prosecutor with whom Felix worked considered him an "exemplary cooperator" and, as the 5K1.1 Letter states, Felix's cooperation was "above and beyond" even the most extraordinary government expectations. (5K1.1 Letter at 10).

Over the course of his cooperation, Felix was more than simply honest and forthcoming—he was proactive and in fact risked his life numerous times in ways not normally seen in the criminal justice system. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮—but he also gathered sensitive Russian military intelligence data while in Russia, and traveled more than once to precarious regions of Central Asia, where he obtained closely-guarded intelligence information relating to America's most dangerous enemies, including Osama Bin Laden, Al Qaeda, and North Korea. Felix also participated in FBI undercover operations during which he met with Russian criminals in Cyprus and Turkey. And after the attacks of September 11, 2001, Felix used his overseas contacts to obtain extensive information regarding Bin Laden and Al Qaeda, which he relayed to the FBI. In all, as the government's 5K1.1 Letter indicates, Felix's exceptional efforts were "of a depth and breadth rarely seen," and not only involved important intelligence information, but led to nearly two dozen convictions and helped the FBI to attain a greater level of understanding of various sophisticated fraud schemes. This extraordinary cooperation merits extraordinary recognition by the criminal justice system and the Court.

Importantly, Felix stopped engaging in criminal conduct in 1996, two years before the FBI investigation of this matter began, and has fully rehabilitated himself since. During the nearly 11 years since his guilty plea, Felix has worked steadily in several lawful businesses in the United States and Russia. He has maintained a strong and loving marriage and enjoys a healthy family life, raising three daughters who are now ages 11, 12 and 15. By virtue of his ongoing cooperation, Felix remained under FBI supervision pending sentencing for nearly 11 years, an unprecedented amount of time. During that period, prosecutors and FBI agents had sufficient trust in Felix that they found it unnecessary to impose any travel restrictions or pre-trial reporting requirements. Under these circumstances, even a sentence of probation would be unduly harsh and unnecessary. To the contrary, to impose a period of probation with its associated restrictions nearly 11 years after Felix's guilty plea, when Felix has been fully rehabilitated, lawfully employed, and has worked diligently to help the government, would be counter-productive for Felix personally and otherwise would serve no useful purpose in the criminal justice system.

### Felix's Background

Felix was born in Moscow, Russia on March 2, 1966. His family moved several times during his early childhood and he lived in low-income housing in Moscow, a refugee camp in Austria, Israel, and Italy, all before immigrating to the United States with his parents and sister in 1973. The family first resided in Baltimore, Maryland and moved to Brooklyn three months later. Felix began working at a young age, selling newspapers at age eight and working part-time during high school at retail sports and clothing stores. He lived at home until age 18 and he

**Morgan Lewis**
COUNSELORS AT LAW

attended Pace University in New York City for several semesters before withdrawing to take a job on Wall Street in 1985. Felix started as an assistant to an account executive at Bear Stearns and worked there until he earned his Series 7 license and became a securities broker.

Felix quickly became successful on Wall Street, holding positions at a number of prominent financial institutions between 1985 and 1994. By 1991, he was a managing director at Shearson Lehman Brothers, and likely would have continued along this path had it not been for an impulsive act inside a New York City bar. Regrettably, a combination of excess alcohol consumption and a verbal altercation over a woman led to a barroom fight, resulting in a March 1993 assault conviction for Felix, who was 25 at the time of the fight. Felix was sentenced to state prison, and lost his Series 7 license. To this day, Felix is deeply remorseful that his immaturity allowed his life to take such a dramatic downward turn.

Unable to work as a licensed broker and with limited employment prospects as a convicted felon, Felix foolishly joined with a boyhood friend who was engaged in "pump and dump" securities fraud. They and others formed the brokerage firm (eventually known as State Street Capital Partners) that was at issue in this securities fraud case. Felix does not dispute the government's description of his role in criminal conduct relating to his brokerage activity. However, Felix worked at State Street for less than two years (he was in New York state custody from June 1994 through September 1995), and left the firm in 1996, well before the 1998 discovery of the cache of documents that spawned this investigation.

## Felix's Extraordinary Cooperation

The Government's 5K1.1 Letter includes a detailed description of Felix's extraordinary cooperation. We also include the following summary.

### Counterterrorism and Military Intelligence

Felix learned in 1998 that the FBI was looking for him in connection with an investigation into the activities of State Street. At the time, Felix was in Russia, where he was working as a consultant for AT&T. Without any assurance that his efforts would result in any leniency from the U.S. government, Felix immediately began to cooperate. Through a Russian contact, Felix arranged to meet a high ranking U.S. military intelligence officer and former military attaché at the U.S. embassy in Moscow (the "Officer"). At the Officer's request, Felix began to gather sensitive intelligence information for the U.S. government. Specifically, the Officer asked Felix to help the U.S. purchase a particular high-end anti-missile system from Russia. Through Russian contacts, Felix was able to enter covertly a closed Russian military installation, where he located the missile system, and provided details to the Officer. Again at the Officer's request, Felix assisted in the U.S. Central Intelligence Agency's efforts to repurchase U.S.-manufactured Stinger missiles from members of the Northern Alliance in Afghanistan. Felix traveled to Central Asia and obtained the location and serial numbers of approximately 10 Stinger missiles, which he provided to U.S. authorities. On a separate

The Honorable I. Leo Glasser
October 19, 2009
Page 4

**Morgan Lewis**
COUNSELORS AT LAW

occasion, again at the request of U.S. intelligence authorities, Felix made another trip to Central Asia, where he obtained and supplied to the Officer information regarding North Korea's nuclear capabilities.

Remarkably, Felix also provided specific, credible information about Osama Bin Laden, including Bin Laden's satellite telephone numbers and information regarding Bin Laden's supply of weaponry. Felix delivered Bin Laden's satellite phone numbers to the FBI in September 1998, after he voluntarily flew from Russia to the United States to surrender to authorities. Felix was later told by an FBI agent that the numbers were authentic.

Following the attacks of September 11, Felix was able to make contact with an individual who was in contact with Bin Laden. Using a satellite phone provided by the FBI through Felix, that individual provided Felix with a steady stream of details regarding Bin Laden and Al Qaeda. Among the intelligence Felix relayed to the FBI was information on Bin Laden's location following the attacks, a list of Al Qaeda members, names and locations of people who handled security for Bin Laden, secret meetings that Bin Laden planned to attend, a list of Sudanese banks where Bin Laden held cash reserves, and the identity of companies that were controlled by Bin Laden in various parts of the world. Through another source, Felix learned and gave to the FBI the name of a Washington, D.C. restaurant with ties to Al Qaeda and the locations of U.S. embassies targeted by Al Qaeda. Felix also relayed to the FBI names, descriptions, and locations of the organizers of the attacks on the USS Cole and the U.S. African embassy attacks. During the U.S. offensive in Afghanistan in October 2001, Felix relayed information on the locations of weapons held by Taliban and Al Qaeda forces. He provided the location of Taliban leader Mullah Omar and supplied ground reports detailing who had been killed by U.S. air-strikes in Afghanistan. Additionally, Felix relayed the details of an assassination plot against President Bush, as well as a plot to shoot down a plane carrying Secretary of State Colin Powell. While Felix of course has no knowledge what use was made of the information he provided, FBI agents eagerly received the information, which Felix understands was passed on to intelligence authorities. Also, in 2002 following the information regarding the Bush assassination plot, Felix was asked to and did arrange a meeting overseas between his source and agents of the U.S. Secret Service.

<u>Securities Fraud and Organized Crime</u>

Felix's cooperation enabled the government to make cases not only against those involved in State Street and other corrupt brokerage firms, but also enhanced the FBI's understanding of complicated securities fraud schemes popular in the 1990s. As stated in the 5K1.1 Letter, Felix's "information proved to be, in all respects, truthful and highly useful in explaining and corroborating the evidence gathered up to that time...." (5K1.1 Letter at 3-4).

Between 1998 and 2000, Felix spent hundreds of hours with FBI agents and prosecutors, explaining otherwise cryptic documents and describing the roles played by the various participants not only in the State Street firm, but in other similar firms. This included among

The Honorable I. Leo Glasser 
October 19, 2009
Page 5

others the organized crime figures who were used to threaten violence against rivals, industry participants who received kickbacks for inducing unwitting customers to purchase bogus securities, and individuals who laundered illegal proceeds. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Felix's cooperation also led to guilty pleas and cooperation by others, including Bonanno Family captain Frank Coppa Jr., whose own subsequent cooperation led to the convictions of several others, including Joseph Massino, the head of the Bonanno Family, who himself subsequently cooperated.

### Undercover Investigation of Money Laundering and Access Device Fraud

From 2004 through 2008, Felix helped the FBI bring down two separate international money laundering and cyber-fraud schemes that originated in Russia. In the first instance, Felix worked under the FBI's supervision to infiltrate the scheme by pretending to offer money laundering services. For over a year, Felix received money transfers that had been siphoned from banking, brokerage and credit cards in the United States using personal information that had been stolen over the internet. After establishing a relationship with the Russian criminals behind the scheme, Felix traveled to Cyprus under the FBI's supervision and arranged a meeting with the suspects. Felix's cover came dangerously close to being blown during the operation, when the Russians unexpectedly directed Felix to get in a car with them and drive to another area. As stated in the 5K1.1 Letter, Felix "played a crucial role in this investigation and the government would not have sought or obtained an indictment without his assistance." (5K1.1 Letter at 7). In the second instance, which involved a similar scheme, Felix traveled to Turkey with FBI agents to meet the identified leader of the scheme. Again, without Felix's assistance, neither the indictment nor the arrest of that suspect would have been possible.

### Russian Organized Crime

Felix also provided information to both U.S. and Russian authorities concerning Russian organized crime. He provided a significant amount of historical data about the Russian mafia in the U.S. and abroad, including which Russian oligarchs had ties to organized crime figures and what their business interests were in the U.S. He also explained to the FBI how the Russian mafia in the U.S. used accident insurance scams to generate revenue.

### Felix Is Forced to End His Cooperation Following Exposure by the New York Times

Felix's cooperation with the government likely would have continued had it not been for a December 2007 article in the New York Times, under the headline "Real Estate Executive With Hand in Trump Project Rose From Tangled Past" (the "Article")[1]. The Article disclosed the existence of a pending case against Felix, although the case was under seal. The Article

---

[1] A copy of the Article is attached hereto as Exhibit "A."

Morgan Lewis
COUNSELORS AT LAW

The Honorable I. Leo Glasser
October 19, 2009
Page 6

outlined the scheme at State Street and its ties to organized crime figures. At the time Felix was working for Bayrock Group, LLC, a real estate development firm that was a partner in the Trump Soho project in Lower Manhattan and Trump International Hotel and Tower in Fort Lauderdale, among others. Felix had been with the Bayrock Group since 2003, and had successfully promoted and managed projects in partnership with Donald Trump. Following publication of the Article, Bayrock severed ties with Felix.

In addition to disrupting his professional and personal life, the Article also destroyed Felix's ability to continue cooperating with the government. The Article revealed that Felix had been cooperating since 1998 and described the operations he undertook with the CIA, including assisting in the purchase of Stinger missiles. These disclosures not only jeopardized Felix's safety, but also meant that he could no longer serve as an effective informant.

While Felix was briefly unemployed as a result of the Article, and suffered from depression, he soon bounced back. Since February 2008, he has served as an advisor to Mirax Group, a large real estate development company in Russia, and has been involved in several Mirax projects in Europe. Also, since August 2009, Felix has been employed at the Converse Group, and has been hired to develop Converse Precious Medals, which will refine raw gold, silver and platinum for resale. Felix also has since early 2008 been working as a real estate consultant in New York.

## Conclusion

Felix's criminal conduct ended in 1996, thirteen years ago. And it has been nearly 11 years since his guilty plea. Between 1998 and 2008, Felix was under the continuous supervision of numerous FBI agents with whom he worked closely; and each of those agents considered Felix's work with them to be "exemplary." At the same time, Felix was working full-time in lawful businesses in both the United States and Russia, and living with and supporting his wife of 15 years and their three school-age children. In short, Felix has gotten his life back on track. And he has dedicated nearly a decade of his life to give back for the wrong he committed, going "above and beyond" what could reasonably have been expected of any cooperating defendant.

Meanwhile, Felix's most similarly situated co-defendant, Salvatore Lauria, who also cooperated, albeit far less reliably and expansively than Felix, was sentenced in February 2004 to a term of five years of probation, including 12 months of home confinement, and a $20,000 fine. Several other co-defendants also were sentenced to probation.

We ask the Court recognize the value of Felix's extraordinary efforts, and his full rehabilitation, by imposing a sentence of no jail and no probation.

The Honorable I. Leo Glasser
October 19, 2009
Page 7

**Morgan Lewis**
COUNSELORS AT LAW

Respectfully submitted,

Leslie R. Caldwell

Kelly A. Moore

cc: Todd Kaminsky, Esq.

# EXHIBIT A

OCT-19-2008 MON 06:41 PM        FAX NO.            P. 09/14

**The New York Times**
nytimes.com



December 17, 2007

# Real Estate Executive With Hand in Trump Projects Rose From Tangled Past

By CHARLES V. BAGLI

It is a classic tale of reinvention, American style.

Born in the Soviet Union in 1966, Felix H. Sater immigrated with his family to Brighton Beach when he was 8 years old. At 24 he was a successful Wall Street broker, at 27 he was in prison after a bloody bar fight, and at 32 he was accused of conspiring with the Mafia to launder money and defraud investors.

Along the way he became embroiled in a plan to buy antiaircraft missiles on the black market for the Central Intelligence Agency in either Russia or Afghanistan, depending on which of his former associates is telling the story.

But in recent years Mr. Sater has resurfaced with a slightly different name and a new business card identifying him as a real estate executive based on Fifth Avenue. And although he may not be a household name, one of the people he is doing business with is: Donald J. Trump.

Mr. Sater — who now goes by the name Satter — has been jetting to Denver, Phoenix, Fort Lauderdale, Fla., and elsewhere since 2003, promoting potential projects in partnership with Mr. Trump and others. In New York, the company Mr. Sater works for, Bayrock Group, is a partner in the Trump SoHo, a sleek, 46-story glass tower condominium hotel under construction on a newly fashionable section of Spring Street.

But much remains unknown about Mr. Sater, 41, and determining the truth about his past is a bit like unraveling the plot of a spy novel: Almost every character tells a different tale.

A federal complaint brought against him in a 1998 money laundering and stock manipulation case was filed in secret and remains under seal. A subsequent indictment in March 2000 stemming from the same investigation described Mr. Sater as an "unindicted co-conspirator" and a key figure in a $40 million scheme involving 19 stockbrokers and organized crime figures from four Mafia families.

The indictment asserted that Mr. Sater helped create fraudulent stock brokerages that were used to defraud investors and launder money. Mr. Sater and his lawyer, Judd Burstein, repeatedly refused to discuss in detail his role in the stock scam.

But a onetime friend, Gennady Klotsman, who is known as Gene and who was accused with Mr. Sater as a co-conspirator, contends that they both pleaded guilty in 1998, and that Mr. Sater began cooperating with the authorities. Prosecutors are unwilling to discuss either the 1998 complaint or the 2000 indictment.

"I'm not proud of some of the things that happened in my 20s," Mr. Sater said in an interview. "I am proud of

the things I'm doing now."

Mr. Sater, who has an untitled position at Bayrock, said he started spelling his name as Satter to "distance himself from a past" in an age when anyone can look up a name on Google. But he continues to use the name Sater on the deed to his house on Long Island.

Mr. Burstein added, "He does not hide his past, and difficulties he had, from anybody he does business with."

But Alex Sapir, president of the Sapir Organization, a partner in Trump SoHo, said he was "not happy" to have just learned of Mr. Sater's past on Thursday. "This is all news to me," he said.

Mr. Trump also said he was surprised to learn of Mr. Sater's past. "We never knew that," he said of Mr. Sater. "We do as much of a background check as we can on the principals. I didn't really know him very well."

Mr. Trump said that most of his dealings with Bayrock had been with its founder, Tevfik Arif, and that his son Donald and his daughter Ivanka were playing active roles in managing the project. Neither Bayrock nor Mr. Trump has been accused of wrongdoing.

Mr. Sater has generally kept a low profile on the Trump projects, although he mingled with guests and the owners at the September party introducing Trump SoHo. Mr. Trump and Mr. Sater were also together in Loveland, Colo., in 2005, where they were interviewed by a reporter for The Rocky Mountain News about potential development deals in nearby Denver. Mr. Trump said he did not recall Mr. Sater's being there.

"They seemed to get along just fine," said Justin Henderson, a Denver developer who worked with Mr. Trump and Mr. Sater on an ultimately unsuccessful deal to build the tallest towers in Colorado. "It seemed that Mr. Trump relied heavily on Mr. Sater's opinion on certain markets."

Mr. Sater's latest transformation could prove to be a cautionary tale for Mr. Trump, who has carefully molded his image into an international brand that has extended from real estate to bottled water, men's suits, steaks, vodka, a television show and, in his latest invention, the Trump Hotel Collection.

The hotel collection, a hotel management company, includes two projects with Bayrock: Trump SoHo and Trump International Hotel and Tower in Fort Lauderdale. A third joint project, in Phoenix, is also in the works.

"Trump is a name associated with a certain cachet and bravado, I suppose, that will attract certain kinds of people," said Rita Rodriguez, chief executive of the Brand Union, a corporate branding and identity agency.

"The brand is a strategic and financial asset," she said. "It has to be taken care of very similarly to any other asset you have on your balance sheet. Anything that would detract from that could jeopardize the brand impression the brand makes."

Mr. Sater was born in the Soviet Union, the son of Rachel and Mikhail Sater, according to public records, court testimony and the federal indictment. He has said his parents, who are Jewish, moved first to Israel, then to Baltimore and finally to New York in the early 1970s to escape "religious persecution."

Mr. Sater was born Haim Felix Sater, but he once testified in court that he "Americanized" his name to Felix

Henry Sater in the early 1990s.

Mr. Sater took classes at Pace University but dropped out at 18 to work at Bear Stearns. Like Mr. Klotsman, he rose quickly, moving from firm to firm selling stock.

Mr. Sater's first brush with the law came in 1991. Mr. Sater and Mr. Klotsman were at El Rio Grande, a Midtown watering hole, celebrating with a friend and eventual co-conspirator, Salvatore Lauria, who had just passed his stockbroker's exam.

Mr. Sater later told a judge that he was in a good mood, having made a quick $3,000 in commissions that day. But he got into an argument with a commodities broker at the bar, and it quickly escalated. According to the trial transcript, Mr. Sater grabbed a large margarita glass, smashed it on the bar and plunged the stem into the right side of the broker's face. The man suffered nerve damage and required 110 stitches to close the laceration on his face.

"I got into a bar fight over a girl neither he nor I knew," Mr. Sater said in an interview. "My life spiraled out of control." Mr. Sater was convicted at trial in 1993, went to prison and was effectively barred from selling securities by the National Association of Securities Dealers.

But according to the 2000 federal indictment in the fraud case, Mr. Sater, Mr. Klotsman, Mr. Lauria and their partners gained control in 1993 of White Rock Partners, which later changed its name to State Street Capital Markets. Although the companies "held themselves out as legitimate brokerage firms," the indictment states, "they were in fact operated for the primary purpose of earning money through fraud involving the manipulation of the prices of securities."

The trio would secretly gain control of large blocks of stock and warrants in four companies through offshore accounts, the indictment said. In an illegal "pump and dump" scheme, they would inflate the value of the shares through under-the-table payoffs to brokers who sold the securities to unsuspecting investors by spreading false information about the companies. Brokers were prohibited from acting on sell orders from investors unless they found another buyer, the indictment said.

The partners would then sell large blocks of stock at a steep profit. Investors suffered substantial losses as share prices plummeted. Despite the prohibition against selling securities, a subsequent complaint by regulators at the N.A.S.D. recounted how Mr. Sater "cursed, yelled and screamed" at the firm's brokers in an attempt to motivate them. He also offered cash rewards to brokers who sold the largest block of house stocks.

At the same time, Mr. Sater, Mr. Lauria and others sought protection and help from members of the Mafia in resolving disputes with "pump and dump" firms operated by other organized crime groups. In 1995, for instance, Edward Garafola, a soldier in the Gambino crime family, sought to extort money from Mr. Sater. Mr. Sater, in turn, got Ernest Montevecchi, a soldier in the Genovese crime family, to persuade Mr. Garafola to back off, according to the indictment.

The denouement of Mr. Sater's career on Wall Street began in 1998 at a locker at a Manhattan Mini Storage in SoHo, where investigators discovered two pistols, a shotgun and a gym bag stuffed with a trove of documents outlining the money laundering scheme and offshore accounts of Mr. Sater and his partners. According to a law enforcement official, as well as Mr. Klotsman and another defendant in the case, Mr. Sater

had rented the locker and then neglected to pay the rent. Mr. Sater denied having anything to do with the locker or the guns.

At the time investigators opened the storage locker, Mr. Sater and Mr. Klotsman had gone to Russia, where their wheeling and dealing continued, they said. Their most interesting stories, however, are hard to assess.

Mr. Sater and Mr. Klotsman tried to cut a deal with the C.I.A., according to a book co-written by Mr. Lauria, "The Scorpion and the Frog: High Times and High Crimes." In exchange for leniency, the book said, they offered to buy a dozen missiles that Osama bin Laden had placed on the black market. The deal later collapsed.

Mr. Lauria has since renounced his book, which also details the false stock brokerage scheme, calling it largely a work of fiction. He even tried unsuccessfully to block publication. However, his co-author, David S. Barry, said he documented all the stories in the book with records and other interviews.

Mr. Klotsman said that Mr. Sater did obtain information for the United States about another set of black-market missiles, and that those efforts "bought Felix his freedom" from prison.

Mr. Sater, Mr. Klotsman and Mr. Lauria eventually returned to New York. Mr. Klotsman and Mr. Lauria agreed to cooperate with the United States attorney's office in Brooklyn and pleaded guilty to racketeering charges in connection with the fraudulent stock brokerages, other defendants and lawyers in Mr. Sater's case said. The information they provided helped prosecutors obtain guilty pleas from all 19 of their former cohorts, including six with ties to the mob.

Mr. Klotsman and his lawyer assert that Mr. Sater also pleaded guilty and cooperated. "Felix was one of the significant participants in the fraud," the lawyer, Alexi M. Schacht, said.

Mr. Klotsman, who grew up with Mr. Sater, now lives in a $600-a-month apartment in Moscow. In an interview, he said he was paying the American government $625 a month in restitution for the $40 million lost by investors. He questioned whether Mr. Sater was paying a dime.

But Mr. Sater and his lawyer, Mr. Burstein, avoided many questions concerning his legal problems involving the Wall Street scam, including whether he pleaded guilty and cooperated. "I challenge you to find any official government document anywhere demonstrating his indictment or conviction for any crime other than the assault," Mr. Burstein said.

Mr. Sater said he joined Bayrock in 2003 at the urging of the company's founder, Mr. Arif. A neighbor of Mr. Sater's in Sands Point, on Long Island, Mr. Arif is a former economist for the Soviet government who built a chain of five luxury hotels in Turkey and Kazakhstan after the collapse of the Soviet Union.

Within a stone's throw of the Manhattan Mini Storage building, the Trump SoHo is rising rapidly at the corner of Spring and Varick Streets, another new glass tower amid the somewhat grubby industrial buildings of what had been the city's printing district. The tower has generated opposition from some local residents and preservationists.

It is, for Mr. Sater, an emblem of his new life. "I'm trying to lead an exemplary existence," he said. "Old, bad

luggage is not something anyone wants to remember."

Copyright 2007 The New York Times Company

Privacy Policy | Search | Corrections | RSS | First Look | Help | Contact Us | Work for Us | Site Map